UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                                           :
                                           :  **OPINION AND ORDER REGULATING**
IN RE SEPTEMBER 11 LITIGATION              :  **FEE ALLOWANCES AND**
                                           :  **DISAPPROVING SETTLEMENTS**
                                           :
                                           :  21 MC 101 (formerly 21 MC 97) (AKH)
                                           :
------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    Four of the last remaining plaintiffs in the wrongful death actions against the airlines and other aviation defendants of 9/11 seek judicial approval to distribute the proceeds of their settlements. The law firm that represents them, Azrael, Gann & Franz, seeks a higher percentage of the settlement amounts as a contingent fee award than were received by all other law firms in all previous cases (but for three approved-exceptions). As I now have learned from considering the issues relating to the four settlements, the settlement amounts in these four cases are substantially higher than those of similarly situated plaintiffs in previous settlements. The issue that I have to decide is the fairness of the settlements and fee awards of these four cases, in relation to claimants in the remaining cases against these same defendants, and in relation to the lesser awards of previous settlements. For the reasons discussed in this opinion, I decline to approve the fee awards and settlements because they are unfair and unreasonable in material respects, and I will vacate, by separate order, earlier orders approving the settlements.

    The Air Transportation Safety and System Stabilization Act ("ATSSSA", or the "Act") was enacted within weeks of the terrorist-related aircraft crashes into Towers One and Two of the World Trade Center, the Pentagon, and a field in Shanksville, Pennsylvania. The Act limits the liability of the airlines and other aviation defendants to their insurance coverages. ATSSSA, Section 408(a)(1), 49 U.S.C. § 49101. This limit, imposed by the ATSSSA, is

1

considerably less than the aggregate of wrongful death, personal injury and property damage claims against these defendants. Reports submitted to the Court indicate that, even after accounting for all of the settlements that have been approved thus far, the claims against the airlines and other aviation defendants exceed permissible recoveries from insurance proceeds by much more than a billion dollars.

The excess of claims over permissible recoveries presented a unique and potentially disabling problem to Court and counsel. Could settlements occur in individual cases and settlement proceeds be distributed, if settling parties had to wait until all cases were resolved to ascertain their aliquot shares of a limited recoverable amount? Could there be a differentiation between wrongful death and personal injury claims, and property-damage claims, if in law they had equal status? Could settlement discussions be encouraged, even among the wrongful death and personal injury claimants, where there were 95 of them, killed and injured from crashes in three different states, represented by 15 different firms, as well as one self-represented plaintiff, with each claimant and each law firm resolved to obtain the highest possible recovery for each plaintiff?[1]

Several claimants made it known that they wished to settle. For various reasons, they had not filed claims with the Victim Compensation Fund (see ATSSSA, Section 401 *et seq.*, 49 U.S.C. § 40101),[2] but preferred to settle their claims rather than undergo the further agonies

---

[1] The wrongful death and personal injury claims all stemmed from one of the four plane crashes: American Airlines Flight 11, departing from Logan Airport in Boston, collided with Tower One at 8:45 am. United Airlines Flight 175, also departing from Logan, crashed into Tower Two at 9:03 am. American Airlines Flight 77, departing from Washington Dulles Airport, collided with the Pentagon at 9:37 am. United Airlines Flight 93, departing from Newark Liberty International Airport, crashed in a field in Shanksville, Pennsylvania at 10:02 am.

[2] On average, those plaintiffs who wished to pursue resolution of their claims through traditional litigation have received larger amounts in settlement than those obtained through the Victim Compensation Fund, but also may have incurred larger expenses as well as the uncertainties and challenges of litigation. Ninety-seven percent of families of victims received compensation through the Victim Compensation Fund: the Fund distributed over $7.049 billion to survivors of 2,880 persons who were killed in the September 11 attacks and 2,680 injured victims, with an average award to family members of decedents of $2,082,035.07. Department of Justice, Kenneth R. Feinberg,

of a difficult litigation. The interests of justice required that the litigants and court develop procedures to make such settlements possible and, indeed that settlements be encouraged, for the problems of the ongoing litigation of the several categories of post-9/11 claims were daunting, and their number, eventually reaching well over 10,000 cases, threatened to swamp the limited capacities of the judicial system.[3]

A special protocol was developed to resolve the dilemmas that were presented. Despite the fear that payments of earlier settlers would leave inadequate funds for later verdicts and settlements, the property-damage claimants agreed to defer progress on their claims in order to allow wrongful death and personal injury settlers to settle and be paid, provided that such settlements would be approved by the Court as fair and reasonable. It was also important to assure equality of status to all plaintiffs', and all defendants', counsel, and prevent the timing of settlements to work to the advantage, or disadvantage, of counsel or clients, and these considerations also were incorporated into the protocol. The special protocol, developed over several case management conferences, had the following features:

1. Judicial approval to certify fairness and reasonableness would be required for each settlement. See Nov. 18, 2005 conf. tr., at 10.

2. The desire of all plaintiffs to maintain confidentiality of their separate recoveries would be respected. See March 3, 2006 conf. tr., at 13, 21. Thus, the approval process would

---

Esq., I Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001 Table No. 12, 110 (2004).

[3] The vast majority of the September 11-related lawsuits, which number in the tens of thousands, have been consolidated before me under four master case numbers and are arranged by subject matter: (1) 21 MC 101, encompassing wrongful death, personal injury and property damage lawsuits occurring as a result of the terrorist attacks, and which includes the four suits at issue in this opinion; (2) 21 MC 100, encompassing personal injury lawsuits filed by workers engaged in the search, rescue and clean-up effort at the World Trade Center site in the weeks and months following September 11, 2001; (3) 21 MC 102, encompassing personal injury lawsuits filed by search, rescue and clean-up workers in areas outside the World Trade Center site; and (4) 21 MC 103, encompassing personal injury lawsuits filed by search, rescue and clean-up workers who worked both within and without the World Trade Center site. In addition, there are disputes against, and among, the insurers of various of the parties allegedly responsible for damages suffered by several of the parties to the lawsuit.

be split. The participants to the initial approval process would be limited to counsel for the paying aviation defendants and counsel for the settling plaintiff. Following approval, up to five settlements would be grouped, and the fairness and reasonableness of the grouped settlements would be reviewed by all other affected defendants' counsel for acquiescence or objection. Stipulation and Order Regarding Settlements, dated April 10, 2006.

3. Contingent fees would be limited to 15 percent of net recoveries. See March 3, 2006 conf. trans., at 31-32.

4. There would be no advantage to being late, or early, in the settlement process. Early settlers would not be permitted to leverage recoveries against later settlers, and later settlers would not be permitted to leverage recoveries against earlier settlers. March 3, 2006 conf. tr., at 7; see also Sept. 8, 2005 conf. tr., at 5 ("I cannot preside over this case contemplating that one plaintiff's lawyer will do better in a similar case than another plaintiff's lawyer. That is not going to happen.").

5. A period of time would be allotted to the wrongful death and personal injury claimants to negotiate settlements. The property damage claimants agreed to a slowed discovery schedule until counsel for the wrongful death and personal injury claimants had reasonable opportunities to negotiate settlements. They agreed also to limit their involvement in certain depositions in an effort to accommodate the government's desire to limit as much as possible the number of counsel who would have access to discovery material that had to be filtered through the United States Transportation Security

Administration ("TSA") and cleared of any Sensitive Security Information ("SSI")[4]. May 12, 2006 conf. tr., at 16.

6. I offered a Board of Mediators to help counsel negotiate, comprised of former Judge Abraham D. Sofaer, George P. Shultz Senior Fellow in Foreign Policy and National Security Affairs at the Hoover Institution on War, Revolution and Peace at Stanford University; Patricia Hynes, former partner at Milberg Weiss and current senior counsel at Allen & Overy; and Jay Lefkovitz, former Chief of Domestic Policy Planning under President Bush and current partner at Kirkland & Ellis. Instead, counsel for the aviation defendants and for the wrongful death and personal injury claimants made their own choice of mediator, Sheila Birnbaum, Esq. of Skadden, Arps, Slate, Meagher & Flom LLP. Jan. 27, 2006 conf. tr., at 12-14. Ms. Birnbaum took an active role as mediator, ultimately assisting the parties in consummating more than 85 settlements.

The protocol enabled approximately 30 cases to settle within three months. But a significant number remained, and settlement negotiations seemed to slow. And for the cases that remained, the discovery issues were formidable. The procedure by which discovery had to be filtered through the TSA for SSI was slow and cumbersome; there were continuing controversies how depositions potentially involving SSI would be conducted, and how many, and which, lawyers could attend and what should be their roles. See Memorandum and Order Regulating Deposition Protocol and Supplementing Orders of March 31 and May 5, 2006, 431 F. Supp. 2d 405 (S.D.N.Y. May 16, 2006). Disputes, if SSI issues could not be resolved by negotiation, were to be litigated by appeals to the United States Courts of Appeals. Id. Witnesses that various counsel wished to depose—for example, FBI agents said to have knowledge of risks from

---

[4] SSI is defined according to two criteria: (a) that which, if disclosed, would "[b]e detrimental to the security of transportation," and (b) TSA's final determination that information should be so characterized. 49 C.F.R. § 1520.5(a)(3).

5

terrorists before September 11, 2001—could not easily be deposed without elaborate court proceedings and uncertain results. Id. Many years of discovery proceedings lay ahead before any of the cases could be tried.

At Case Management Conferences held on March 22, June 14 and June 25, 2007, I offered an alternative: trials only of plaintiffs' damages in a selected few cases, selected for their representative quality in relation to remaining cases. The experience, I commented, should facilitate settlements of many more cases, for the values awarded by juries would help plaintiffs and defendants negotiate possibly different numbers, whether higher or lower than the numbers they had discussed in their previous negotiations. Furthermore, the difficult and time-consuming discovery issues involved with the TSA and SSI might become unnecessary, and depositions and written discovery of each plaintiff's particular claims of injury would be simpler, and involve much less time, than the discovery required for the issues of liability.

Most or all counsel objected at first but, notwithstanding their reservations, accepted my approach and cooperated in identifying a number of cases as representative of the different damage situations presented by the remaining wrongful death cases. I told counsel that I would limit my choices of cases for damages-only trials to those who had consented. Since the Azrael firm persisted in their objections, I stated that I would not choose any of their cases. See June 25, 2007 conf. tr., at 32-34.

I then identified six cases for damages-only trials, and selected a trial date for the first trial, and ordered discovery on damage issues to proceed in those cases. Order Scheduling Damages Trial and Pretrial Proceedings, dated July 2, 2007 (fixing trial dates to begin September 4, 2007, with final pretrial conferences to occur on August 30, 2007); see Opinion Supporting Order To Sever Issues of Damages and Liability in Selected Cases, and To Schedule Trial of Issues of Damages, 21 MC 97, 2007 WL 1975559 (S.D.N.Y. July 5, 2007). I gave discovering

these cases immediate priority. When issues arose, included the playing in camera of the cockpit recorder on United Airlines Flight 93 to ascertain if the recorder and related exhibits could be relevant to prove emotional damages, I was immediately responsive to counsels' needs and arranged for in camera proceedings. See Order Regarding United Airlines Flight 93 Cockpit Voice Recording, 02 Civ. 7912, 2007 WL 2668608 (S.D.N.Y. Sept. 12, 2007). I also entertained a motion to test if punitive damages would be available, and held that they would not be allowed. See June 14, 2007 tr., at 147-83; Opinion and Order Regarding Punitive and Compensatory Damages, 494 F. Supp. 2d 232 (S.D.N.Y. July 3, 2007).

No cases had to be tried. My rulings led to renewed negotiations, and settlements. The Law Firm of Motley Rice LLC played an active role in the discovery and settlement phases of these proceedings, and applied, with their clients' consents, for an increased fee of 25 percent of the settlement proceeds. In August 2007, I rejected such an application for Plaintiffs Deena and Beverly Burnett, because I saw no reason to distinguish the Burnetts' case from the settlements that had come before. However, I issued an order that acknowledged that the litigation had become more demanding than for earlier settlements, due to depositions, the involvement of experts, and the filing of motions. I acknowledged the possibility that a fee of more than 15 percent might be appropriate in certain future cases, and set out the requirements for applications of fees above 15 percent. I stated that an attorney seeking a fee of greater than 15 percent would need to file a supporting affidavit, under seal, showing "the time and expense devoted to the case of the settling plaintiff, and a fair allocation of time and expense devoted by the attorneys generally to all their September 11 wrongful death cases". Order Concerning Settlement and Fees, 21 MC 97, 2007 WL 2298352 (S.D.N.Y. Aug. 9, 2007).

Motley Rice filed such applications following my August 2007 order. In three cases, all of which required significant additional attention because they were being prepared for

7

trial, Motley Rice sought fees in excess of 15 percent: one of the three cases was the first case to be scheduled for trial, and the other two were actively discovered in anticipation of trial immediately after the first trial. Motley Rice sought fees of 25, 22 and 20 percent in the cases, based on how much work had been involved in each case. Motley Rice advised the Court that attorneys fees had been set at 25 percent in all three of these cases in the retainer agreement, but the firm had, in light of my comments, voluntarily reduced the amount of fees sought. I did not grant the attorneys fees sought, but rather approved an attorney fee of 20 percent in each case, finding that level reasonable and appropriate, and equitable among the three clients. I also indicated, at the time that I signed the sealed compromise orders, that I was unlikely to approve heightened fees in other cases, since no others had experienced the extensive discovery work as had the three settled cases. (Sealed orders dated Jan. 31 and March 13, 2008).

By this time, settlements had been reached in 83 cases on behalf of 84 victims of the 95 wrongful death and personal injury victims on whose behalf claims originally had been filed and coordinated in 21 MC 97. Of the claims that remained, three were personal injury cases of varying degrees of severity that, I believed, were likely to settle on their own. The eight wrongful death cases that remained involved special circumstances, or, in my judgment, unreasonably high settlement demands that made them unsuitable for special judicial treatment or a separate master calendar. Accordingly, I ordered master calendar 21 MC 97 closed, and non-settled cases transferred to 21 MC 101, the master calendar containing the property damage cases arising from the destruction of Towers One and Two of the World Trade Center. Joint Order Transferring Cases to 21 MC 100 (AKH) Docket and Closing 21 MC 97 (AKH), dated March 18, 2008.

Azrael argues that he should be allowed to charge a 25 percent contingent fee. He submits nearly identical affidavits from his clients in each of his four cases consenting to 25

percent contingent fees to Azrael, each client confirming that he so agreed.  Azrael claims that he did outstanding work to earn the fee, producing settlements higher than those recommended by the mediator and, therefore, higher than those obtained by similarly situated plaintiffs.  He submits a lengthy declaration of his own to describe, by conclusory paragraphs and without any time records, the services delivered by his firm.  He argues that the proceedings are confidential, and no one will know about a higher fee award given to his firm.  And he produces affidavits of professors who teach ethics and professional responsibility to opine that 25 percent contingent fees are ethical.

Azrael's four settlements all involve modest wage earners at the Pentagon; three of the decedents were in their late fifties or early sixties with adult children; and one decedent was in her late twenties with no children.  The settlements propose to pay the deceaseds' legal successors a total of $28,500,000 ($5,500,000 where the deceased left two parents and an adult sibling but no children; $7,000,000 where the deceased left a spouse and two adult children; $8,000,000 where the deceased left a spouse and six adult children; and $8,000,000 where the deceased left a spouse and two adult children).  These settlements are disproportionately large when compared with the amounts received by similarly situated plaintiffs in earlier settlements.[5] A fee of 25 percent would yield a fee of $7,125,000; a fee of 15 percent, $4,275,000, in both cases, against gross recoveries.  Presumably, since Azrael fails to identify any expenses incurred in prosecuting the cases, there may not have been anything significant that he proposes to absorb. And since he does not bother to set out the time rates of the lawyers in his firm who provided services, nor provide any details about the services he describes in a conclusory fashion, I am unable to agree with his conclusion that his services were "significant", "substantial" and

---

[5] Out of respect for the privacy of the earlier settling parties, I will not, in this opinion, provide comparative information about earlier settlements.  I will, however, be filing under seal an addendum to this footnote, providing comparative information about previous settlements, to illustrate the disproportionate nature of these four settlements.

9

"extensive". Azrael ignores the criteria required by my order of August 9, 2007. In my opinion, an award of the magnitude he requests would reflect a very large windfall.

Mr. Azrael did not function in a liaison capacity. Neither he nor any lawyer in his firm appeared, according to my memory, to argue any motion or present any pleading. He or another member of his firm attended most conferences, but rarely spoke. Although the description of his services contains self-flattering statements of his contributions to the common effort, they are all conclusory and I have no perception of any contributions on his part. Such services as he gave representing his clients in preliminary discussions with the Special Master of the Victim Compensation Fund, or to arrange probate, or to form non-profit corporations for portions of a recovery are not relevant to the question of a reasonable fee in the cases before me, and moreover, are likely similar to services provided by attorneys in many other September 11 wrongful death cases. Azrael's entire strategy seems to have been to coast on the work of others, and to wait for last position before entering into any meaningful settlement discussions with respect to his clients. Azrael's strategy made little contribution to the progress of the cases before me, or to the settlements that largely have resolved this litigation; indeed, his strategy is now an affront to the hard work that others contributed in the belief that they would not be prejudiced in comparison to later settlers.

When Azrael indicated his readiness to participate in settlement discussions, he asked for the court's mediating help, for I had helped bring several plaintiffs and defendants together. However, when it became clear that Azrael would make demands intended to improve his clients' results over all previous settlements, I advised him, through the mediator, that I would not participate in such a mediation. See March 22, 2007 conf. tr., at 11. Azrael's negotiations were direct with counsel for the aviation defendants. He engaged Motley Rice to assist him in the negotiations. Thus, he sought to advantage his clients by leveraging on the

desire of insurance carriers to eliminate or substantially reduce loss reserves on their financial statements and thus improve their assets and earnings, a feature that becomes possible when the last remaining outstanding claims against an insurance carrier on a particular risk are settled. And he sought, as well, to advantage his clients by leveraging on Motley Rice's settlements.

None of this is unethical, for by these tactics a lawyer seeks to gain the highest possible award for a client. Nor is a 25 percent contingent fee award inherently unethical; it is within the schedule of contingent fee charges that can be reflected in an engagement letter between a client and his attorney under the laws of the several States in which the various clients reside.

But this is not an ordinary case. The ATSSSA provides that the United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions regarding any claim "resulting from or related to the terrorist-related aircraft crashes of September 11, 2001". ATSSSA, Section 408(b)(3), 49 U.S.C. § 40101. In providing for the Southern District of New York as the site of exclusive jurisdiction over litigation resulting from or related to the events of September 11, Congress evidenced an intention to have all of these cases handled in a uniform and consistent fashion. See 147 Cong. Rec. S9589-01, S9592 (Sept. 21, 2001) (statement of Senator Schumer) ("The intent here is to put all civil suits arising from the tragic events of September 11 in the Southern District."). Congress was concerned that recoveries, as well, should be consistent. 147 Cong. Rec. S9589-01, S9595 (Sept. 21, 2001) (statement of Senator Hatch) ("For those who seek to pursue the litigation route, I am pleased that we consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded."). Congress intended also to avoid crushing liability to the airlines. See 147 Cong. Rec. S9589-01, S9594 (Sept. 21, 2001) (Senator McCain) ("In addition to removing the specter of devastating potential liability from the

11

airlines, and guaranteeing that the victims and their families will receive compensation regardless of the outcomes of the tangle of lawsuits that will ensue, the bill attempts to provide some sense to the litigation by consolidating all civil litigation arising from the terrorist attacks of September 11 in one court.").

The legislative history leading to the passage of the ATSSSA shows clearly that while family members of the victims should be properly protected, treated fairly and receive compensation promptly, Congress was equally concerned that the amounts awarded be logical and not arbitrary, and that fees or other expenses not swallow up the available funds. As Senator McCain stated:

> No amount of money can begin to compensate the victims for their suffering. Nothing will make them and their families 'whole'. It is not the intent of the federal fund to do this. Nor is it the intent of the fund to duplicate the arbitrary, wildly divergent awards that sometimes come from our deeply flawed tort system—awards from which up to one third or more of the victims' award is often taken by attorneys.

147 Cong. Rec. S9589-01, S9594 (Sept. 21, 2001) (statement of Senator McCain). See also 147 Cong. Rec. S9589-01, S9595 (Sept. 21, 2001) (statement of Senator Hatch) ("[B]ecause the pool of funds available to potential plaintiffs will be limited, we need to eliminate, or at least limit, the punitive damages that can be awarded. I do not want to deny any legitimate plaintiff just compensation. He or she should receive both economic and reasonable noneconomic damages which would include everything from lost earnings to emotional distress. However, if we do not limit outrageous jury awards of punitive damages, we run the risk of denying some plaintiffs their rightful share in an award. If one plaintiff's punitive damage award is excessive, it could very well deplete the amount of funds available to pay awards, leaving other plaintiffs out in the cold. Don't we want to ensure that all legitimate plaintiffs receive compensation?"); 147 Cong. Rec. S9589-01, S9601 (Sept. 21, 2001) (Senator Sessions) ("If [a plaintiff is] a widow of a person who has lost his life, they can make a claim and certify that and get their payment without

any fees needing to be paid."); 147 Cong. Rec. S9589-01, S9603 (Sept. 21, 2001) (Senator Enzi) ("I understand the need for expediting compensation to the victims, but I'm not sure that we have done that. Perhaps we have just opened up a trial lawyer's dream. I have been assured that the section will be reworked to give assurance that the money will go to the victims and not just to attorneys, and that the taxpayer won't be the one providing all the compensation.")

The disproportionate settlement amounts and contingent fees in the four cases before me, if allowed, would be inconsistent with the Congressional purpose of exclusive federal jurisdiction in a single district court. Whatever the ability of parties under the particular laws of a State to settle cases as they wish, and to pay their attorneys contingent fees as they agree, such laws and such practices are inconsistent with Federal law expressed in the ATSSSA. ATSSSA, § 408(b)(2), 49 U.S.C. § 40101 (the law of the State where the crash occurred is to govern "unless such law is inconsistent with or preempted by Federal law.") Whether a State regulates a wrongful death settlement or not, and whether a State considers a 25 percent contingent fee reasonable and appropriate or not, are not material considerations under the ATSSSA. Under the ATSSSA, this district court, discharging its task to administer all the cases before it, must consider these settlements in the context of all other settlements and all remaining outstanding claims.

There is no question that a higher contingent fee reflects itself in a higher settlement. A client's willingness to award millions more in fees to his lawyer does not result from largess, or gift, but because the client is getting more for himself. In fact, plaintiffs' affidavits filed in support of Azrael's request for a 25 percent contingent fee explicitly stated that plaintiffs took into account the settlement amounts that Azrael recovered for them. These four settlements prejudice, by the unreasonableness of their amounts, the remaining claimants. And they embarrass and prejudice the earlier settling claimants. It was fundamental to the settlement

13

process that parties were willing to begin the settlement process, and continue in it, without undue fear that later settlers would be able to leverage on earlier settlers. A litigation of 95 cases cannot be administered, or lawyered, as if it were a single case. I administered the cases to produce the same sorts of efficiencies and economies as in class actions, using liaison counsel, coordinated discovery, and responsive judicial proceedings, giving priority to the special needs of the 9/11 lawsuits. Like a class action, I have jurisdiction to limit and award allowances for attorneys' fees to protect the interests of the plaintiffs as well as the public, and for the very same reasons. See, e.g., In re High Sulfur Content Gasoline Prods. Liab. Litig., 517 F.3d 220 (5th Cir. 2008); 4 Newberg on Class Actions § 14:1 (4th ed. 2008).

These four settlements were previously tendered to me, without any representation of the fee that would be requested or the discrepancy between these settlements and all prior settlements. Although I approved the settlements, I did so without being aware of the considerations that now impel me to disapprove them. Having now reviewed the settlements, a separate order will be issued vacating my previous orders of final judgment approving the settlements.[6]

The wounds of 9/11 will not easily be assuaged. But neither should they be exacerbated by rich rewards of fees and benign indifference to unreasonably large awards. Unquestionably, the families of those who were murdered by the terrorists of 9/11 have suffered greatly. Their reasons for rejecting the option of the Victim's Compensation Fund established by the ATSSSA are to be respected. The ATSSSA confirmed their right to sue, ATSSSA, Section 408(b)(1), 49 U.S.C. § 40101, and this court has made every effort to provide prompt, responsive, economical and efficient proceedings for their cases. Fairness, however, is indivisible, and the four settlements tendered to me surpass fairness and reasonableness. Were I

---

[6] Out of respect for the privacy of these plaintiffs, the order vacating the Orders of Final Judgment in these four cases will be filed under seal.

to allow my earlier approval of the settlements to stand now that I have fuller information, it would compromise the assurances I gave to earlier settlers that all plaintiffs would be treated equally, and that no benefit would be given to hold-out plaintiffs. Thus, I must vacate the orders of final judgment approving the settlements.

I will issue a sealed order vacating the orders of final judgment in these four cases. The papers submitted to the Court that sought to justify the fee arrangement in these four settlements will be returned to counsel. Counsel shall promptly redact the names of the plaintiffs and, thus redacted, promptly file all papers in open records. This opinion and order will be filed in open records. I will hold a conference on August 6, 2008 at 2:30 pm, open only to counsel for the settling parties, to decide on future proceedings.

SO ORDERED.

Date: July 24, 2008
New York, New York

/s/ ALVIN K. HELLERSTEIN
ALVIN K. HELLERSTEIN
United States District Judge