1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE SEPTEMBER 11TH
     LITIGATION,
4

5                                              21 MC 97

6    ------------------------------x
                                   New York, N.Y.
7                                  June 14, 2007
                                   10:15 a.m.
8
     Before:
9
                      HON. ALVIN K. HELLERSTEIN,
10
                                          District Judge
11
                          APPEARANCES
12
     MOTLEY RICE
13        Attorneys for Plaintiff
     BY:  DON MIGLIORI
14        MICHAEL E. ELSNER
     BY:  GREGORY P. JOSEPH LAW OFFICES, LLC
15        Attorney for Plaintiff

16   FLEMMING ZULACK WILLIAMSON ZAUDERER, LLP
          Attorneys for Plaintiff
17   BY:  RICHARD A. WILLIAMSON

18   CLIFFORD LAW OFFICE
          Attorneys for Plaintiff
19   BY:  TIMOTHY S. TOMASIK

20   U.S. DEPARTMENT OF JUSTICE
          Attorneys for Plaintiff
21   BY:  BETH GOLDMAN
          SARAH SHEIVE NORMAND
22        JEANNETTE VARGAS

23   AZRAEL GANN & FRANZ, LLP
     BY:  KEITH S. FRANZ
24

25   KREINDLER & KREINDLER, LLP
          Attorneys for Plaintiff

76EAASEPA1                    Argument

1   BY:  MARC MOLLER

2   CONDON & FORSYTH, LLP
          Attorneys for Defendant
3   BY:  DESMOND T. BARRY, JR.

4   DEBEVOISE & PLIMPTON, LLP
          Attorneys for Defendant
5   BY:  ROGER E. PODESTA

6   SIMPSON THACHER & BARTLETT, LLP
          Attorneys for Defendant
7   BY:  JOSEPH F. WAYLAND

8   O'MELVENY & MYERS, LLP
          Attorneys for Defendant
9   BY:  MARK WOOD

10  PERKINS COIE, LLP
          Attorneys for Defendant
11  BY:  MARY P. GASTON
              MACK H. SHULTZ
12
    QUIRK AND BAKALOR, P.C.
13        Attorneys for Defendant
    BY:  JEFFREY J. ELLIS
14

15

16

17

18

19

20

21

22

23

24

25

76EAASEPA1                        Argument

1              (Case called)

2              THE COURT:  Good morning.  Please, be seated.

3              I want to thank Mr. Barry and Mr. Moller for helping

4     organize the activities today, and we will follow the agenda

5     that has been distributed.  There are four main issues about

6     which we will have discussion.

7              The first, whether federal law pre-empts state law

8     concerning the standard of care applicable to the aviation

9     defendant's conduct.

10             The second, whether punitive damages are available.

11             The third, whether aviation defendants should be able

12    to discover from the government preSeptember 11th intelligence

13    and other threat information known to the government but not

14    conveyed to the aviation defendants.

15             And fourth, whether Pennsylvania law should apply to

16    United Airlines flight number 93 compensatory damages claim.

17             Those are the four issues.  Have we missed anything

18    that someone else has raised in motions?

19             There will be no time limits.  We will discuss each

20    issue in turn until the discussion has been completed.

21             Sometimes the hearer of a discussion completes his

22    hearing before the transmitter of information completes the

23    transmission, and if there is that dichotomy we will try to

24    deal with it as best we can.

25             On the first issue having to do with the standard of

1    care, Mr. Podesta for the aviation defendants will speak first.

2    Ms. Gaston for Boeing will speak second.  Mr. Wood for the

3    airport operators will speak third.  Now, I think much of what

4    Mr. Wood would probably be covering will be covered by

5    Mr. Podesta and Mr. Joseph will speak for the plaintiffs.

6          As you know this judge has a bit of impatience in

7    argument and has the habit of cutting in and entering into

8    dialogue before the presenter may be finished.  I'll try to

9    discipline myself more than usual this morning.

10          Mr. Podesta, there's lot of people here.  I don't know

11    how adequately the room is mic-ed.  If anyone in the back can't

12    hear, please, raise your hand.  We will raise our voices, but I

13    want everyone here to be able it to hear and pay attention.

14          Mr. Podesta.

15          MR. PODESTA:  Good morning, your Honor.

16          Roger Podesta, for American Airlines on behalf of the

17    aviation defendant's motion for determination of the federal

18    aviation security regulations established the standard of care

19    governing their conduct on 9/11.  I'd like to reserve with the

20    Court's permission a couple of minutes for rebuttal.

21          THE COURT:  We will have interchange.  There is no

22    time limits.  We will leave that to the Court of Appeals.  They

23    have lights.

24          MR. PODESTA:  I will try to focus my argument on a few

25    key highlights and rely on my colleagues and the briefing for

76EAASEPA1                              Argument

 1   most of the points.  I don't want to argue so long that Judge

 2   Griesa starts knocking on the door.

 3          The main theme for my argument this morning, your

 4   Honor, is that the issue before you on this motion is

 5   essentially one of statutory interpretation.  And its

 6   interpretation not so much of the Federal Aviation Act but of

 7   the Stabilization Act or ATSSA Congress specifically created

 8   for purposes of the 9/11 litigation.

 9          And even more precisely the issue is what did Congress

10   mean when it wrote in Section 408 B 26 ATSSA that the

11   substantive law for its new federal cause of action was to be

12   derived from the law of the state where the crash occurred

13   unless such law is inconsistent with or pre-empted by federal

14   law.

15          Now, plaintiffs tend to read Section 408 B 2 as if the

16   sentence stopped with the words "where the crash occurred" and

17   attribute little significance to the remainder of the sentence.

18          They argue that inconsistent with is just another way

19   of saying conflict pre-emption and that there is no preemption

20   here at all because the federal regulations only establish

21   minimum standards.  But we submit that that ignores the basic

22   principal.  Then in construing statutory language courts ought

23   to strive to give meaning to every word in the statute.

24          And under that cannon of construction the worlds

25   inconsistent with and pre-empted by should each be given

76EAASEPA1                              Argument

1    independent meaning.  And I would suggest that plaintiff's

2    position also fits poorly both the text of Section 408 B 2 and

3    the context of the enactment of the Stabilization Act.

4          When you look at it the phrase pre-empted by

5    inconsistent with or pre-empted by is a uniquely powerful

6    combination of terms.  As far as the parties research has

7    revealed Congress had never once used that combination of terms

8    inconsistent with or pre-empted by in any federal statute prior

9    to 9/11.

10         THE COURT:  It seemed to me, Mr. Podesta, that the

11   latter phrase raises an issue of intent.  On the former phrase

12   raises an issue of logical inconsistency.  That is to say if it

13   was the intent of a particular statute and perhaps regulation

14   to pre-empt state law.  That is expressive of an intent by

15   Congress to supersede state law by federal law.  The issue

16   raises congressional intent and the supremacy clause.  The

17   phrase inconsistent with would suggest that the operation of a

18   state statute or common law standard would be inconsistent with

19   the federal standard.  Again, the issue is the supremacy clause

20   of the Constitution.  But it's a feature other than specific

21   intent and it then goes beyond normal pre-emption law which

22   normally takes in both standards but deals with a first

23   inconsistent with as a suggestion of the second congressional

24   intent.  Here they're made independent.

25         MR. PODESTA:  I would say that the pre-emptive by

76EAASEPA1                    Argument

1    language refers to the normal pre-emption principles which are

2    both expressed and implied occupation appealed and conflict

3    pre-emptions and inconsistent with is really an expansion of

4    those concepts in the operation and that what really --

5    inconsistent with is really stating, inconsistent with is a

6    softer word than conflict or direct conflict.

7            THE COURT:  I think your point is that it connotes

8    something more than normal pre-emption.

9            MR. PODESTA:  Yes, that is correct.

10           THE COURT:  That the ATSSA is intended to have a more

11   inclusive effect superseding state law more than would

12   otherwise be the case in normal pre-emption analysis.

13           MR. PODESTA:  That's correct.  If Congress wished to

14   confine the analysis under this statute simply to the

15   traditional principals of expressed or implied pre-emption it

16   could simply have said pre-empted by.  But it said inconsistent

17   with pre-empted buy.  And to my way of thinking, the way I read

18   the English language that involves a less lower level of

19   conflict between the federal and state interests is required

20   for federal law to control than it would be if it were purely a

21   conflict pre-emptive issue and I think when you look at the

22   text of the statute derived from state law --

23           THE COURT:  Let's say you've persuaded me of this

24   point, let's move on and see where it goes.

25           MR. PODESTA:  All right.  Then I would say if Congress

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                    Argument

1    puts those words inconsistent with or pre-emptive by I think it

2    is hard to avoid the conclusion that in drafting that language

3    Congress must have intended that there was some body of state

4    law that would apply and some aspects of state law that would

5    be displaced.

6              THE COURT:  Not necessarily.  It could be

7    hypothetical.  It could be an expression of Congress that if

8    there is a straight standard that is inconsistent with the

9    ATSSA that state law won't be applied.

10             MR. PODESTA:  That, hypothetically, that hypothetical

11   possibly possibility exists.  But Congress I think I'll try to

12   persuade you that Congress was aware that there was an

13   extensive body of federal regulations in the aviation security

14   industry.

15             THE COURT:  I think everyone will agree that there is

16   extensive occupation in the field by Congress.

17             MR. PODESTA:  And I would think that it's also logical

18   to conclude that if Congress meant to displace, to adopt any

19   body of federal law it would be the detailed aviation security

20   regulations such as the ACSSP the cog and the provisions of the

21   Federal Aviation Act.  I suggest that if you step back from the

22   statutory language and forget about the verbiage of the brief

23   what the statute is really saying and being -- is where state

24   and federal law cover the same subject matter and the state law

25   is appreciably different than the federal, then the state law

76EAASEPA1                      Argument

1    yields to the federal and the federal controls.

2            THE COURT:  Mr. Podesta, I think the trouble with

3    urging that point and persuading me of that point is it's too

4    general, and as a judge I really occupy the position of an

5    educated layman.  I don't know the term.  I don't know the

6    specific areas.  I don't know the techniques and the technique

7    of the legislation, so I would like you as an experienced

8    lawyer in this area to lead me through it.  I take your first

9    point.  There is something more in ATSAA than normal

10   pre-emption analysis but I am anxious to see where that goes.

11           MR. PODESTA:  All right.  I think one key clue to what

12   Congress meant is the situation in which it was acting on 9/11.

13   Congress obviously wanted to centralize all of the 9/11

14   litigation in a single court and it could only do that by

15   citing a federal forum, but it had a problem.  There are

16   several Supreme Court decisions that is pointed out serious

17   constitutional issues with Congress, just taking stated court

18   cases and bringing them into a federal court under a purer

19   jurisdiction statute.  So in order to avoid the constitutional

20   issues Congress had to create a federal cause of action that

21   gave rise to another problem.

22           There is no preexisting federal common law of torts to

23   which Congress could readily make reference.  So what it

24   decided to do, rather than create its own new body of federal

25   tort law from scratch, was to borrow the pre-existing body of

76EAASEPA1                    Argument

1    state authority law from the law of the state of each crash.

2    But I suggested it didn't disregard the federal regulatory

3    scheme, but what the last phrases of Section 48 B 2 really are

4    saying is that where there is pre-existing federal law on point

5    there is no need to borrow from the state common law and

6    federal law controls over the state law.

7         Now, I'd suggest that that is the most logical

8    interpretation of what Congress was doing, but I am sure the

9    plaintiffs will say where is your proof?

10        THE COURT:  Mr. Podesta, I have to say you I want to

11   step back from your point as well.  We don't know what Congress

12   had in mind because the legislative history of ATSSA is sparse

13   to nonexistent.  So we take the statute and we try to

14   understand what the words say and mean and how far they may be

15   applied.  It is quite possible and I think probable that the

16   legislators had in mind standards of care that customarily are

17   addressed by the common law of the several states.  And the

18   overlay of extensive regulation in the federal statutes and

19   regulations book and would depend on the courts to bring those

20   several bodies together and make sense of them, noting the

21   federal supremacy, particularly, in the breath of the wording

22   that we discussed a few minutes ago.  But dealing with

23   standards of the common law as well as the regulatory book.

24   That's how I would approach the subject.

25        MR. PODESTA:  I think the common law standard is

76EAASEPA1                  Argument

1    basically one of reasonableness and I think what Congress is

2    saying in the last clause is where there is a federal

3    regulation that told the aviation defendants what they were

4    supposed to do.  That is the reason.  That supplies, answers

5    the questions what is reasonable under state law in the

6    circumstances of the federal regulatory --

7            THE COURT:  I would say it provides answers but it may

8    not answer.

9            MR. PODESTA:  All right.

10           THE COURT:  I'd like to move from the abstract to the

11   actual.  I'd like to deal with the specific federal statutes

12   and regulations that may be applicable here and look at their

13   text and see if we can apply the ATSSA their text.

14           MR. PODESTA:  All right.  But I would just like to

15   make one more point and that relates to the Price Anderson Act.

16           Congress had faced an identical problem.

17           THE COURT:  Price Anderson Act for those who may not

18   know is the congressional regulation that deals with the atomic

19   energy developments in the 1960s, in particular.  I don't

20   remember the date of the statutes.

21           MR. PODESTA:  These are the 1988 amendments.  This is

22   Congress's final solution to the problem.  In the Price

23   Anderson Amendment Acts Congress created, as it did in that

24   statute, an exclusive federal cause of action and provided that

25   the substance of the federal cause of action for nuclear power

76EAASEPA1                    Argument

1    plant accidents was to be derived from the law of the state

2    where the accident occurred except where that law was

3    inconsistent with federal law.  And because of the sparseness

4    of the legislative history I can't point to something and say

5    Congress specifically considered this but think of this as if

6    it were a federal case.  I don't have an eyewitness that would

7    say the Price Anderson Act was present at the creation of the

8    Stabilization Act.

9              THE COURT:  It was a model.

10             MR. PODESTA:  I've got something better.  I've got

11   effective the statutory DNA of the Price Anderson Act is

12   present in the Stabilization Act that you look at the structure

13   and language of the two statutes they're too strikingly similar

14   for that to be a mere coincidence and Congress also had before

15   it on 9/11 --

16             THE COURT:  It also has similarities of function and

17   purpose.  The Price Anderson Act reflected Congressional

18   concern that a catastrophe resulting from a nuclear accident

19   would ruin the industry and by the threat of a ruination

20   prevent proper development and investment in the field and so

21   Congress entered it with schemes of federal insurance and the

22   statute that you discussed.  And I would take your point and

23   agree with it that it is a model that can be persuasive.

24             MR. PODESTA:  There is an important nuance on that and

25   that is that Congress when it puts new language in the federal

1   statutes is presumed to be aware of how that language that has

2   previously been interpreted by the courts.

3           THE COURT:  I accept that as well.

4           MR. PODESTA:  And as of 9/11 there was a unanimous

5   body of federal judicial opinions consisting of four different

6   federal circuit courts and at least 12 district courts

7   including Judge Cote in this district who had held that the

8   words inconsistent with in the Price Anderson Amendment Act

9   established an exclusive federal standard of care for assessing

10  the liability of nuclear power plant operators.  And the courts

11  have also held that that standard of care was to be provided by

12  the regulations of the nuclear energy regulatory commission,

13  and that the issue in Price Anderson in that case is, did the

14  defendants comply with the provisions of the statute and the

15  nuclear energy commission regulations?  If so there is no

16  liability.

17          In other words, the common law standard of

18  reasonableness is converted into compliance with the nuclear

19  energy regulatory commission regulations where there is a

20  nuclear energy regulatory commission regulation on point.  And

21  that was the unanimous interpretation from four circuits and

22  Judge Cote as of the date Congress modeled the Stabilization

23  Act on the Price Anderson Act Amendment.

24          But let's move into the area of some specific examples

25  of inconsistencies and possible direct conflicts.  I am

76EAASEPA1                     Argument

1    focusing on and inconsistent with.  That really reflect the

2    allocation of my argument with my colleagues.  I certainly

3    endorse the pre-empted by arguments but I know Mary is going to

4    cover a lot of them and I --

5         THE COURT:  Mr. Podesta, I would like you to occupy

6    the field.

7         MR. PODESTA:  Okay.  Unfortunately, I think Mr. Joseph

8    is going to carve out an area that's not pre-empted for

9    himself.

10        But in our opening brief we provided numerous examples

11   of what the aviation defendants were required to do under the

12   federal aviations and compared them to what the plaintiffs'

13   theories of liability appear to be insofar as we can determine

14   them from the questions that the plaintiffs were asking our

15   witnesses at their depositions.

16        For example, plaintiffs appear to suggest that the

17   aviation defendants should have given special scrutiny to the

18   persons and the carry on baggage of CAPPS selectees.

19        THE COURT:  Sorry.  Say again.

20        MR. PODESTA:  CAPPS.  The computer had a number of

21   factors who determine the trying to select passenger who were

22   perceived as above high risk and over the years there was a

23   variety of FAA regulations telling the aviation defendants what

24   they were supposed to do with these CAPPS selectees.  And it's

25   important here because I believe nine or ten of the hijackers

76EAASEPA1                         Argument

1    were cab selectees.  And plaintiffs are basically contending

2    that the common law of the states where the crash occurred

3    required the airlines and the screening companies to give

4    special scrutiny to the persons and the carry on bags of CAPPS

5    selectees.

6         Beyond that you would be given to a normal passenger.

7    In other words, you open every bag, hand wand or pat-down every

8    selectee.  Now, the problem with that analysis is that it's

9    flatly inconsistent with the security directives that were in

10   place for CAPPS selectees on 9/11.

11        As of 9/11 the standard was set forth in security

12   directive -- I think it is a 9701, they all have these catchy

13   titles -- and that basically said that the only special

14   scrutiny that a CAPPS selectee was to receive on 9/11 related

15   to the checked baggage of the cab selectee, not to his person,

16   not to her carry on bags.  They were all otherwise except for

17   their checked baggage same scrutiny as other passengers were to

18   receive.

19        There was good reason for that.  It was largely a

20   product of the views of the Gore commission that basically was

21   concerned about ethnic, racial or religious profiling in

22   selection of passengers for screening.  And it also is premised

23   on the assumption that the FAA and the Gore Commission both

24   made that the biggest threat was explosives, particularly, in

25   checked baggage because that had been the problem with Pan Am

76EAASEPA1                          Argument

1    and was thought to have been the problem with TWA flight 800 at

2    the time these regulations took effect.  So plaintiffs here

3    there have a direct inconsistency here.

4           THE COURT:  Mr. Podesta, take me through the language,

5    please.  I want to see the regulations.  I want to you walk me

6    through the regulations.  First, show me the special scrutiny

7    point and the general scrutiny point.  I think that this is

8    extremely important -- and this a word to the rest of you --

9    it's extremely important to work with the precise text of the

10   language that we're dealing with any analysis or inconsistency

11   has to deal with text and expressions.

12          (Pause)

13          MR. PODESTA:  Well, this is to the easiest thing to do

14   live because the attachment that we're referring to is Exhibit

15   C to -- Exhibit D.  I'm sorry -- to Mr. Barry's initial

16   affidavit.

17          Do you have it in front of you?

18          THE COURT:  We will have it in a minute.

19          (Pause)

20          THE COURT:  What is the regulation.

21          MR. PODESTA:  Security direct 9701, security directive

22   and I don't think this is consist have the same binding affect

23   as FAA regulations.

24          THE COURT:  This is a regulation issued by the

25   Department of Transportation, October 27, 1997.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                    Argument

1        MR. PODESTA:  Yes.  And although this particular one

2   expired March 1988.  In fact, successors continued it through

3   September 11, 2001.

4        THE COURT:  This is the one in effect as of September

5   11, 2001.

6        MR. PODESTA:  That's right.  And this is for CAPPS.

7        THE COURT:  I noticed the TSA redactions.

8        MR. PODESTA:  Yes.  Well, that's an issue we

9   frequently have.  But I think we can take you through the

10  meaning and I think probably for purposes of this argument make

11  sense to look at the revision summary and in the first page and

12  it says in the first paragraph this security --

13       THE COURT:  I don't know if there are any reporters

14  here who want to have the benefit of this information, but my

15  staff will work with you afterwards to allow you to see the

16  information that may not be readily available to you to get the

17  story straight.

18       MR. PODESTA:  You'll see first bullet point, your

19  Honor, says this security directive allows for the use of an

20  FAA approved computer assisted passenger screening CAPPS system

21  to profile passengers.  And the very second bullet point

22  requires profiling of only, in bold face, those passengers

23  checking baggage.

24       THE COURT:  It doesn't say the checked baggage.  It

25  says the passengers checking bags.

76EAASEPA1                    Argument

1          MR. PODESTA:  That's right.  Then if you turn to the

2     third page it talks about actions required by U.S. carriers and

3     then it goes through the requirement of a profile and then it

4     says, A, the checked baggage belonging to a passenger is

5     identified as selectee using CAPPS shall be cleared using one

6     of the procedures outlined in section four.  Then it goes on --

7          THE COURT:  So what I understand from this is that the

8     focus is on the checked baggage.

9          MR. PODESTA:  Correct.

10         THE COURT:  Your point is that the experience at

11    Lockerbie and other places showed dangers and risks in the

12    checked baggage.

13         MR. PODESTA:  Yes.  And this is confirmed by the

14    findings of the Kane Commission which said that the only effect

15    of the CAPPS profiled select system on 9/11 was as to checked

16    baggage and I think it is like page 846 the Kane Commission

17    interpreting those regulations that CAPPS selectees on 9/11

18    were to be subject to no special scrutiny for their persons or

19    for their carry on bags.

20         But there are many other examples that I can give you,

21    your Honor, of inconsistencies between what they think the

22    plaintiffs are claiming.

23         THE COURT:  Let's talk about this.  This has a certain

24    degree of force.  What is the force of a security directive?

25         MR. PODESTA:  A security directive has the affect of a

1     federal aviation administration regulations.  It has the

2     binding effect of law and that was also noted by the Kane

3     Commission in their report.  It is to be distinguished from an

4     information circular which simply provides the aviation

5     defendants with information about possible terrorist threats

6     but doesn't require them to do anything.

7              THE COURT:  Now, you read this, Mr. Podesta, and I

8     think it is a fair reading of it, that this is an instruction

9     to those responsible for checking people coming into the

10    airplanes, that if a person exceeds the profile and therefore

11    is a potential security risk, the focus of attention should be

12    on the baggage and not on the person.

13             MR. PODESTA:  Checked baggage.

14             THE COURT:  And not on the person or the hand carry

15    baggage.  So this is what the instruction is, it's binding

16    instruction.  It instructs everyone.  I'll put a hypothetical

17    to you.  Those responsible for security are concerned about a

18    risk and suspect a certain person.  Are they forbidden to have

19    a more rigorous review of that person, inspection of that

20    person and that which he carries than they would do if you or I

21    assuming we are boring persons go through a checkpoint.

22             MR. PODESTA:  It would depend.  The answer is as a

23    general matter under the federal regulations all passengers are

24    to be given the same degree of scrutiny.  Only exception is for

25    CAPPS --

1          THE COURT:  They say all persons other all categories

2     of persons?  I put the question --

3          MR. PODESTA:  They talk generally about persons

4     passing through the screening checkpoint.

5          THE COURT:  Is a checker forbidden to have a more

6     rigorous inspection?

7          MR. PODESTA:  I would say that there is an element, of

8     course, of common sense in the federal regulations which

9     doesn't mean they're superseded by state law standards, but if

10    someone comes in and is acting dramatically suspicious is

11    intoxicated or says I have a bomb or starts being belligerent

12    and fighting with people, obviously, the screener would have

13    the authority to take a special look at that person.

14         THE COURT:  Do we know and can we say publicly what it

15    was about nine of the ten people that made them more

16    suspicious?

17         MR. PODESTA:  I can say publicly.

18         THE COURT:  Let me talk to you about that for a

19    moment.  There is a precise issue that can be drawn here.  It's

20    wrong to profile people by racial type or ethnic type, perhaps,

21    other forbidden categories.  But it makes sense when you are

22    suspicious about a person -- than his ethnic or her ethnic make

23    up to have a more rigorous standard.  Do we have to know in

24    this case what were the bases of suspicion about these nine

25    people?

76EAASEPA1                    Argument

1          MS. GOLDMAN:  The perhaps selection process is

2     computer generated selection process, so it wasn't man made.

3     It was done by the computer.  So I think that that plays --

4          THE COURT:  In other words, there were criteria that

5     if noticed would have raised suspicion about these nine people.

6          MS. GOLDMAN:  Correct.

7          THE COURT:  And are the criteria based on mannerisms,

8     can you say, or are they based on matters that various among us

9     with consider improper profiling characteristics?

10          MS. GOLDMAN:  I'll start by explaining that the CAPPS

11     criteria themselves that I think your Honor understands are SSI

12     and that's why we're not discussing what they are.

13          THE COURT:  Sensitive security information.

14          MS. GOLDMAN:  But your Honor should understand that

15     the CAPPS program was submitted to the Department of Justice

16     for review to ensure that it was not a violation of any civil

17     rights laws by putting it into place, and I think that's

18     probably what I can say right here.  This is an issue that is

19     going to be, I think, an element of discussion among the

20     parties in discovery.  So it may be premature for us to give

21     you factual information at this point about the nature of this

22     but --

23          THE COURT:  I think we have crossed that, Mr. Podesta.

24          MR. PODESTA:  I would note, your Honor, that the CAPPs

25     selection is a computer system.  It has nothing, whatsoever, to

76EAASEPA1                    Argument

1    do with how the passengers behaved when they presented

2    themselves on the airport because the computer has no way of

3    knowing how they are conducting themselves, and there is also a

4    random selection.  So some people are selected for no run

5    reason at all other than we want to select a random election

6    and others are selected because of their particular information

7    about them in the computer.

8         THE COURT:  What can you say about these nine people

9    in terms of how they presented themselves, whether they were

10   noted as designees under CAPPS, whether their baggage was

11   scrutinize, whether their hand luggage was not?

12        MR. PODESTA:  I believe that all of the CAPPS

13   selectees were subject to the required procedures under

14   security direct 970 and its successors.  Now, if they didn't

15   have any checked baggage and a number of them didn't, the

16   designation of selectees really has no consequences.  If they

17   did have checked baggage the checked baggage was handled in

18   accordance with the regulations which varied, I think, a bit.

19        THE COURT:  What you are telling me is there was no

20   heightened scrutiny given of these nine in relationship to

21   their persons or their hand luggage in relationship to what

22   might be given to all others.

23        MR. PODESTA:  I believe that is correct, your Honor,

24   and I think --

25        THE COURT:  And the plaintiffs would argue that it was

76EAASEPA1                         Argument

1    negligent to do that and the question is how do we articulate

2    the standard that would be instructed the jury.

3         MR. PODESTA:  The standard in terms of CAPPS selectees

4    we would argue the standard is whether we met the requirement

5    set forth in the federal regulations.  CAPPS selectee program

6    was created by federal regulations that was exclusively a

7    federal creation and the question of whether we were negligent

8    in applying CAPPS is a question of whether we substantially and

9    reasonably complied with the federal CAPPS regulations.

10        THE COURT:  So what would be the consequence of your

11   motion?  Suppose I granted your motion.  What difference would

12   it make in the trial?

13        MR. PODESTA:  I think that we, I believe that the

14   instruction if our motion were granted --The standard of care

15   that the aviation defendants were expected to follow on 9/11

16   was established by federal regulations.  Those regulations and

17   I guess you would read the pertinent ones --

18        THE COURT:  What would really be taken by the jury,

19   the gut of it would be that there was not to be any greater

20   scrutiny of a person who was identified by CAPPS except for his

21   checked baggage.

22        MR. PODESTA:  That is correct, beyond what an ordinary

23   passenger would receive.  You want me to instruct that as a

24   matter of law.  That would be the instruction.  I think that

25   could be the instruction as a matter of law.  Then the question

1   of fact for the jury would be whether the aviation defendants

2   substantially collide with the federal aviation and whether any

3   breach of that regulation was a proximate cause of the

4   plaintiff's injuries.

5           THE COURT:  I'm going to take the liberty of a judge.

6   Keep you in place and ask Mr. Joseph how you would want me to

7   rule on this and what would be its consequence.

8           MR. JOSEPH:  Your Honor, we would want to rule the way

9   the FAA described a significance.

10          THE COURT:  Louder.

11          MR. JOSEPH:  In Exhibit 12 of our declaration we

12  actually have the associate administrator for the FAA and civil

13  aviation describe the importance of a security directive.  This

14  is Exhibit number 2.

15          THE COURT:  Give me a moment.

16          MR. JOSEPH:  Sure, your Honor.

17          If your Honor who look at the beginning of the third

18  paragraph.

19          THE COURT:  This is the letter of March 13, 1996.

20          MR. JOSEPH:  Correct.  By the associate administrator

21  for civil aviation security.  In the third paragraph he

22  describes what the significance of a security directive is and

23  it says security counter measures issued by the FAA in a

24  security directive established security minimums for adoption

25  by airlines and airports.  Airlines and airports may exceed

76EAASEPA1                    Argument

1    these minimum standards by implementing more stringent security

2    requirements.  That would be the instruction we would say, your

3    Honor, with respect to all of these standards because he has

4    pointed to --

5              THE COURT:  Let me help you out on this.  What would

6    be the way I would articulate a standard to the jury under your

7    view given these two sentences.

8              MR. JOSEPH:  Your Honor, I would use what Lockerbie

9    says because Lockerbie was the law that presumably Congress had

10   in mind when they were looking at what's inconsistent.  These

11   minimum standards what --

12             THE COURT:  You would want me to tell the jury that

13   what is stated in security directive 9701 was a minimum

14   standard and whether or not some higher standard was to be used

15   in relationship to these nine people was an exercise of what

16   reason, judgment, stated standards.

17             MR. JOSEPH:  And federal to use the highest degree of

18   safety possible in the circumstances.  But I also point out,

19   look at the text that he is calling your attention to.  It just

20   allows in the first bullet point, it requires in the second

21   bullet point.  It doesn't purport to be exclusive or exclusive,

22   but it doesn't say you can do no more.

23             THE COURT:  Let me draw you out on here because I

24   think we have a serious tension between two facets of a

25   program.  The concept of profiling is a very serious one.  As

1    of the early morning of September 11, 2001 there was concern

2    that profiling should not be exercised on ethnic lines among

3    other aspects of forbidden categories and so if it was an

4    ethnic base for suspicion the airlines could look at this court

5    directive and say if we do more because these people appear

6    ethnically suspicious, we're violating rights of citizens under

7    American law and right of people and we should not do it and we

8    should only do that which we're required to do.  I think that

9    would be your point, Mr. Podesta.

10              MR. PODESTA:  Yes, it would.

11              THE COURT:  And then we're told, hey, this is only

12   minimum.  You are supposed to do more.  The airlines are at

13   sea.  What more should they do?

14              MR. JOSEPH:  Your Honor, first of all, you understand

15   that several of these individuals were CAPPS selectees.

16   Secondly, a ticket agent --

17              THE COURT:  What is CAPPS selectee.

18              MR. JOSEPH:  Somebody who was identified under the

19   CAPPS computer profile.

20              THE COURT:  Mr. Podesta, it says nine out of ten.

21              MR. JOSEPH:  So they weren't pulled out.  Nothing

22   procures them from doing further computer -- based on the

23   circumstances and when you look at the cog and the ACSSP.

24              THE COURT:  What the cog?

25              MR. JOSEPH:  Check point operations guide which is

76EAASEPA1                    Argument

1    Exhibit 10 of our compilation.

2              THE COURT:  Take me through that when I give you the

3    chance and what was the other?

4              MR. JOSEPH:  ACSSP air carrier standard security

5    program.  Both of them say --

6              THE COURT:  You'll get back to me.

7              MR. JOSEPH:  Yes, sir.

8              THE COURT:  But now you've gotten a better heads up

9    about what Mr. Joseph is going to say.

10             MR. PODESTA:  First of all, with respect to

11   Mr. Josephs example it has nothing to do with CAPPS.  It's a

12   letter about photo identification.  In fact, if you look we

13   submitted an FAA memo that was produced in FAA document

14   discovery dated -- it says and it's dated February 14, 2000 and

15   it says that by January one, 2000 --

16             THE COURT:  What exhibit?

17             MR. PODESTA:  Exhibit K.  By January 1, 2000 all major

18   airlines had voluntarily implemented CAPPS in advance of the

19   rules mandating it as the only acceptable form of prescreening

20   for scheduled operations.

21             THE COURT:  Where is this?

22             MR. PODESTA:  In the replay declaration.

23             THE COURT:  No.  Where in the exhibit?  I want to read

24   it with you.

25             MR. PODESTA:  I am reading it from my brief actually.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                    Argument

1           MR. JOSEPH:  TSA 0526, your Honor.

2           THE COURT:  What paragraph?

3           MR. JOSEPH:  The fourth bullet.

4           THE COURT:  Got it.

5           MR. PODESTA:  Now that language certainly doesn't seem

6      to me the only acceptable form of passenger prescreening seems

7      pretty mandatory and not minimum.

8           THE COURT:  Now, do you accept or reject the

9      proposition that an airline could do more if it wished to do

10     more without violating the law?

11          MR. PODESTA:  The answer to that is complicated.  So

12     give me a minute to answer it.  There are certain limited areas

13     where an airline could voluntarily do more tests coming into

14     compliance with the FAA regulations before their due date

15     giving additional screener training.  You would say that has

16     nothing to do with the issue of pre-emption.  The minimum

17     standard --

18          THE COURT:  Let me put a hypothetical to you.  I come

19     in to an airport screener at LaGuardia.  It's a busy day.  I am

20     above the CAPPS profile.  I have no checked baggage.  My bag

21     goes through the flourescent device the magnetometer.  I go

22     through the magnetometer.  I'm pulled aside even though nothing

23     is registered for more scrutiny.  If I refused I say I bought a

24     ticket I am entitled to go on this airplane.  You can't do

25     anything more to me and the airline insists they will do more.

76EAASEPA1                    Argument

 1   Is the airline subject to liability for preventing that person?

 2            MR. PODESTA:  You didn't alarm the magnetometer.

 3            THE COURT:  I did not.

 4            MR. PODESTA:  I believe that the airline if it pulled

 5   you aside after you didn't alarm the magnetometer and you did

 6   not exhibit any suspicious signs you were not belligerent, you

 7   were not --

 8            THE COURT:  I was very nice.

 9            MR. PODESTA:  You conducted yourself like Judge

10   Hellerstein.

11            THE COURT:  The best I could but I went to special

12   acting school and I was able to get through.

13            MR. PODESTA:  That would be inconsistent with the

14   requirements of the federal regulation.

15            THE COURT:  Therefore the airline could be liable for

16   refusing a passenger on the plane.

17            MR. PODESTA:  I can give you citations to that as well

18   appendix three to the ACSSP which is Exhibit A to Mr. -- -- if

19   you look at Exhibit A to the original declaration of Mr. Barry.

20            THE COURT:  I have it.

21            MR. PODESTA:  You will see and turn to Appendix three

22   which is AALTSA 7592 and you'll see this is, this first page is

23   the screening guidelines for persons and hand carry on items,

24   the screening guidelines and you'll see in the introduction

25   that this basically says this is what the FAA prescribes and it

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                      Argument

1   says these guidelines are consistent with current legal

2   guidelines, consistent with current legal guidelines not

3   dissimilar from the language of the statue and are designed to

4   effect uniform application optimum safety and the courteous and

5   efficient treatment of all persons subject to preboard

6   screening.

7           Then if you look down in Roman two on that page it

8   says guideline or screening persons.  And it says initial

9   process something conducted by air carrier representative

10  employee or agent screening company using either a walk through

11  metal detector or a hand held metal detector and then it says

12  if the person being screened does not alarm the detector the

13  person is cleared to proceed beyond the screening point.  There

14  is no -- unless there is some special circumstance, but if you

15  were just behaving in the courteous way you ordinarily do there

16  would be no legal basis for the airline or the screener company

17  to subject you to additional scrutiny and that's right in the

18  regulations.

19          And the plaintiffs with the benefit of hindsight want

20  to come in and say, well, we believe that New York law or

21  Virginia law or Pennsylvania law required that even if you

22  didn't alarm the magnetometer and were to the otherwise

23  suspicious you could be subjected to additional hand held or

24  pat-down searches.  The regulations don't provide for that.

25          Now, in a special threat situation like if there was a

76EAASEPA1                    Argument

1    threat of a bomb for a particular flight the FAA could alter

2    these regulations and say we are going to randomly inspect

3    people but those weren't regulations we were operating on 9/11.

4            I think that that's a very clear example of where the

5    plaintiffs appear to be suggesting something that we were not

6    permitted to do.  And they also seem to suggest that we should

7    have conducted more physical searches of carry on bags instead

8    of relying principally on x-rays.

9            But here again in this same exhibit if you turn to

10   page 28 of the ACSSP and I'll give you the -- it sets forth

11   the, it's TSA 7439 and it sets forth the requirements for

12   screening carry on items and it's raised in -- all carry on

13   items passing through the screening check point shall,

14   mandatory language --

15           THE COURT:  Where?  I have it.

16           MR. PODESTA:  Shall be screened using FAA approved

17   inspection methods.  And it basically goes, first it says when

18   an image is displayed on an x-ray monitor and it looks -- then

19   it must be subjected to additional screening.  And it provides

20   for two possibilities.

21           THE COURT:  So there has to be a display.  It has to

22   be displayed how?  Physically or through a --

23           MR. PODESTA:  The primary.  Let me take you through

24   this.  The primary method of inspection is x-ray.  X-ray

25   operator sees a possible threat item on the x-ray and he then

76EAASEPA1                        Argument

1    is supposed to direct the bag, the carry on bag to be sent for

2    additional scrutiny.  Now, what scrutiny it receives depends on

3    what the threat item is perceived to be.  If its perceived to

4    be an explosive then you look at item A under two, which says

5    exam the carry on item using an EDT device.

6                THE COURT:  What is that?

7                MR. PODESTA:  Explosive trace detector.

8                On the other hand if it's a gun or a knife you go to B

9    and you conduct a physical inspection of the item which would

10   be a hand search but that's only if the x-ray operator

11   perceives a threat item when he looks through the screen.

12               Now, there is another requirement and that's continual

13   inspections.  And if you go down to item three it says, the

14   following measure shall be conducted at all category X airports

15   which included Logan and Newark and Dulles and it says

16   inspections of carry on items shall be -- and where the first

17   reference was A and unfortunately the TSA has deleted certain

18   language but what the random search was if ETD devices were

19   available they were supposed to be used to inspect carry on

20   items that cannot be cleared by the x-ray operator then when a

21   number of carry on items is not -- in other words the x-ray

22   operator isn't saying any -- then there is supposed to be

23   random inspection under item one.  Other items must be

24   random --

25               THE COURT:  I don't think I understand.  The number of

76EAASEPA1                      Argument

1    carry on items selected by the x-ray operator for image

2    resolution not enough to insure continual ETD devices for

3    inspection.  I don't think I know what that means.

4              MR. PODESTA:  Let me you try to explain it to you.

5    The x-ray operator is looking through the bags and it happens

6    to be that a whole bunch of nuns are boarding the plane and

7    there is nothing at all suspicious, so the operator isn't

8    selecting any items for the other screener to use the ETD

9    device on or to do hand searches to look for a gun or a knife.

10   In that event they just don't want them doing nothing.  They

11   want the screeners to randomly select for explosive trace

12   detection inspection more carry on items so that randomly

13   people coming through it see that on a random basis not every

14   bag by any means but a certain percentage of bags are being

15   subject to ETD and this shows, look --

16             THE COURT:  The idea being deterrence of other people

17   in the airport.

18             MR. PODESTA:  Yes.  It shows the preferred method was

19   x-ray and ETD and you only got into hand searches where you

20   didn't have ETD which was not the case at the 9/11 airports or

21   where you had a trace item.

22             THE COURT:  The point that you are teaching me,

23   Mr. Podesta, is that these regulations were the sum and

24   substance of what check point operators had to do and there is

25   no room in your argument for additional high ended standards.

76EAASEPA1                    Argument

1          MR. PODESTA:  Right.  That is correct.

2          THE COURT:  That if the airline was more diligent it

3     exposed itself to liability.

4          MR. PODESTA:  It was just, these are the legal

5     requirements is my argument.  Even if we could do more our

6     failure to do more didn't expose us to legal liability.

7          THE COURT:  I want to put this question.  The -- law

8     when standards are set out in regulation whether compliance is

9     evidence of reasonable conduct or conclusive evidence of

10    reasonable conduct.  The first argument would say that the

11    airlines could argue that I am not negligent because I did

12    everything the lawyer told me to do, and other side will say

13    but you could have done more and should have done more given

14    whatever was going on at the time.  You are saying that there

15    is no room for that second argument and if there Mr. Joseph

16    were to make that argument you would stand up and object and I

17    should sustain your objection.

18         MR. PODESTA:  I would hope you've taken care of it on

19    a pretrial ruling but, yes, I would hope you would sustain my

20    objection.  The reason for that is that's what the statute is

21    saying when it says inconsistent with or pre-empted by.

22         THE COURT:  Mr. Joseph would say that it's certainly

23    not pre-empted.  There is no intent and is -- there is nothing

24    inconsistent in this book of regulations with doing something

25    extra if the circumstances made it reasonable for do something

76EAASEPA1                    Argument

1   extra.  You are arguing that as a matter of law.

2           MR. PODESTA:  I make two arguments on that.  First,

3   almost every standard of care is in some sense of minimum

4   standard of care.  You can always do more than the law legally

5   requires.

6           If the tests were that you can do voluntarily

7   something more than the reasonable care or the FAA regulations

8   there would never be pre-emption indeed state law would just

9   feed on itself.  As reasonable care you exceed in reasonable

10  care you set a new standard.  There numerous case that define

11  pre-emption that under the Federal Aviation Act, the 58 Act

12  that Mary will get into and under the Price Anderson Amendments

13  Act and many other statutes where the defendant could

14  voluntarily have done something more.  But he satisfied his

15  legal obligation by meeting the federal regulations and the

16  states were not entitled to require the defendant to do more

17  than the federal regulations required on pain of liability.

18          THE COURT:  Mr. Joseph would argue that if you can do

19  more it then becomes a question of reasonableness.  Should you

20  do more?

21          MR. PODESTA:  That's because Mr. Joseph reads the

22  statutes it depends with the language where the crash occurred.

23          THE COURT:  I am trying to bring out another point,

24  Mr. Podesta.  The consequence of your argument may be that it's

25  wrong to do more, that it would be a violation of federal

76EAASEPA1                        Argument

1    regulations to do more, that if a passenger were to be stopped

2    doing more that passenger could sue you for denying his

3    entrance to a public transportation vehicle and I am wondering

4    if I am drawing your argument too much.

5             MR. PODESTA:  No.  You are drawing the argument quite

6    correctly.  It is too facile to say --

7             THE COURT:  You are not arguing the minimum.  You are

8    saying exclusive.

9             MR. PODESTA:  Yes.

10            THE COURT:  You can't do more.  You shouldn't do more.

11   You shouldn't do more.

12            MR. PODESTA:  In most instances we shouldn't do

13   anything more or different and it's --

14            THE COURT:  When should you do more?

15            MR. PODESTA:  Well, that gets me -- all right.  There

16   is an element of common sense required under the regulations.

17   That is not a --

18            THE COURT:  Mr. Joseph would rise up --

19            MR. PODESTA:  He might rise.

20            THE COURT:  I'll rise for him.

21            MR. PODESTA:  The federal regulations set forth the

22   exclusive standard to the extent they use words like "common

23   sense" like in judging whether a particular knife is menacing.

24   There might conceivably be a question of fact under the federal

25   standards whether the particular screener or airline --

76EAASEPA1                    Argument

1           THE COURT:  What do I care?  The jury doesn't care,

2     federal or state what the jury cares about and what I care

3     about I am trying to think what I am supposed to do with the

4     trial that is my test.  So I am right to think if Mr. Joseph

5     starts arguing reasonableness, you aren't reasonable, you

6     aren't paying attention then I can't sustain our your objection

7     whether it's federal source or state it makes no difference if

8     it's federal -- of state makes no difference.

9           MR. PODESTA:  Federal standard of common sense that

10    has to be decided in the context of the federal regulations

11    which say that four inch knives are generally permitted, Swiss

12    army knives are generally permitted.

13          THE COURT:  You use words like "generally".

14          MR. PODESTA:  That is the federal standard.  The cog

15    says Swiss army knives are permitted, but the common --

16          THE COURT:  What it generally means, what common sense

17    exceptions mean is that the airlines could argue that I was

18    absolutely reasonable, perfectly reasonable in doing what the

19    federal law required me to do and not doing more and it would

20    be permissible for Mr. Joseph to argue that in the

21    circumstances presented on the morning of September 11, 2001,

22    you should have done more and you would say what is the basis

23    of that.  And the basis of that is common sense.  So you would

24    say as matter of argument that I did what I had to do and you

25    should have done more and the jury would decide.

76EAASEPA1                    Argument

1          MR. PODESTA:  That is true, but that would be decided

2     under the federal regulations.

3          THE COURT:  What is the difference?  The jury doesn't

4     care about --

5          MR. PODESTA:  Because if you just have a naked state

6     law rule you don't have the basic starting point that knives

7     under four inches are permitted unless they are menacing and

8     the common sense comes into place in making a judgment as to

9     whether a particular knife is menacing.  The plaintiffs cont

10    argue we should have banned all the --

11         THE COURT:  I would think I agree with you.  In other

12    words, where there is a specific statement on an absolute -- in

13    the regulation you should follow that.  But where there is any

14    kind of exception for common sense or where words like

15    "generally" are used that suggest looking at circumstance that

16    your conduct could be challenged on standards of reasonableness

17    in the circumstance.

18         The jury doesn't hear whether it's a federal

19    incorporation of the state standard to talk about common sense

20    or not.  What the jury is told is that the regulations say four

21    inches and generally or common sense exception and then the

22    question is is there grounds for an exception.

23         MR. PODESTA:  There could be a question of fact.  I

24    think I agree with the way you phrase it as long as they're

25    told this is what the federal regulation says we're obliged to

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

76EAASEPA1                    Argument

1   follow the federal regulations.  You have to decide, ladies and

2   gentlemen, whether in carrying out that regulation we exercise

3   the --

4          THE COURT:  I am going to want to talk with you more

5   about this after I hear Mr. Joseph.  I think what we're coming

6   down to is something that I quite understand.  It's going to be

7   a difficult instruction to give because I have to incorporate

8   all the specific regulations and deal with the common sense

9   exceptions but it can be done and I think that's what I am

10  learning from you, Mr. Podesta.

11         MR. PODESTA:  You want me to sit down or may I

12  continue?

13         THE COURT:  Well, it's tempted to say yes.

14         MR. PODESTA:  I can voluntarily do more.

15         THE COURT:  I really enjoyed listening to you.

16         MR. PODESTA:  Can I just make one more point then I

17  will sit down complying with your Honor's regulation.  To get

18  back to your point about it's a very differ judgment to

19  determine whether voluntarily exceeding is consistent with the

20  regulations.  For example, we could do more, could have done

21  more than 9/11 by for example singling out all young Arab males

22  or pat-down searches.  That would have been more but it would

23  have been inconsistent with the policy and the regulation.

24         Would it have been doing more to arm our pilots on

25  9/11 and just disregard the common strategy?  Some might argue

1   was doing more, but it would be inconsistent the regulations.

2   The regulations are based on a series of policy judgments that

3   were designed, what is the threat, what is the best measure to

4   meet the threat?  How do I adopt these security measures while

5   still maintaining an efficient air transportation system

6   while still meeting our civil rights obligations to the

7   passengers and that's why the FAA regulations control.

8           They're the ones who were making the judgment as to

9   how to best take into account those various considerations.  A

10  jury 9/11 just given a post reasonable care standard is surely

11  going to focus on security and ignore the other policy

12  consideration the FAA had to take into account.

13          THE COURT:  One of challenges of this trial would be

14  to put the jury in a frame of mine before the events of 9/11

15  clearly and I fully anticipate the very interesting rhetoric

16  that you've just expressed will be heard again in the mouth of

17  an expert.

18          MR. PODESTA:  Yes.  But I would note that rhetoric

19  would be a lot more speculative if we get some of discovery

20  from the government that Mr. Wayland is going to be asking you

21  for and I will try not to jump up, your Honor.

22          THE COURT:  All right.

23

24          MR. ELLIS:  Your Honor, I know you wanted limited

25  argument from one attorney given until last evening that

1   Mr. Podesta would be the only presenter from our side.  He

2   focused on inconsistent with.  I think adds your Honor started

3   to say beginning of his presentation you were interested in

4   pre-empted buy as well and if I would intrude on you too much

5   if you gave me just a couple of minutes I could briefly address

6   it.

7           THE COURT:  Go ahead, Mr. Ellis.

8           MR. ELLIS:  Thank you, your Honor.

9           THE COURT:  Then I think we will break.

10           MR. ELLIS:  Thank you, your Honor.

11           Just briefly, Jeffery Ellis on behalf of United.

12           The language of the statute not only has the words

13   inconsistent with but also has the worlds pre-emptive buy.  And

14   as our supplemental briefing set forth there are three statutes

15   that are at issue that, quite frankly, you need to look at in

16   order to determine what is their pre-empted scheme and what the

17   scope of any pre-empted that might be focused by that scheme.

18           Those statutes are the 1958 Federal Aviation Act, the

19   cases we have cited to unequivocally establish that it was

20   Congress's intent as long back as 1926 to establish a

21   uniformity of regulation.  It is that statute in 1958 that

22   contained in its safety regulatory provisions, a minimum

23   standards provision, as well as a savings of remedy provision

24   for remedies existing at that time.

25           I might add, your Honor, that actually that provision

76EAASEPA1                        Argument

1    goes back to I believe it was 1926 and at that time including

2    in 1958 any intervening criminal act would not allow any

3    recovery for anyone.

4          So the remedies that were saved are saved in that

5    statute.  What is important I think most important in this

6    litigation is the Aviation Security Improvement act which was

7    passed in 1990 in response to Lockerbie.  The Lockerbie

8    decision did not have the Aviation Security Improvement Act to

9    consider because it wasn't in effect.

10          The president established a commission to evaluate

11   aviation security in the aftermath of Lockerbie and to come up

12   with a solution to try and combat what was starting to be a

13   growing problem international terrorism.  The solution that

14   Congress came up with in words of the statute are quite clear.

15   They didn't want to have any screw-ups here.  They wanted to

16   try and set up a system to do the best they could and that

17   system required in accordance with 29 U.S.C. 44904 it

18   specifically required the director of the Federal Bureau of

19   Investigation, the Administrator of the FAA to consult, to

20   decide what are the most effective counter measures to address

21   any deficiencies that they found to exist with respect to the

22   security significance system.

23          Those words most effective correct any deficiency

24   clearly mean what they say.  The system that they mandated to

25   be implemented was supposed to be the most effective and to

76EAASEPA1                    Argument

1   have corrected any deficiencies.  The plaintiffs arguments is

2   in essence, that system was not the most effective.  It wasn't

3   even reasonably effective and there were deficiencies.  That

4   flies in the face of the congressional language that Congress

5   used in the Aviation Security Improvement Act and Section 44903

6   of that section specifically states that that system is

7   supposed to be uniform for every air carrier --

8           THE COURT:  I want to follow your argument.  You are

9   referencing sections 316 A of the public law --

10          MR. ELLIS:  Your Honor, I wish I could tell you, but I

11  think that was it, yes.

12          THE COURT:  It reads as follows:  The administrator of

13  Federal Aviation Administration shall prescribe such reasonable

14  rule and regulations; is that the one?  Is that the section?

15          MR. ELLIS:  I'm reading from the codification, your

16  Honor, but go ahead.

17          THE COURT:  Shall prescribe such reasonable -- I tell

18  you what, let me ask you to look at the book.

19          (Pause)

20          MR. ELLIS:  I think you are looking at the wrong

21  section, your Honor.

22          THE COURT:  I could follow you.  I have it here.  What

23  is the section again?

24          MR. ELLIS:  Your Honor, if you could look at 44904.

25  Domestic air transportation security system.  Your Honor, if

1    this is a good time for a break we can get the stuff and make

2    it easier.

3            THE COURT:  I don't want you to feel pressed.  Let's

4    take ten.

5            (Recess)

6            THE COURT:  Okay.

7            MR. ELLIS:  Thank you, your Honor.

8            I have a copy of the U.S.C., your Honor.  And there

9    were two sections I was going to refer you to.  The first is

10   44904 and that section has three subparts.  The statute itself

11   is entitled Domestic Air Transportation security system.

12   Section A is entitled Assessing Threats and it states:  The

13   administrator of the FAA and the director of the FBI jointly

14   shall assess current and potential threats to the domestic air

15   transportation security system.  The assessment shall include

16   consideration of the extent to which there are individuals with

17   the capability and intent to carry out terrorist or related

18   unlawful acts against that system and the ways in which those

19   individuals might carry out those acts.  The administrator and

20   the director jointly shall decide on and carry out the most

21   effective method for continuous analysis and monitoring of

22   security threats to that system.

23           Section B again ascribes to the director and the

24   administrator director of the FBI and the administrator of the

25   FAA the challenge of assessing security that is in place in

76EAASEPA1                    Argument

1   response to those threats.

2          And Section C, improving security, states:  The

3   administrator shall take necessary actions to improve domestic

4   air transportation security by correcting any deficiencies in

5   that security discovered in the assessment analyses and

6   monitoring carried out under this section.

7          And in conjunction with that, your Honor, Section

8   4944903 Subsection B (3) says:  The administrator shall

9   prescribe regulations to protect passengers and property on an

10  aircraft operating in air transportation or intrastate air

11  transportation against acts of criminal violence or aircraft

12  piracy.  When prescribing a regulation under this subsection

13  the administrator shall and it goes on to state --

14         THE COURT:  To the maximum extent practical to require

15  a uniform procedure for searching and detaining passengers and

16  property to ensure their safety and other criteria.

17         MR. ELLIS:  It also says courteous and efficient

18  treatment by an air carrier.

19         Your Honor, I can tell you that from the pre-emptive

20  aspect of the issues that are before you --

21         THE COURT:  What you are telling me, Mr. Ellis,

22  implementing what Mr. Podesta was telling me is that there is a

23  federal regulatory mechanism that needs to be observed.

24  Whether there is any room for additive im put in terms of words

25  like generally, minimum standard etc. that is the area where

76EAASEPA1                    Argument

1    reasonableness can be exercised.  And to define what is

2    reasonableness we look to what is established in the federal

3    law and to whatever extent appropriate and to the common law.

4           MR. ELLIS:  I would respectfully disagree to this

5    extent, your Honor.  You had asked a question of Mr. Podesta

6    with respect to whether or not the failure to do more could

7    hold airlines liable.  I argue the third, before the Third

8    Circuit the Abdulla case and argue before the Fifth Circuit the

9    Witty case and that was the claim in both of those cases.  In

10   Abdulla it was claimed that American Airlines pilots instead of

11   avoiding a thunder storm by 20 miles should have avoided by 40

12   or 100 miles.

13          THE COURT:  Because of the dangerous nature of that

14   thunder storm.

15          MR. ELLIS:  More safety.  An expert appeared and said

16   that is what they should have done.  The jury came back with a

17   verdict and we moved to set the verdict aside.  The district

18   court judge agreed with us.  He said that federal law

19   pre-empted, you can't argue for more and the Third Circuit

20   agreed.

21          In the Witty case which the Fifth Circuit took a

22   couple of years ago after they had the Hodges case and they

23   clarified what they meant in the Hodges case.  But in the Witty

24   case the argument was I got deep vein thrombosis on your

25   flight.  I got it because I was sitting in a cramped seat.

76EAASEPA1                    Argument

1   What you should have done is two things.  You should have given

2   me more of a warning telling me I could get deep vein

3   thrombosis on an airline flight and you should have given me

4   more leg room.

5           And what the Fifth Circuit said, number one, airline

6   warnings are controlled by federal law.  And airline warnings

7   are prescribed by federal law not to require this additional

8   information.  You can't use that as a basis for liability.

9           The second thing that they said was the Airline

10  Deregulation Act of 1978 precluded a claim requiring you to

11  have more leg room because the net result of that would be

12  increased fares and you can't use state law to try and achieve

13  that result.

14          THE COURT:  I think you'd like me to take note of

15  several holdings in the Witty case.  We hold that federal

16  regulatory requirements for passenger safety warnings and

17  instructions are exclusive and pre-empt all state standards and

18  requirement.

19          MR. ELLIS:  Yes, your Honor.

20          THE COURT:  That's at page 385.  Allowing courts and

21  juries to decide under state law that warnings should be given

22  in addition to those required by the Federal Aviation

23  Administration would necessarily conflict with the federal

24  regulations.

25          Here is another statement.  We do not, for example,

1   express an opinion as to whether emergency or unplanned

2   situations on flights can form the basis of a state failure to

3   warn claim that is not pre-emptive.

4            MR. ELLIS:  Yes, your Honor.  Witty does -- I am

5   sorry, your Honor.

6            THE COURT:  I was just thinking to myself that there

7   is room in these decisions for exercise of reasonable conduct.

8   But the field is very largely occupied by its precise federal

9   requirements.

10           MR. ELLIS:  Your Honor, I would say this, and I'm

11  going to cut my presentation off because you have been very

12  kind to let me say a few words but I will say this, the Abdulla

13  case, the Witty case which I know Ms. Gaston will get into, of

14  course, will say that the entire field is occupied and they'll

15  get into that aspect of it.  But at the end of the day

16  plaintiff's claim boils down to them saying that what the FAA

17  was mandated to do by statute, namely, correct any deficiencies

18  in the current system they didn't do and that we can be held

19  liable for that.  Not only do we say federal law pre-empts that

20  argument, but I would also say this, your Honor, they do not

21  dispute the fact --

22           THE COURT:  I would like to hear that after I hear

23  from Mr. Joseph.

24           MR. ELLIS:  And I will just end with one thing, to the

25  extent they claim that state law actually imposes higher

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

76EAASEPA1                    Argument

1   security requirements there is absolutely nothing --

2          THE COURT:  Save that too.

3          MR. ELLIS:  Okay.  Thank you very much.

4          THE COURT:  Ms. Gaston.

5          MS. GASTON:  May it please the Court, your Honor, Mary

6   Gaston, on behalf of the Boeing company.

7          As your Honor is aware, Boeing moved independently for

8   a determination of the applicable law.  Boeing did that, your

9   Honor, for a very simple reason.  All of the claims against

10  Boeing.

11         THE COURT:  Speak a little louder, please.

12         MS. GASTON:  Yes, your Honor.

13         All of claims against Boeing are predicated on the

14  factual allegation that the planes that were hijacked on 9/11

15  were defectively designed.  Because the issue of whether

16  Congress has pre-empted the area of aircraft design depends on

17  an analysis of Federal Aviation Act of 1958 and its predecessor

18  statute.  That is the reason Boeing moved independently, your

19  Honor.  It required this Court to construct whether Congress

20  intended to pre-empt the field of aircraft design from state

21  regulation.

22         And I'd like to start there, your Honor, because of

23  something that you just mentioned.  You indicated that you felt

24  that there was room in state law to both impose the federal

25  regulations which you recognize are extensive as well as impose

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    state tort law.

2           THE COURT:  No, I don't think so.  If I said that I

3    don't think that was an accurate reflection of what probably is

4    the case.  What I thought to say was that where there are

5    issues of reasonableness probably they are federally sourced,

6    but that since there is so little definition in federal law of

7    standards and care, undoubtedly, the federal law would

8    incorporate much of what the common law has developed.

9           I keep thinking, Ms. Gaston, how I am going to apply

10   the information today.  Presumably, it's in jury instructions.

11   Presumably it will be in terms of objections.  It may also be

12   in the kinds of evidence that will be presented, for example,

13   expert evidence.  None of which is before me.  So, largely,

14   this can be informational.  I don't know.  But there is no

15   motion to dismiss.  There is no motion for summary judgment

16   before me.  But it's very important material that is been

17   presented because it does inform how we all think about these

18   cases.

19           MS. GASTON:  That clarification, your Honor, is very

20   helpful.  It is very helpful in a couple of contexts,

21   specifically, with regard to the Court's discussion of minimum

22   standards.  Turning to Section 408 B 2, your Honor, of the

23   Stabilization Act which simply has the language in it that

24   state law will be applied only if it is inconsistent or

25   pre-empted.

76EAASEPA1                    Argument

1          Mr. Podesta covered at length the inconsistent

2     provision.  And I am going to occupy the field, your Honor,

3     because I am going to devote almost all of my discussion to the

4     issue of field pre-emption.  But I would like to make one

5     comment with regard to the inconsistent as it relates to

6     Boeing.

7          You asked for examples of where there were any

8     inconsistencies and we pointed out in our brief, your Honor,

9     that as I mentioned earlier they are suing Boeing alleging that

10    the door, the cockpit door was allegedly defective because it

11    didn't prevent this hijacking.

12          On a totally collateral note, we've moved for summary

13    judgment on the issue of causation that there is no linkage

14    between the door and the hijacking.  But, nonetheless, before

15    the Court is the briefings on the standard of care which is why

16    Boeing obviously submitted its Boeing motion.

17          With regard to that claim that the doors were

18    defective and should have prevented a hijacking, we pointed out

19    to the Court that this was an issue that the FAA specifically

20    looked at back in the early 70s.  The FAA explicitly published

21    a notice of rule making, identifying that the issue of

22    hijackers getting into the cockpit and harming the crew and

23    taking over the plane was a matter of concerning to the FAA.

24    And at FAA, therefore, put out a variety of rules suggesting

25    ways that the cockpit could be made more intrusion resistant.

76EAASEPA1                         Argument

1    And over the course of several years it considered those

2    options.  And ultimately, your Honor, the FAA rejected any

3    additional cockpit intrusion resistant measures for safety

4    reasons.

5             We have provided that the federal registry sites in

6    our brief, your Honor.  The point of that is only that it would

7    be inconsistent for obvious reason to hold Boeing liable under

8    state tort law for an issue that the FAA, explicitly, as the

9    determiner of aviation aircraft design safety determined was

10   not appropriate.

11            THE COURT:  I'd like you to take me through the

12   applicable regulations.

13            MS. GASTON:  I will, your Honor, if you could just

14   give me one second.

15            (Pause)

16            MS. GASTON:  The FAA notice of proposed rule making

17   was first published in the federal register at volume 35 number

18   145 on Tuesday July 28, 1970 and it was docket number 1046D

19   Notice of Proposed Rule Making 70-20.  The name of the proposed

20   rule was Pilot Compartment Security Large Passenger Carrier

21   Airplanes.  And in there, your Honor -- I don't know that I

22   have the page in the federal register -- but on a second column

23   in the proposed rule making it specifically identifies that

24   despite concerted efforts being made by the FAA and air

25   carriers incidents continue to occur within the safety of the

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

76EAASEPA1                        Argument

1    flight of aircraft engaged in passenger carrying operations

2    under part 121 of the -- has before jeopardized by persons

3    intending to harm the crew or take command of the aircraft.

4              In the context for this is, obviously, your Honor, the

5    rash of hijackings that were occurring in the 1960s.  The

6    notice of proposed rule making goes on to discuss a variety of

7    ways that they could increase the security of, for example, the

8    cockpit door by improving the hinges, by improving the locking

9    mechanism.  It did discuss a way to permit the crew to view

10   through the doors and a variety of other measures.

11             Approximately two years later there were additional

12   security measures proposed by the FAA in conjunction with that

13   same rule and it dealt with bulletproofing the cockpit,

14   additional means that could be taken to protect the pilot in

15   the event of a hijacking.

16             That occurred on Friday March 17, 1972 and was

17   published in the Federal Register, volume 37, number 53.

18             Ultimately, your Honor, after receiving public

19   comments, I believe they received approximately 20 different

20   public comments, On Thursday September 27, 1973 Federal

21   Registered, volume 38, number 187, the FAA published notice

22   that it was withdrawing its proposed rule making notice 72-7

23   which was the subsequent number.  You have to kind of walk it

24   through to follow the numbering.

25             And the FAA explained why it was that it did so.  It

76EAASEPA1                    Argument

1    explained that in light of the, what it referred to here as the

2    comment strategy, the FAA approved way of dealing with

3    hijackers.  It referred to the fact that it was unlikely that

4    simply strengthening the door would actually result in

5    hijackers not entering the compartment because the pilot would

6    let them in any way with a threat to a passenger or crew

7    member.  It did you say the fact that there was the fear that

8    pilots negotiating behind a secured door might actually trigger

9    more violence.  The FAA actually discussed the fact that it

10   also may increase the use of explosives to get into the

11   cockpit.  But the bottom line, your Honor, is these types of --

12           THE COURT:  What you are saying is that there was a

13   deliberate decision on the part of the agency regulating air

14   craft manufacturer not to have intrusion proof doors.

15           MS. GASTON:  That is correct, your Honor.  And the FAA

16   has made clear --

17           THE COURT:  That's preclusive.  What you are saying is

18   that since the FAA made a conscious deliberate decision after

19   proposed rule making not to do it.  Then the states don't have

20   the power, common law or statute to mandate doing it.

21           MS. GASTON:  I agree, your Honor.

22           THE COURT:  That's your argument.

23           MS. GASTON:  I agree, your Honor, for two different

24   reasons.  First because of conflict pre-emption because it

25   would be inconsistent for the states to require something which

76EAASEPA1                    Argument

1    the FAA has decided not to do.  So under classic conflict

2    pre-emption and in fact under the -- decision of 2000 that

3    conclusion is mandated.  You cannot force, the states can't

4    force the manufacturers --

5              THE COURT:  That is what I was trying to say.

6              MS. GASTON:  But the second issue is equally important

7    and that is you cannot do it because the issue -- because

8    Congress has decided that the field is occupied and that is

9    important, your Honor, and that is what I'd like to focus my

10   attention on.  I'd actually like to discuss --

11             THE COURT:  I don't think you need to say much about

12   that.  This is aircraft design state to state.  It's not a

13   matter of having state interest.  State can supersede the

14   federal interests.  It is clearly an argument for commonality

15   here.

16             MS. GASTON:  I would agree.

17             THE COURT:  I think you can reserve on that point.  If

18   it's raised you can come back but I think that point is clear.

19             MS. GASTON:  Okay.  In that case, your Honor, the

20   reason I had and intended to focus the discussion on field

21   pre-emption is because it seems from the judge's comments that

22   where there were minimum standards, and there is no question

23   that that language is in the Federal Aviation Act --

24             THE COURT:  You are saying that the Federal Aviation

25   Administration deliberately decided that it did not want

76EAASEPA1                    Argument

1    intrusion proof doors being manufactured on airplanes.

2              MS. GASTON:  Right.

3              THE COURT:  Because in its judgment it thought it was

4    counterproductive.  That is a very important decision.  Now, I

5    guess the way it decided it may be important and why they

6    decided it may be important.  But you are telling me that this

7    was a deliberate, conscious decision weighing the pros and cons

8    of the situation and exercising judgment by the federal agency

9    and how it exercises such judgment.

10             MS. GASTON:  That is correct, your Honor.  But given

11   the creativity --

12             THE COURT:  Why didn't you move for summary judgment.

13             MS. GASTON:  My expectation that we will after you

14   rule on our causation position.

15             THE COURT:  Well, I ruled against you on causation.

16   No, on duty.  But the causation argument is a different

17   argument.

18             MS. GASTON:  That is correct, your Honor.

19             THE COURT:  You are saying that the argument of

20   negligence is faulty because you did what the feds told you to

21   do.

22             MS. GASTON:  That's correct, your Honor.

23             THE COURT:  Well, it's a different argument from that

24   which was made before.  The argument I ruled against you was on

25   duty.  The issue of proximate cause is, I think, factor and

76EAASEPA1                     Argument

1    very much depends on the issue of intervening cause.  But

2    that's not why we're here today.  We are talking about standard

3    negligence and you are saying that you complied with standards.

4           MS. GASTON:  Your Honor, yes, I am saying that we

5    complied with the standard including the standard with regard

6    to the cockpit door and we did exactly what the FAA told us to

7    do.  There are also, however, this plaintiff's complaint, some

8    more amorphous allegations of numbers against Boeing where they

9    allege that the plane is defective but they don't allege with

10   any specificity how the plane is defective.

11          The concept of field pre-emption, therefore, is still

12   applicable.

13          THE COURT:  Well, at this point in time I think we're

14   going to need some more definition.  I want to read out the

15   portion of my decision on duty reported at 28 F.Supp 2d 279

16   having to do with Boeing.  It appears at pages 307 and 308 of

17   the decision.

18          Boeing also argues that the regulations of FAA

19   relating to the design of passenger airplanes did not require

20   an impenetrable cockpit door and thus it designs which

21   satisfied FAA requirements could not be defective.  However,

22   the only support provided by Boeing of its argument is after

23   the fact FAA policy statement issued to explain why the FAA in

24   2002 was requiring airplane manufacturers to provide such doors

25   even though the FAA previously had not done so.

76EAASEPA1                    Argument

 1          And what you are doing now is going back to 1973 and

 2   showing me that this had been a conscious decision much earlier

 3   and controlled what was done in relationship to aircraft that

 4   were flown on September 11, 2001.

 5          MS. GASTON:  That is correct.

 6          THE COURT:  Why don't we reserve everything else until

 7   after we here from Joseph?

 8          MS. GASTON:  Will do.

 9          Thank you very much, your Honor.

10          MR. WOOD:  My name is Mark Wood and I am counsel for

11   Massachusetts Port Authority, although, this morning I am also

12   speaking on behalf of Dulles International Airport and Newark

13   International Airport.

14          Your Honor, I will try to be brief and not to repeat

15   what has been gone over by my colleagues.

16          THE COURT:  I won't let you.

17          MR. WOOD:  I am sure of that.  I have previous

18   experience.

19          After the airport operators, of course, there is about

20   airport security, this case.  And we seek a ruling that federal

21   law assigns the airport security responsibilities.  In other

22   words, you have to look at federal law to find out at an

23   airport, JFK or Logan or any other of these airports in the

24   country, you have to look at federal law to find out what the

25   security responsibilities are and one of the reasons --

 1          THE COURT:  Doesn't Mr. Ellis's argument on

 2   pre-emption and Mr. Podesta's argument on an inconsistent with

 3   and the specific statutes given to me by Mr. Ellis really say

 4   what you want to say?

 5          MR. WOOD:  Well, it does, your Honor.  If you would

 6   also note that at pages ten to 14 of our opening brief we have

 7   other specific statutes and regulations that are apply

 8   specifically, your Honor, to airports.

 9          THE COURT:  Let's go to those.  Go right to the extra

10   stuff.

11          MR. WOOD:  Okay.

12          THE COURT:  I have your brief in front of me.

13          MR. WOOD:  We start out with -- if you look at page 11

14   at 49 U.S.C. 449003B and in those sections Aviation Act

15   specifically delineates security responsibilities.

16          I think if you look at the brief rather than have me

17   treck through all of this, your Honor --

18          THE COURT:  You know, Mr. Wood, I learned in law

19   school that you go to the source.  Stay you away from secondary

20   stuff.

21          MR. WOOD:  And if you go to the source you find out

22   that the administrator of the FAA is directed to prescribe

23   regulations requiring preboarding screening and that's the

24   obligation of the air carrier.

25          THE COURT:  Administrator shall prescribe regulations

76EAASEPA1                      Argument

1   to protect passengers and property on an aircraft operating in

2   air transportation or intrastate air transportation against an

3   act of criminal violation or aircraft piracy 44903B.  That's

4   what Mr. Ellis read.

5           I really want to move you into new stuff.  Let's

6   assume that one of the requirements that Congress required of

7   you -- decide to consented to the President's Act is I knew how

8   to read and remember.  So let's go from there.

9           MR. WOOD:  The same act then talks about what the

10  airports are to do which Mr. Ellis didn't talk about and that

11  is the administrator will prescribe rules and regulations.  I

12  am looking at 44903C2A to address access control by carrier at

13  an airport operates and to take measures to improved system of

14  access control.

15          And the way, your Honor, if you look further in our

16  brief that that is done is under 14 CFR Section 107.  And under

17  107 there is a whole many pages of specifics federal

18  regulations on how that is to be done.  You have to give badges

19  to people who use the doors.  You have to keep the doors

20  looked.  You have to put a fence up around your airport and a

21  number of other things.

22          This is very carefully, specifically set out as to how

23  security at an airport is to be handled and it is divided up

24  among three parties.  It is divided up among the airport

25  operator, the airlines that are using the airport and the FAA.

1          And the FAA, your Honor, in 49 U.S.C. Section 44933B3

2     are directed to supervise and to approve the way these

3     responsibilities are being carried and that has to be done with

4     a written plan, your Honor, an ASP that we talk about for the

5     airports and by a written plan for the airlines.  And once

6     those are approved you can't deviate from those plans at Logan

7     or Dulles or Newark without having the FAA approve the

8     deviation that you would like to implement at your airport.

9          THE COURT:  Each airport has a federal security

10    manager appointed by the FAA?

11         MR. WOOD:  Yes, your Honor.

12         THE COURT:  And that manager is to receive

13    intelligence information related to aviation security.

14         MR. WOOD:  One of his duties.

15         THE COURT:  And insure and assist in the development

16    of a comprehensive security plan for the airport, establishing

17    each carrier's responsibility.

18         MR. WOOD:  Yes, your Honor.

19         THE COURT:  And measures to be taken during periods of

20    normal aircraft operations and during periods where the manager

21    decides that there is a need for additional airport security.

22         What else is there to look at?

23         MR. WOOD:  I think the other point is that if you are

24    going to deviate from what that regional administrator has

25    approved that you can do at Newark Airport you have to get

76EAASEPA1                        Argument

1    specific authorization and approval from him in order, or her,

2    in order to do that.

3              THE COURT:  Where does it say that?

4              MR. WOOD:  It's found, your Honor, in Part 107.3A.

5    The citation would be 14 CFR 107.3A.  It's a requirement that

6    the airports adopt and carry out a security program that must

7    be approved by the director of civil aviation security by the

8    FAA.  And for example, your Honor, and this applies to the

9    airlines with the manual or with the approved plan that we were

10   talking, Mr. Ellis was talking about.  American airlines out

11   at --

12             THE COURT:  Let me ask this question.  This fellow is

13   a federal appointee, the security manager?  He is a federal

14   appointee?

15             MR. WOOD:  Yes, he is.

16             THE COURT:  If he is a federal appointee and he makes

17   a mistake the airport authority doesn't get blamed, does it?

18             MR. WOOD:  Well, if the airport authority follows the

19   approved plan it doesn't get blamed, that's correct.

20             THE COURT:  So the question then becomes, is there

21   anything in the regulations that apply to the airport authority

22   which gives judgment in and discretion to the airport

23   authority.

24             MR. WOOD:  Not with respect to the delineation of

25   these responsibilities.

1            THE COURT:  Well, you are saying then --

2            MR. WOOD:  If Dulles couldn't decide, we're going to

3    start screening passenger.  They're not authorized or approved

4    in the ASP to do that.  And without getting the FAA's approval

5    to do that they couldn't do that.  It would be illegal to do

6    that.  And of course the reason for this, your Honor, is that

7    if it's everybody's responsibility for security at an airport

8    then nobody's accountable and --

9            THE COURT:  So who is responsible at Dulles?

10           MR. WOOD:  At Dulles it is very specifically set out

11   that the responsibility, for example, for screening passenger

12   and cargo carriers are the air carriers.  It's set out by

13   Congressional statute --

14           THE COURT:  So your argument is that there is no room

15   for liability on the part of airport authority?

16           MR. WOOD:  Not as to that defining responsibility.

17           THE COURT:  What is the argument of liability on the

18   part of the airport authority?

19           MR. WOOD:  What is the plaintiff's argument against

20   the airport authorities?  Well, in the master complaint, your

21   Honor, it is so vague and amorphous.  That was one of the

22   reasons we came in with a motion to dismiss.  We don't know.

23   We're responsible for a safe airport.

24           THE COURT:  You don't know why you are being sued?

25           MR. WOOD:  That's basically what the contention is we

1    are responsible for a safe airport.

2            THE COURT:  You are saying that as long as I've

3    delegated to the right people, that is all I have to do.

4            MR. WOOD:  No.  What I am saying is that as long as we

5    have complied, not negligently complied with the

6    responsibilities that are assigned to us under this federal

7    scheme then we're not liable.

8            THE COURT:  Do you know what, if any, aspect of

9    responsibility is complained of as actionable against you?

10           MR. WOOD:  Not other than operating a safe airport

11   there has been no allegation -- Someone came through a fence or

12   a door.

13           THE COURT:  Why don't you reserve until after

14   Mr. Joseph speaks.

15           MR. WOOD:  If I could just make one other part --

16           THE COURT:  I think you should reserve.  Since you

17   don't know, then there is no point in arguing.

18           Mr. Joseph, you are going to divide it up in, I guess,

19   the same sequence as we heard this morning.

20           MR. JOSEPH:  Speaking for the plaintiffs, my argument

21   going to be direct primarily to the airlines in the security

22   companies.  We did not sue the airport operators.

23   Mr. Williamson can address that.  I may cover Boeing a bit

24   because the statute -- I'm going to go through a statutory

25   analysis was your Honor as I believe your Honor has indicated a

 1    penchant to do and I will touch on the Boeing issue as well.

 2    But I am not first in that.  Mr. Williamson will do that.

 3            THE COURT:  Mr. Williamson, you will do Boeing and

 4    airport authority.

 5            MR. WILLIAMSON:  Yes, your Honor.

 6            MR. JOSEPH:  Your Honor, let me begin with

 7    inconsistent with.  I am not going to go definitionally first.

 8    We actually have some learning from Second Circuit as contours

 9    as inconsistent with.  We have some legislative history, but

10    I'll come back to that.  Let's just take it in a colloquial way

11    from now.

12            If Congress said they didn't want actions to be

13    premised on notions that were inconsistent with federal law

14    what is it that Congress would have in mind?  What was it that

15    the industry, that the FAA said these regulations meant?  Were

16    they a pass, a free pass if they were honored to go forward or

17    were they minimum standards because of the statutory duty to

18    exercise the highest possible degree of safety in the public

19    interest?

20            And your Honor if you have our declaration handy that

21    might be useful.

22            THE COURT:  Yes.

23            MR. JOSEPH:  Exhibit 19 of that declaration is from

24    the FAA web site as it existed on 9/11.  At the top of page

25    you'll see it's dealing with civil aviation security.  So this

76EAASEPA1                    Argument

1   is what the FAA thought on 9/11 with respect to civil aviation

2   security.  If you look at the third question on the first page,

3   can an airline exceed FAA minimum requirements?  Answer:  Yes,

4   the FAA sets minimum requirements for airlines to follow.

5   Should airlines wish to exceed those requirements, the FAA

6   cannot prohibit them from doing so.

7              And if your Honor will with me turn to page four of

8   five, again, this is the printout from the FAA web site.

9              THE COURT:  This responds directly to Mr. Ellis's

10  argument.

11             MR. JOSEPH:  Exactly, your Honor.

12             THE COURT:  Of Abdulla and Witty teach that the

13  regulations are conclusive.

14             MR. JOSEPH:  Your Honor, the Abdulla case deals with a

15  specific regulation that specifically sets out a standard of

16  care.  We have a small statutory compilation for your Honor

17  that might be handy, if I could hand it to you and opposing

18  counsel that I will be referring to.

19             THE COURT:  Yes.

20             MR. JOSEPH:  Your Honor, Abdulla standard is number

21  nine in here, the last one.  It's 14 CFR 91.13, careless or

22  reckless operation.  And it says, A, aircraft operations for

23  the purpose of air navigation.  No person may operate an

24  aircraft in a careless or reckless manner so as to endanger the

25  life or property of another.  Here the FAA has spoken and set

1   forth a standard of care and that is a standard of care that

2   does not apply to security.

3        We have a statutory standard of care which is in the

4   first tab 44701, Subdivision D.  And this is in prescribing

5   regulations which includes security regulation.  It says when

6   prescribing regulation or standard under Subsection A or B --

7        THE COURT:  Slow down.

8        MR. JOSEPH:  Subsection D is the last subsection on

9   the last threes line up from the bottom.  When prescribing a

10  regular or standard under subsection A or B of this section or

11  any of other sections of this title, the administrator shall,

12  one, consider, A, the duty of an air carrier to provide service

13  with the highest possible degree of safety in the public

14  interest.

15        Now, this statute has a predecessor which the Second

16  Circuit has spoken on and said that this is the standard in the

17  security case.  The predecessor statute is Section 601 of the

18  1958 Act which we have as Tab 7.

19        THE COURT:  That one that says minimum standards.

20        MR. JOSEPH:  The minimum standards is here also at the

21  top of the same page.  This is as it is on 9/11 Subdivision A

22  at the top.  The administrator of the Federal Aviation

23  administration shall promote safe flight of civil aircraft in

24  air commerce by prescribing -- and if you skip down to

25  subdivision five -- regulations a minimum standards for other

1    practices, methods and procedures the administrator finds

2    necessary for safety in air commerce and international

3    security.

4           And when we get to it I'll show that the security

5    regulations cite this statute and the next one which says the

6    same thing as authority for the regulations.  So minimum

7    standards are premised with the regulations, the highest degree

8    of safety is the premise, and this existed back throughout the

9    time we're dealing with through since 1958.  I believe it's

10   subdivision tab 6.  I believe it's tab four, your Honor.

11          This is the 1958 version which says exactly the same

12   thing in another order.  In Section 601A at the top it says the

13   administrator is empowered and it shall be his duty to promote

14   safety of flight of civil aircraft and air commerce by

15   prescribing and revising from time to time such minimum

16   standards governing the designs, materials, workmanship

17   construction and performance -- and if you skip all the way

18   down to six -- such reasonable rules and regulations or minimal

19   standards governing other practices, methods and procedure as

20   the administrator may find necessary to provide adequately for

21   national security safety and commerce.  And subdivision B

22   states again in prescribing standards, rules and regulations.

23   And in issuing certificates under this title.  The

24   administrator shall give full consideration resting upon air

25   carriers to perform their services with the highest possible

76EAASEPA1                     Argument

1    degree of safety in the public interest.

2           In 1975 the Second Circuit had a hijacking case

3    refusal of -- it was called Williams against TWA.  And Williams

4    TWA 509 F.2d at 946, the Court says that under this statute and

5    under the common law in dealing with these court obligations

6    the airline has the duty to exercise highest possible degree of

7    safety.  And in effect it would be remarkable if any court

8    ruled otherwise that when millions of lives are at stake the

9    defendants have a duty other than to exercise the highest

10   possible degree of safety in the public interest.

11          So we have then minimum standards in the statute.  We

12   have as I started to show you from the FAA web site, the FAA

13   says, these are minimums.  If your Honor would turn on Exhibit

14   19 to page 4 it is actually even more specific on screening

15   issues since that's come up today.

16          It's page 405 at the top.  It's 513 at the bottom.

17   The first question at the top:

18   "Q. Why can I carry the same item through bun passenger

19   screening check point and not through others?

20   "A. Some airlines or airports have stricter interpretations of

21   deadly and dangerous items.  What one airline will allow, other

22   airlines will not.

23          Next question.

24   Q.  What items are prohibited beyond the passenger screening

25   check point?

```
 1    A.   The FAA prohibits airlines from allowing dangerous or
 2    deadly items through the passenger screening check point.
 3    Because of the subjective description of dangerous or deadly
 4    items it is the airlines' responsibility to determine what they
 5    will allow.  Most airlines will prohibit items such as
 6    scissors, tray tools and items resembling firearms.
 7              There was no question that if we just tak inconsistent
 8    with as a colloquial use of language, what the FAA thought,
 9    what Congress is presumed to have thought they were dealing
10    with minimum standards that there was discretion.
11              THE COURT:  What is the legal strength of this
12    document?
13              MR. JOSEPH:  Your Honor, it is some deference if you
14    find it persuasive.  I'm going to go through the statutory
15    basis for why it should be given.  It's some deference because
16    it's not an official one.  I intend to go through statute,
17    regulation --
18              THE COURT:  Mr. Joseph, don't rush it.
19              MR. JOSEPH:  Thank you, your Honor.
20              We went through Exhibit 12 before which is the
21    associated administrator of the FAA for civil aviation security
22    saying that security directives established security minimums.
23    That gentleman's predecessor, that was '96, issued a similar
24    statement a letter in 2001, two months before 9/11 and that's
25    Exhibit 14 of the binder you have before you.
```

76EAASEPA1                    Argument

 1              THE COURT:  I have it.

 2              MR. JOSEPH:  All right.  Your Honor, the second

 3      paragraph beginning in the fourth line at the end of the line

 4      the sentence begins:  The Federal Aviation Administration, FAA,

 5      provides guidelines for air carriers to determine what may

 6      constitute a deadly or dangerous weapon.  While airlines are

 7      required to meet certain standards, they possess the final

 8      decision to impose more stringent restrictions for carry on

 9      items.

10              THE COURT:  This letter by Michael A. Caravan,

11      associate administrator for civil aviation security has what

12      effect?

13              MR. JOSEPH:  Again, your Honor, an expression of an

14      agency's view that is not codified is due some deference if

15      your Honor finds it persuasive.  But since we're dealing with

16      what Congress had in mind when its issuing a statute that says

17      inconsistent with, we suggest that it is worth deference --

18              THE COURT:  I certainly have to look at it.

19              MR. JOSEPH:  It will depend on whether you find it

20      persuasive.  We saw what 44701 and afterwards 44702 says the

21      same thing.  The highest degree of public safety and minimum

22      standards.  And this is completely consistent with a minimum

23      standard analysis.  It is more than just the FAA though because

24      the airlines themselves were aware of this.  But before I leave

25      the FAA there was discussion by counsel earlier -- I believe it

76EAASEPA1                        Argument

1   was by Mr. Podesta -- of an ACSSP and various provisions of the

2   ACSSP.  And the argument was if we follow the ACSSP we're

3   blessed.  That isn't what they were told by the FAA and it

4   isn't what they told their own ground coordinators.

5            And if your Honor would look with me at Exhibit 25 in

6   the binder before you, this is a PowerPoint presentation by an

7   FAA employee, Annmarie Avala who was the principal security

8   inspector for U.S.  Airways an employee of the FAA.  Your

9   Honor, the last -- the second to the last page of this

10   exhibit -- 233 is the Bates number at the bottom -- is entitled

11   program oversight and it's a talking about prescreening, the

12   first dashed item dealing with this is U.S.  Air carriers must

13   follow the air carrier standard security program, ACSSP

14   requirements.  And then if you look at the last line of text on

15   the page, and her comments it is says U.S.  Airways may go

16   above and beyond the requirements.  Everybody understood on the

17   FAA side and on the airlines side these are minimum

18   requirements.

19            And the next exhibit in the binders, Exhibit 26, which

20   is a set of PowerPoints three weeks before 9/11 that were put

21   together by U.S.  Air to instruct the ground security

22   coordinators, the initial training August 21, 22 and 23 of

23   2001.

24            And if you will turn with me, your Honor, to the Bates

25   numbered page.  It's about third from the end.

76EAASEPA1                    Argument

1            THE COURT:  Okay.  This is --

2            MR. JOSEPH:  This is a U.S. Air document.  This was

3    not to show what the industry actually understood.

4            THE COURT:  Who is presenting?

5            MR. JOSEPH:  All we know is that they've produced it

6    as a PowerPoint.  It's being given as training to their ground

7    security coordinators.

8            THE COURT:  U.S. Air?

9            MR. JOSEPH:  U.S. Air.  The first textural paragraph

10   on page 2426 beneath the PowerPoint.  The PowerPoint says base

11   line security measures.  The explanatory text beneath it reads:

12   The ACSSP manual establishes base line security measures.

13   These measures are the minimum requirements necessary for each

14   carrier.  Each carrier may implement more restrictive measures

15   when deemed necessary.

16           Contrary to what your Honor is being told now the

17   airlines did not on 9/11 believe that they could and should do

18   only what was required, what the base line was.  That is

19   evidence.  Or we would not dispute that that is evidence of

20   their compliance with the standard of care.  It is not

21   dispositive.  The circumstances determine that.  And we are

22   going to go into a few moments to the check point operations

23   guide and even the ACS that's more discretion because all of

24   these are context driven.

25           But I just want to step back for a second.

76EAASEPA1                    Argument

1            THE COURT:  Supposing I agree with you.

2            MR. JOSEPH:  Yes, your Honor.

3            THE COURT:  What is the practical consequence of

4   today's exercise?

5            MR. JOSEPH:  Let me read Lockerbie instruction because

6   this is what we would like, something like that standards of

7   care Lockerbie was a Warsaw Act case.  This was the

8   instruction:  Mere compliance of government regulations --

9            THE COURT:  Slowly, please.

10           MR. JOSEPH:  Mere compliance with government

11  regulations is not necessarily proof of absence of willful

12  misconduct, a much higher standard because it was a Warsaw

13  convention case.  Compliance where government regulations is

14  not necessarily proof of absence of willful misconduct.  You

15  may, for example, find that the circumstances existing for the

16  security of Flight 103 on December 1, 1988, required the

17  defendants to provide security measures in addition to the

18  minimum standards required by the FAA regulations and the

19  ACSSP.  And that's really where we are, your Honor, that what

20  Lockerbie said, what the FAA said.

21           THE COURT:  So what you want is ruling that one

22  instruction over another will be appropriate.

23           MR. JOSEPH:  Correct.  That that is something that is

24  evidence --

25           THE COURT:  Like a motion in limine.

76EAASEPA1                     Argument

1          MR. JOSEPH:  Like our precharge conference, your

2     Honor.

3          THE COURT:  Way too early though.

4          MR. JOSEPH:  We didn't file the first brief but we are

5     not going to sit quietly by when it is filed.

6          THE COURT:  I think this is very, very useful and

7     important.

8          MR. JOSEPH:  Your Honor, what I don't want to do is --

9          THE COURT:  The later -- Younger taught trial advocacy

10    better than anybody else and one of the things I took from him

11    is that when you prepare a trial you prepare for what you'll

12    say last and what the judge will instruct last.  So in effect

13    you are conditioning me, both sides, of what I have to say to

14    the jury and that conditioning will influence everything you do

15    during the trial.  So therefore it is important.

16         MR. JOSEPH:  Your Honor, what I don't want to do is

17    wear the patience of Court.

18         THE COURT:  I'll let you know.

19         MR. JOSEPH:  I would like to turn to a few provisions

20    in check point operations guide.

21         THE COURT:  The reason I want you to do this slowly,

22    Mr. Joseph, is because I have to deal with text and I need to

23    absorb the text and you are giving me a run through of the

24    applicable text.  So I need to be absorb what you say and I

25    think everyone else needs to absorb.  You are doing what is

1    essential.  Take your time to do it.

2              MR. JOSEPH:  Thank you, your Honor.

3              If we could turn to Exhibit 10 in the compilation

4    which is the check point operations guide.  And there is lot in

5    the briefs about this document which is something that is --

6    let's be candid.  There is no question there are uniformed

7    procedures.  The only question is whether that's the be all and

8    end all or whether, in fact, they have discretion and a duty to

9    exercise that

10             THE COURT:  I think Mr. Podesta agreed that this is an

11   exercise in discretion and that charge I have to give and it's

12   not the Lockerbie charge, but the charge I have to give has to

13   take into consideration what the check point people are

14   instructed to do and what element of discretion they have and

15   what standards you should govern that element of discretion.

16   And I have a feeling that at the end of today there is going to

17   be a large area of agreement.

18             MR. JOSEPH:  I think looking a check point you'll see

19   that they have complete discretion whenever there was any

20   threat potential threat to safety.

21             THE COURT:  That begs the question of what I was

22   asking Mr. Podesta about how do we deal with this computer

23   generated heightened threat analysis.  You know, I don't want

24   to disturb your --

25             MR. JOSEPH:  Your Honor, in 2007 if there is anybody

1    who suggest that there is not anti-air -- in the United States

2    would be a lie, but in 2001 we hadn't had 9/11.  Nobody knew

3    who Osama Bin Laden was.  We're concerned now about focusing on

4    what was going on in 9/11.  Ticketing agents -- and we have

5    testimony about this -- had the discretion to put somebody into

6    the CAPPS system.  It wasn't just the computer profile.  There

7    is nothing preclusive.  Safety is the paramount goal.  And we

8    have testimony from a person named Ernie Miller to that effect.

9            THE COURT:  I would believe that.  But the question is

10   what are the criteria that allows someone to do that?  And

11   we're a little frustrated because of what Ms. Goldman said

12   before about we don't know what the criteria are and we're

13   concerned that profiling by ethnicity may not have been

14   appropriate.

15           MR. JOSEPH:  Your Honor, these people were computer

16   generated selectees.  These people looked suspicious.  It

17   wasn't ethnicity.  But if that's an argument they want to make

18   that it was because they were concerned about issues whether

19   you call it political correctness or legitimate concern about

20   people's rights, they can make the argument.  But it's a

21   factual determination.  We don't determine if -- this isn't

22   even a 56 motion on motion a determining the applicable

23   standard of care.  The applicable standard of care is set forth

24   in Williams and Lockerbie.  It's a high standard of care and

25   it's reasonableness the circumstances given that duty.

76EAASEPA1                    Argument

1              THE COURT:  Federal standard you are saying.

2              MR. JOSEPH:  Williams says the common law in the

3    states is the same.  The reason we focused on the state

4    standards access says you apply state law unless it's

5    inconsistent and there's no inconsistency.  I think we're

6    saying the same thing though.

7              THE COURT:  You know the trouble with dealing with

8    large abstractions is they appear to be a guidelines but they

9    cause more trouble because your experience, my experience,

10   Mr. Podesta and Ms. Gaston, everything depends on the

11   particular matter before the Court, particular document that's

12   given before the Court, the particular expression of a witness.

13   It's very hard to deal in limine with these kinds of issues.

14             MR. JOSEPH:  You are right, your Honor.  We were on

15   Exhibit 10 which is the check point operations guide.  If your

16   Honor will turn to the second page of the document, page 11991.

17   It's the preface, this applies to the entire check point

18   operations guide.  And if you look at the fourth paragraph it

19   says the cog as is inclusive as possible.  However, some

20   situations do not lend themselves to specific procedures.

21   Screeners, supervisors and managers must keep in mind that some

22   day-to-day situations will require -- will occur that require

23   on-site decisions.  Discretion is built into the system.

24             If your Honor will turn with me to the next page.

25             THE COURT:  You didn't want to read the next sentence?

76EAASEPA1                    Argument

1          MR. JOSEPH:  No action should ever be taken that could

2     compromise the aviation security process.  All probables should

3     be resolved by the most experienced screener or supervisor

4     available and/or referred to responsible airline.  The

5     responsible airline.

6          Discretion is built into the system because we're

7     dealing with minimum standard.  The next page is dealing with

8     weapons and explosive devices.  It makes exactly the same

9     point.  I am looking at the last paragraph.  And if you start

10    on the third line it begins with the sentence that says:

11    Knives with blades under 4 inches, such as Swiss army knives,

12    scout knives, pocket utility fives, etc. may be allowed to

13    enter -- may.  However, some knives with blades under 4 inches

14    could be considered by a reasonable person to be a "menacing

15    knife" and/or maybe illegal under local law.  No.  Local law is

16    stricter you have to apply local law.  And should not be

17    allowed to enter into the sterile area and we have serrated

18    knives.

19          THE COURT:  Stay with this.  Explore this with me.

20          MR. JOSEPH:  This means that when these gentlemen

21    walked through there was discretion.  It wasn't enough just to

22    say the blades were 3.9 inches.

23          THE COURT:  What did they have?  They had box cutters.

24          MR. JOSEPH:  Your Honor, if we are going to get into

25    the facts, it's not a 56 motion.  I'm not the right person to

76EAASEPA1                    Argument

1    be giving you all the facts.

2              THE COURT:  The reason I am asking is because I am

3    reluctant to express a view.  I think although educational and

4    important it is also premature.  I am reluctant to express a

5    point of view except with respect to something very specific

6    put before me.

7              MR. JOSEPH:  It may be, your Honor, that this is

8    something that needs to be done in a 56 context after

9    discovery.  We've only had --

10             THE COURT:  If I let you all go you'll have 6500 more.

11             MR. JOSEPH:  Any time, your Honor, you want to set a

12   trial date that's okay.  Let me just, my point here is simply

13   we're dealing with generalities with the standard of care

14   discretion is built into this federal system.

15             THE COURT:  What would you think of a trial date on

16   damages?  Discovery that's still to go with liability.  The

17   damages issue are discrete.

18             MR. JOSEPH:  My inclination, Judge, is to say any

19   trial we can get is a good trial.

20             THE COURT:  I think so too.

21             MR. JOSEPH:  I may have 35 cocounsel to disagree with

22   me.  Your Honor, again, I am going to go through two more pages

23   of this.

24             THE COURT:  Go ahead.

25             MR. JOSEPH:  When we are talking about whether or not

76EAASEPA1                       Argument

1    actions are prescribed and as an automaton does it.

2              THE COURT:  Just stop it.  I am thinking, you know,

3    what am I supposed to take from this?  If the knives are under

4    four inches Mr. Podesta's clients would say that they didn't

5    have to stop.  They also tell me about the rules that say look

6    only at the checked baggage.

7              MR. JOSEPH:  Nothing stops anybody from doing --

8              THE COURT:  And then the question comes what are the

9    reasons that arguably require them to do more?  And how do I

10   formulate that standard to my mind?  The jury doesn't care if

11   it's a federal mandate or a state mandated standard.  They need

12   to know what the right rule is to be applied.

13             MR. JOSEPH:  Your Honor, I think this the only issue

14   that can be resolved today is that we're dealing with are

15   minimum standards and there is discretion involved and there is

16   a factual determination whether or not the behavior was

17   reasonable given -- I don't think that there is anything else

18   that can come out of today's hearing.  It is not a summary

19   judgment hearing.  But the argument that's being made by the

20   defendants is that near compliance exonerates them.  Now

21   Mr. Podesta seemed to back off at that and I respect that

22   but --

23             THE COURT:  Well, he didn't back off that.  That was

24   his argument throughout.  He had to lead me through it the way

25   you are leading me through it.  The question I keep coming back

1   to is, what do I take from this?  What do I learn from this?  I

2   know that we all have to respect what is stated in the federal

3   law and we do.  The question is where are the outside

4   perimeters of when we start to argue.

5           MR. JOSEPH:  There are two points that are basically

6   summarized in -- Your Honor, what I was saying is that I think

7   the clear dichotomy -- to go back to your question -- the clear

8   dichotomy is are the standards preclusive if honored.  We won't

9   say they weren't honored.  But they preclusive if honored

10  minimum standards -- we think that the law is very clear that

11  the latter is correct.  But I don't think more than that could

12  is correct.  Your Honor wouldn't be ruling that they have --

13          The second take away, I believe, would come from the

14  Williams case from 44701-44702 and from the regs that are

15  security regs enacted pursuant to those statutes and others and

16  that it is a duty to exercise the highest possible degree of

17  safety in the public interest in connection with operations

18  including security operations.

19          Now, that doesn't decide anything other than what is

20  the framework that we're working with, but I believe those are

21  the take aways from today.  Those are the two issues because

22  the contract position simply we do what we're told and that was

23  sufficient.

24          Your Honor, there is one more, perhaps, two more in

25  the cog that I could point out, but I think your Honor has the

76EAASEPA1                    Argument

1    flavor for this and our brief does recite the specifics here

2    and since we're going to break in about 5 minutes I think --

3    let's turn to Exhibit 11 which is --

4              THE COURT:  I'm very interested in Ms. Gaston's point.

5              MR. JOSEPH:  That's not my area, but I can point one

6    thing out because she alluded to it, but your Honor didn't --

7    your Honor just said why don't you reserve on it.  If you go

8    back to tab one in the statutory compilation, the manageable

9    one that ended up.  Tab one.  I read Section A and then I read

10   A5.  A being the administrator of the FAA shall promote safe

11   light --

12             THE COURT:  I took note of that.  That's minimum

13   standard also in aircraft design but what she pointed out to me

14   is something more that a deliberate choice was made by FAA

15   don't have cockpit intrusion proof doors.

16             MR. JOSEPH:  I'm not the right person, all I can say

17   is, your Honor --

18             THE COURT:  Then pass on it.

19             MR. JOSEPH:  -- counsel will address that.  Let me

20   just pass for that.

21             The ACSSP is the other document to which they would

22   give preclusive effect.  That's the air carrier standard

23   security program.  We have that as Exhibit 11 in the large

24   document.  And, perhaps, the quickest way just to give an

25   example if you go to the page at the bottom that is XC and then

76EAASEPA1                    Argument

1    at the end 966.

2              THE COURT:  Last page I have is 909.

3              MR. JOSEPH:  I'm sorry.  It's further up than that.

4    It's in the middle somewhere.

5              THE COURT:  Oh, I see.  I have it.

6              MR. JOSEPH:  At the top of the page is deadly or

7    dangerous weapon guidelines and you will just read the first

8    paragraph.  The following guidelines are furnished to assist in

9    making a reasonable determination of what property in the

10   possession of a person should be considered a deadly or

11   dangerous weapon.  They are only guidelines however and common

12   sense should always prevail.  So everything here whether it's

13   in a reasonableness standard --

14             THE COURT:  How do I find common sense?  How do I

15   instruct the jury as to common sense?

16             MR. JOSEPH:  They have to act reasonably recognizing

17   what their duty is to act --

18             THE COURT:  How does it differ from what came out at

19   the end of Mr. Podesta's argument or Mr. Ellis's argument?

20             MR. JOSEPH:  Compliance is not preclusive.  Mr. Ellis

21   was talking about -- but in terms of actually what the standard

22   is, I believe we may all be in agreement that the standard is

23   that we have regulations that evidence of compliance of

24   regulations is evidence a jury may consider on the issue of

25   reasonableness, but it's not dispositive.

76EAASEPA1                    Argument

1            THE COURT:  Whether you do more depends on the

2      circumstances.

3            MR. JOSEPH:  Exactly right.  Perhaps I should turn for

4      a second to the pre-emption issue.  It's been fully briefed.

5            THE COURT:  I think your point here is that where

6      there are specific ways of flying outside of the thunder storm

7      or whom to admit or whom not to admit in some specific

8      instance, I follow it.  You don't do less and you don't do

9      more.  But where regulations are intended to be setting minimum

10     standards, the suggestion in the regulations themselves that

11     there may be times when you do more.

12           MR. JOSEPH:  Your Honor, let me address Abdulla for a

13     second.  Abdulla was tried under the state common law standard

14     of reasonableness.  The Third Circuit I pointed your Honor to

15     the reg and the Court said, of course, the district court may

16     just reinstate the same verdict because the standard may be no

17     different.  The regs that they are relying on don't purport to

18     be preclusive of anything else and that is why we point to what

19     the FAA is saying what the cog says.

20           THE COURT:  I keep asking what are the take away

21     points and I'm not sure that there is differences among you.

22           MR. JOSEPH:  We would agree with the articulation of

23     what your Honor just made of what that duty is and what that

24     standard is.  May I make a couple points?  I am perfectly

25     prepared to be told no.

76EAASEPA1                    Argument

1            THE COURT:  Cardoza expressed himself as a state judge

2    and later as a federal judge, justice, the same person who

3    spoke and if he made sense in one category he made sense in a

4    different category.  Defined the common law standards of

5    reasonableness.  It's the same thing as reasonableness in a

6    federal statute with one exception that where the federal

7    statute is specific and tells you what you can and can't do you

8    follow.  It's probably a generality.  It probably just doesn't

9    help but anyway.

10           MR. JOSEPH:  If your Honor in the small binder would

11   just turn to tab seven since Mr. Ellis was pointing to the

12   Aviation Improvement Act of 1990.  It is not very long.  I

13   would simply point out that neither in this act nor in any

14   other is there any expressed preclusion of the state common law

15   standard.

16           THE COURT:  No.  Clearly there is -- well, again it's

17   abstraction.  Where something is specifically stated you can't

18   have something that's different and whether you call it a

19   pre-emption but intent or pre-emption by affect is not very

20   important to me.

21           MR. JOSEPH:  There is a line of cases the Supreme

22   Court in Hillsborough or R.J. Reynolds that says that agencies

23   in Congress know how to pre-empt when they want to.

24           THE COURT:  All find language that says something

25   else.

76EAASEPA1                    Argument

1          MR. JOSEPH:  But the FAA has pre-empted the area of

2     drug testing and the Drake case in the Second Circuit pointed

3     that out the.  The Aviation Security Act of 1990 was in

4     response to Lockerbie bombing.  Nothing had anything to do with

5     pre-emptions.  The ADA, the Deregulation Act is an economic

6     regulation act and it precludes.  It pre-empts rates, roots and

7     services.  So we have the Supreme Court saying you can't effect

8     those.

9          Nothing in any ATSSA verdict is going to effect rates,

10     rooms and services.  We have completely insulated defendants

11     which is why the Price Anderson parallel, I'll say two things

12     about that, first, the language isn't identical.  Their breach

13     says the language isn't identical.  But the context isn't

14     identical either.  We have complete protection of this industry

15     because any award is limited to insurance.

16          And the third point I'd make is --

17          THE COURT:  Well, it's parallel.

18          MR. JOSEPH:  When the same language is used in

19     different statute, but damages under the Clayton and RICO Act

20     is both limited to business or property.  Under the Clayton Act

21     it means competitive.  Under RICO it means anything.  So I

22     think we have to look at this statute and we know --

23          THE COURT:  Mr. Ellis, the point I take from

24     Mr. Joseph is that the standards of what should have been done

25     at the check points were minimal standards and that in various

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

76EAASEPA1                    Argument

1   circumstances more could be done, more can be done, more may be

2   required to be done and I am not interested in whether it's a

3   federal reason for more or a state reason for more, but more

4   could be done.  Are you saying something different?

5           MR. ELLIS:  Yes, your Honor.

6           First of all, Mr. Joseph omits from his brief and from

7   his presentation the provisions of the Aviation Security

8   Improvement Act that we discussed after the break which said,

9   not the airlines, but the FAA and logically the FBI, by the

10  way, injunction with the intelligence community of the United

11  States assess the threats.

12          THE COURT:  Depends now what are the circumstances

13  that make it a threat.  I am told on this motion that nine out

14  of the ten people were identified in the computer as raising a

15  suspicion but I don't know why and I don't know whether it

16  should have been noted or not noted at the check point or not.

17  The question, I think, is a little question of begging and

18  that's why I am kind of resistent.

19          MR. ELLIS:  Something more should have been done for

20  those nine people.

21          THE COURT:  Sure.  In the appropriate circumstances if

22  a perception of threat were involved should something more have

23  been done?

24          MR. ELLIS:  May I first say one I thing, your Honor?

25  Like you sure as heck like when it gets specific and I wish

76EAASEPA1                    Argument

1   they had been this specific before we came to court today,

2   because one of the things I would have brought to Court, your

3   Honor, is the testimony of Captain Edmund Soliday who appeared

4   before the 9/11 commission and was asked about profiling 9/11

5   and what you could do.

6           THE COURT:  This is another day.  I started to open

7   this open with Ms. Goldman and she told me to stay away from

8   that.

9           MR. ELLIS:  The point of the matter is, your Honor,

10  the answer is when we get specific, no, you couldn't vary and

11  profile more and if we want to get into a factual inquiry about

12  that we'd be happy to do that.

13          THE COURT:  Now, if Mr. Ellis is right on facts

14  because it fits squarely into a regulation then there is

15  pre-emption.

16          MR. JOSEPH:  Your Honor, that regulation states what

17  is required, but in any event the CAPPS system which we haven't

18  had full discovery on, we don't have information. which -- was

19  developed voluntarily by the airlines permitted agent, ticket

20  agents to put people into the system and that was done on at

21  least one instance in a case.  There was discretion built into

22  that system ticket agents put a --

23          THE COURT:  So that if there was discretion built into

24  the system then I have to instruct the jury how to exercise

25  discretion.  How to review the exercise in discretion.  It is

76EAASEPA1                    Argument

1    a -- just I am confused about what I have to do.  What do you

2    want me to do, Mr. Ellis?

3             MR. ELLIS:  Your Honor, yes.

4             Your Honor, quite frankly I agree with you when your

5    statements when we're discussing things in the abstract.  I

6    would say what they need to identify today is in order to award

7    a damage remedy, have the right to regulate conduct differently

8    than what the federal system required.

9             THE COURT:  I think the answer to that is, probably

10   no, but absolutely I won't say and whether --

11            MR. ELLIS:  I liked the first answer.

12            THE COURT:  Probably we are looking at the federal

13   sources.  But you know the federal sources bounce right back

14   into the state sources.

15            MR. ELLIS:  Except for one thing when we bounce back

16   into a state remedy then we --

17            THE COURT:  Not state remedy, state standard.

18   Remedies are different.  Remedies are how much damages you

19   award.  We're not talking about that now.

20            MR. ELLIS:  Right.  But what is the standard for

21   conduct?  And in fact the states do not impose liability for

22   doing what the airlines were doing at the airports.  We are

23   referring to those as minimums, your Honor.

24            THE COURT:  What the states say is that any person

25   causes injury to another by doing something or failing to do

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                    Argument

1    something which in the circumstances is unreasonable and

2    negligent the damages have to be paid.  I may have stated it

3    wrong, but, basically, I think you get the drift of what I am

4    saying.

5              Here with a large overlay of federal regulation we

6    certainly have to pay attention to what is federally required

7    and to some extent it may be preclusive and to some extent it

8    may require the exercise of discretion and if it does require

9    the exercise of discretion, how that discretion was exercised

10   or if it was failed to be exercised whether the failure was

11   negligent is a question that the jury will have to decide.  And

12   if it comes to elaborating on the definition of how to exercise

13   due care in the circumstances, both of you are going to be

14   giving me cases that probably arise under state law because

15   they're not too much federal law on the point.  And I don't

16   know that I can say anything more useful than that.

17

18             MR. ELLIS:  I appreciate what you've said, your Honor,

19   and I guess that the first point is simply one that I think

20   you've indicated.  You probably see the way that we see it

21   which is that the states don't have the right to regulate.

22   Where it gets tricky is --

23             THE COURT:  You are enlarging now.

24             MR. ELLIS:  Where it get's tricky, of course, is when

25   there are built into what the federal program requires some

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76EAASEPA1                    Argument

1    area of discretion.  I would like at some point if we get

2    specific about those thing.  We could decide whether or not

3    there actually was discretion because there seems to be --

4              THE COURT:  I think it's going to be left to another

5    day.

6              MR. JOSEPH:  Your Honor, it's one o'clock.  I think

7    you've said everything I could usefully say unless there is a

8    particular area.  Let's talk off the record about this

9    afternoon.

10             (Discussion held off the record)

11             THE COURT:  Can you do your brief rebuttal now?

12             MR. PODESTA:  First of all, with respect to source of

13   the aviation regulation screening authority that is contained

14   in 44903.

15             THE COURT:  I understand.

16             MR. PODESTA:  Which is not the statute Mr. Joseph

17   read.  This is a 1974 enactment that deals with the

18   administrator for prescribing regulations to protect passengers

19   and property on aircraft operating in air transportation

20   against an act of criminal violence or aircraft piracy.  The

21   statute didn't exist at the time of the Williams case or the

22   events in the Williams case.

23             THE COURT:  What is the difference?

24             MR. PODESTA:  The difference is this statute doesn't

25   talk about highest duty of safety.  It talks about protecting

76EAASEPA1                    Argument

1    passengers and the public interest in promoting air

2    transportation and interstate air transportation.  This is

3    44903.  And it talk about to the maximum extent practical

4    requiring a uniform procedure for searching and detaining

5    passengers or property to insure that their safety courteous

6    and --

7              THE COURT:  But the FAA knowing about this issues an

8    educational bulletin just before September 11 which talks again

9    about minimum standards.

10             MR. PODESTA:  In the sense that there is -- that's

11   just a reference to the common sense element.

12             Second, even minimum standards aren't pre-empted as

13   Abdulla has found, as --

14             THE COURT:  Even minimum standards.

15             MR. PODESTA:  Even standards that can be described as

16   something a defendant can voluntarily accede have pre-empted

17   effect under the decisions affecting the Federal Aviation Act.

18             THE COURT:  First of all, what do you mean by

19   voluntary.

20             MR. PODESTA:  Our position, let me make it very clear,

21   is that the cog and the ACSSP set forth the legal standards

22   that we were obliged to follow.

23             THE COURT:  You are saying that the minimum standard

24   is the satisfaction of reasonableness.

25             MR. PODESTA:  The ACSSP and the cog define

76EAASEPA1                         Argument

1    reasonableness for purposes of the Stabilization Act or ATSSA.

2              THE COURT:  What you would say is the definition of

3    reasonableness, Mr. Joseph would say is the minimum standard.

4              MR. PODESTA:  Right.  And there are numerous -- those

5    cases, the cases that Mr. Ellis cited, Abdulla and Green and

6    four district court decisions in this circuit since Lockerbie

7    have found pre-emption of the very FAA, by the very FAA

8    aviation standards.

9              THE COURT:  Suppose I agree.  What different does it

10   make?  The difference is that still there's a common sentence

11   standard that comes right back in and whether I call it a

12   Cardoza standard or a U.S. standards makes no difference.

13             MR. PODESTA:  It makes a great deal of difference and

14   the reason why we're having trouble discerning that difference

15   today is when we gave specific examples of what the plaintiffs

16   were saying in deposition, this is what you should do.  And we

17   pointed out in our opening brief how the FAA regulations

18   basically set forth different rules.  They made no response.

19   They were completely silent.  They have never identified what

20   it is they say we should have done above the supposed minimum.

21   They hint in their deposition questions that we should have had

22   an intensive interview program, behavioral profiling such, as

23   el al, but that is entirely outside the federal system and it

24   involves an entirely different approach.

25             THE COURT:  Are they required to specify what you

76EAASEPA1                    Argument

1   should have done.

2          MR. PODESTA:  I think that they should be -- how can

3   we have effective discovery?  How can your Honor make rulings

4   on critical issues until they say, look, this is what you

5   should have done beyond that which is specified in the cog, in

6   the ACSSP.

7          THE COURT:  Mr. Moller, should you be required to

8   respond to a bill of particulars at this point.

9          MR. MOLLER:  I think the answer to that is, no, until

10  we get some additional discovery which you had informed us

11  precisely how to respond.

12         MR. PODESTA:  The chicken and the egg, Judge.

13         THE COURT:  Mr. Podesta, we have decided to put this

14  up for decision at this point.  But it's part of the

15  frustration I think that permeates that discussion.  You want

16  to know what the contentions are so you can rebut them.  They

17  don't want to tell you till they finish discovery, federal

18  rules side with Mr. Moller but I have discretion to modify.

19         MR. PODESTA:  And your Honor recognizes the March 22

20  conference is that it was important to key these issues up.  In

21  our opening brief we gave six or seven examples such as

22  behavioral profiling, extensive hand waning, putting special

23  scrutiny on Arabs and Middle Eastern people and we pointed each

24  of them reason afoul of the federal regulations and should

25  be -- they didn't respond at all.

76EAASEPA1                    Argument

1          THE COURT:  I think what you do to me now,

2   Mr. Podesta, is illustrate why I feel frustrated because there

3   is nothing specific on which to rule.  I find what has been

4   done this morning extremely important and extremely helpful in

5   my understanding of the respective positions, but it's nothing

6   on which I can rule.

7          I feel at this point in time that I am not going to

8   make a ruling and as I do with motions in limine I give you my

9   indications and reserve complete freedom of action on the

10   trial.  When the facts are clear and specific and something is

11   tendered to me for decision, I'll rule.  But in this kind of an

12   amorphous record I find the motion --

13          MR. PODESTA:  That creates enormous practical

14   difficulties as for the scope of discovery to be conducted and

15   for the scope --

16          THE COURT:  Why don't you tell me that after lunch.

17   You'll be first up.

18          (Luncheon recess)

19          (Continued on next page)

20

21

22

23

24

25

76E59112                        argument

1           THE COURT:  Roger Podesta for the aviation defendants.

2           MR. PODESTA:  May I begin?

3           THE COURT:  Go ahead, Mr. Podesta.

4           MR. PODESTA:  You will be glad to know, your Honor, I

5    did not take advantage of this interval to come up with more

6    comments.

7           My first point is with respect to the F.A.A. websites

8    and the travel and correspondence, these are obviously not

9    official statements of the F.A.A. and they are obviously

10   entitled to a great deal less weight than the actual text of

11   the ACTSSP or the cog in which the F.A.A. approved and which

12   was in use for many years.

13          But, most importantly, they don't address the critical

14   issue before this Court which is not whether the aviation

15   defendants can sometimes exceed the F.A.A. requirements but

16   whether the states can require the aviation defendants to

17   exceed the federal requirements.

18          THE COURT:  That's not an important issue because the

19   answer is clearly, "No," and no one is urging that that

20   happened.

21          MR. PODESTA:  All right.  Well, thank you.  I was

22   going to cite the authorities in our brief where the F.A.A. has

23   taken official positions endorsing Abdella including their own

24   administrative rule in the Fairview case saying the states have

25   no role.

76E59112                        argument

1          THE COURT:  The bottom line is what do you want me to

2     rule on?  What practical decision do I make on the basis of the

3     decision?

4          MR. PODESTA:  I think at the time what we would like

5     from your Honor is a ruling that federal law controls where

6     it --

7          THE COURT:  I'm not going to make that abstract

8     ruling.  If there is a piece of evidence that I have to rule

9     on, there is a jury instruction that I have to rule on, I will

10    rule.  But I'm not going to pronounce a statement of law which

11    has no practical implementation.

12         MR. PODESTA:  Well, I think it would be very useful

13    through the course of discovery in this case and particularly

14    in developing experts if we had some idea of the jury

15    instruction that your Honor would propose to give.

16         THE COURT:  If you want to have a procedure to

17    formulate jury instructions, I will be glad to participate in

18    that when it is appropriate and it will be when the evidence is

19    completed or perhaps before you make final choices of experts.

20    I will be agreeable to that.  As you know, I will do whatever

21    has to be done to move the case.

22         This has been a very useful exercise because I've

23    learned the issues, I have seen the respective positions, I

24    have heard respective arguments and I have a certain set of

25    ideas as to how this case has to be shaped and I think I've

1  expressed that in terms of argument.  I have not ruled and I do

2  not intend to rule unless there is some practical

3  implementation that is at hand.  And there is none.

4          MR. PODESTA:  I think the starting of a process as to

5  how to develop jury instructions would be very helpful,

6  particularly before we get into experts because right now one

7  of the issues that troubles us is the plaintiffs can contend

8  that state common law required that we develop an El Al system

9  for --

10         THE COURT:  Mr. Podesta, let me -- time is precious

11  and I want to be a little more efficient than I was this

12  morning.

13         You have pointed out that the plaintiffs have not

14  stated their contentions as to what you should have done and

15  did not do, or in what respects you didn't do something you

16  should have done.

17         Until they do that there are no instructions to give.

18  At some point they're going to have to do that.  We'll get to

19  that and you will have rulings when that comes about.

20         MR. PODESTA:  I would then just add -- and this will

21  lead into Wayland -- that if we don't have guidance on what the

22  arguments the plaintiffs can make state law says we should have

23  done, we are going to have to take more discovery from the

24  government as to why it made the decisions it did.

25         THE COURT:  We will get to that in the next part.

76E59112                          argument

1           MR. PODESTA:  Thank you for your forbearance.

2           THE COURT:  We are now finished with the first topic

3      and ready for the second topic which has to do with discovery.

4      The topic is whether aviation defendants should be able to

5      discover from the government pre-September 11th intelligence

6      and other threat information known to the government but not

7      conveyed to the aviation defendants.

8           Mr. Joseph Wayland will speak for the aviation

9      defendants.

10          MR. WAYLAND:  Thank you, your Honor.

11          Joe Wayland, Simpson, Thacher and Bartlett for

12     Argenbright Security and for the aviation defendants.

13          Your Honor, I want to start with what I think is the

14     false premise of both the government's brief and the

15     plaintiff's brief and that is the following:  That our

16     liability depends solely on what the defendants knew and what

17     they did.  They cannot and they do not support this proposition

18     with any authority.  They do not cite to any principles of

19     authority law and they can't because that proposition is

20     directly contrary to the basic principles of tort law and

21     evidence and it is contradicted by every single case that is

22     ever considered what defendants are allowed to prove at trial

23     to defend themselves in negligence cases.

24          Your Honor wanted to be specific, I'm going to get

25     very specific very quickly.  Let's turn first to the issue of

SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300

76E59112                         argument

1    proximate cause.

2              It is a fundamental principle of tort law that

3    defendants are permitted to show that events and circumstances

4    beyond the defendant's actions are the substantial cause of the

5    plaintiff's injury.  That's horn book law.  There is nothing in

6    the plaintiff's brief or the government's brief that says

7    otherwise.

8              This is what the restatement of torts says and it is

9    what courts across the country have said and we cited to it.

10   Let me just read one section from the restatement that makes it

11   pretty clear.  Some other event which is a contributing factor

12   in producing the harm may have such a predominant effect in

13   bringing it about as to make the effect of the actor's

14   negligence insignificant and therefor to prevent it from

15   becoming a substantial factor.

16             So, too, although no one of the contributing factors

17   may have such a predominant effect their combined effect may,

18   as it were, so dilute the effects of the actor's negligence as

19   to prevent them from being a substantial factor.

20             The Court emphasized -- the Court, and I mean you,

21   your Honor -- emphasized this principle in your September 2003

22   decision and in which you recognized that the actions of others

23   may, quote, so attenuate defendants' negligence from the injury

24   that responsibility for the injury may not be reasonably

25   attributed to the defendant.  And I think your Honor, this

1    morning, essentially said the same thing.

2          So, I think there is no doubt that we are entitled to

3    show evidence of circumstances other than defendant's own

4    actions.  And there is also no doubt -- and I will get into the

5    specifics now -- that the government intelligence regarding

6    terrorist threats and the government's actions in response to

7    those threats is directly relevant to proximate cause.

8          I have a number of examples, your Honor.  Let's start

9    with the first one, and it has to do with a critical issue that

10   you, yourself, identified in the 2003 opinion.  You said that

11   liability may turn on, quote, who was best able to protect

12   against the risks at issue.  Who was best able to protect

13   against the risks at issue.  We think that is a critical issue

14   and it goes to proximate cause.

15         How does government intelligence play in?  Congress

16   charged the FBI and the F.A.A. with the statutory

17   responsibility to assess terrorist threat against the domestic

18   air transportation system.  That's 49 U.S.C. 44904.  It was

19   cited this morning by number of counsel.

20         The statutory instruction is explicit.  The FBI and

21   the F.A.A. are required to assess the extent to which there are

22   individuals with the capability and intent to carry out

23   terrorist or related unlawful acts against the domestic

24   aviation system and the ways in which those individuals might

25   carry out those acts.

76E59112                        argument

1            The FBI has a duty to identify any top terrorists that

2      are in the country and the F.A.A. has the responsibility to

3      determine the procedures and equipment that will most

4      effectively deter those terrorists.

5            Based on this statutory authority we should be

6      permitted to show that the best way to prevent the

7      sophisticated attacks by terrorist organizations such as

8      Al Qaeda is to identify the plots in advance and to take action

9      to eliminate the threat.

10           In fact, your Honor, is it all right if I approach and

11     hand up something?

12           THE COURT:  Sure.

13           MR. WAYLAND:  I want to hand up to your Honor two

14     excerpts from the 9/11 Commission report.  If you turn to page

15     83, your Honor.

16           THE COURT:  Hold on, Mr. Wayland.

17           MR. WAYLAND:  Thank you, your Honor.

18           Your Honor, I ask that you direct your attention to

19     page 83 of the 9/11 Commission report.  The second full

20     paragraph on that page begins with the phrase "The F.A.A.'s

21     policy was to use...

22           Do you see that, your Honor?

23           THE COURT:  Yes.

24           MR. WAYLAND:  I will continue:  The F.A.A.'s policy

25     was to use intelligence to identify both specific plots and

76E59112                         argument

 1   general threats to civil avation security so that the agency

 2   could develop and deploy appropriate counter measures.

 3            So, I think what the Commission is explicitly

 4   acknowledging is that government intelligence was a critical

 5   component in the nation's efforts to stop the kind of attack

 6   that was visited on the United States on September 11th.

 7            We should be permitted to show further that despite

 8   having substantial information about an impending attack by

 9   terrorists against the U.S. in the months leading up to

10   September 11th, the government was unable to identify the

11   specific threat and could not stop the attacks.

12            And I want to direct your attention, your Honor, to

13   the second excerpts from 9/11 which I just handed up because I

14   think it is very important that your Honor understands the

15   extent and the type of information that we are talking about.

16            If you would look at page 255, your Honor?

17            THE COURT:  I have it.

18            MR. WAYLAND:  Under the heading, The Drum Beat

19   Begins -- and, by the way, your Honor, this chapter is

20   entitled, The System was Blinking Red.  It is Chapter 8.  I

21   think it is one of the most significant chapters in the report

22   and critical to understanding what our defense will be, your

23   Honor, and it also is critical, as we talk today, about what

24   specific threat information we expect to receive from the

25   government.  And it is also critical to show that this is the

76E59112                          argument

 1     type of information that the government has already decided as

 2     a general matter it is okay for the public to have an

 3     understanding of.  So, this we will get to later on but it goes

 4     to the issue, the fact if we are creating a burden for

 5     government.

 6              To return to the test.  In the spring of 2001 the

 7     level of reporting on terrorist threats and planned attacks

 8     increased dramatically to its highest level since the

 9     millennium alert.  At the end of March the intelligence

10     community disseminated terrorist threat advisory indicating a

11     heightened Sunni extremist terrorist attacks against U.S.

12     facilities --

13              THE COURT:  It is better, actually, if you speak more

14     slowly.

15              MR. WAYLAND:  Your Honor, a heightened threat of Sunni

16     extremist terrorist attacks against U.S. facilities, personnel

17     and other interests.

18              If you turn the page to 257 the first -- second full

19     paragraph, a terrorist threat advisory distributed in late June

20     indicated a high probability of near term "spectacular

21     terrorist attacks resulting in numerous casualties."

22              And then it goes on to refer specifically to Milan

23     attacks may be imminent and so on.

24              And there are a number of other excerpts I don't want

25     to burden the Court with now but I do want to turn to the

76E59112                         argument

1    evidence, based on government intelligence, as to what happened

2    next and that we go, your Honor, to page 263.

3                THE COURT:  Yes.

4                MR. WAYLAND:  And here the report goes through what

5    the government response was to the threats and, basically, and

6    the Court has it, but the thrust of this is the government had

7    a substantial amount of information and yet it didn't know what

8    to do about the information.  It had much more information than

9    any of the defendants did, certainly.

10               The summation was really in the bottom paragraph.

11               THE COURT:  I will take judicial notice of that.

12               MR. WAYLAND:  The summation, your Honor, is at the

13   bottom of the page.  The September 11th attacks fell into a

14   void between foreign and domestic threats.  It goes on later on

15   that domestic agencies were waiting for evidence of a domestic

16   threat from sleeper cells.  No one was looking for a foreign

17   threat.  The threat was coming from -- that was coming was not

18   from sleeper cells, etc.

19               And then, on the next page, I think also very

20   important, the report says, A second cause of this disparity in

21   response is that domestic agencies did not know what to do and

22   no one gave them direction.

23               This, despite all of the threat information that's set

24   forth in documents like the 9/11 Commission report.

25               THE COURT:  Can I digress?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59112                          argument

1          MR. WAYLAND:  Yes.

2          THE COURT:  Suppose you wanted to introduce this

3     statement:  A second cause of this disparity is that the

4     domestic agencies did not know what to do and no one gave them

5     direction.

6          Under 803(8) of the Federal Rules of Evidence, could I

7     allow this in?

8          MR. WAYLAND:  I think there are a number of issues,

9     your Honor.

10          First of all, I would --

11          THE COURT:  That was if one was, of course, prompted

12     to be prepared for this.

13          MR. WAYLAND:  I could quote an eminent jurist who

14     said, "Stay away from secondary sources."

15          So, as a matter of trying a case to jury, your

16     Honor -- that was from Hellerstein -- but as a matter of trying

17     a case to a jury, your Honor, that's a very separate issue.  Do

18     I want to put it in through statement or do I want the

19     government witnesses to be able to get on the stand and say

20     these are the facts that we knew, these are the conclusions we

21     reached, and these are the actions that we took.

22          So, I think that the parties will have a lot to say

23     about how much of this report comes in when the time is

24     appropriate.  I would argue that this comes in.

25          THE COURT:  Good answer, Mr. Wayland.

76E59112                          argument

1        MR. WAYLAND:  Anyway, so I think, your Honor, what

2   this tells us -- this sort of information tells us is that the

3   government had substantial information -- let me start at the

4   beginning.

5        The government was charged with assessing threats.  It

6   was their business to go out and look and decide what the

7   threats were.  They did that.  There was a lot of information

8   out there that wasn't conveyed to us and the government took

9   certain actions and didn't take other actions.  And we think

10  when the jury is asked to decide what's the proximate cause of

11  what happened on 9/11, they need to hear not only the testimony

12  of Hermie Miller.  And let me talk for a moment about Hermie

13  Miller because that's a witness who Mr. Joseph referred to in

14  his argument this morning.

15       First of all, she was security screener for Flight 93

16  not flight 77, but Hermie Miller is a retired, inner-city,

17  Newark grandmother who has raised a family and she worked at

18  Newark on the date in question.  And she was deposed by the

19  plaintiffs and the thrust of the deposition, as far as I could

20  tell was, did you know who Osama Bin Laden was?  And remember

21  Mr. Joseph said no one knew who he was.  We had to go through a

22  whole hour of this.

23       THE COURT:  Slow down.

24       MR. WAYLAND:  Yes.  We had to go through a whole hour

25  of:  Did Hermie Miller know who Osama Bin Laden was?  Did

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59112                              argument

1    Hermie Miller know about these attacks in Paris 10 years ago?

2    Did Hermie Miller know about the Bojinka plot?  And then we

3    have to find out her exact interpretation of the cog is the

4    same as Joe Smith in Newark or Ronald McDonald in Dulles.  Do

5    they all have the same interpretation.

6             And if that is what the case is about, if that's all

7    the jury gets to hear it will be a very different world and a

8    very unfair world and very unrealistic world.

9             THE COURT:  What makes you think that I would allow

10   those questions?

11            MR. WAYLAND:  I hope you won't, your Honor.  I don't

12   think they should be allowed.

13            But, in any event, when the jury is asked to decide

14   whether it was the activity or conduct of any particular

15   defendant individually at a check point or collectively through

16   the procedures that they had in place, I think the jury is

17   entitled, under basic principles of proximate cause, to be able

18   to consider other factors and those factors, by statute, are

19   the government's action and the government's knowledge that led

20   to whatever action or inaction it took.

21            Let me give you a second example of proximate cause

22   that I think is relevant.

23            We think that the government's knowledge of the

24   terrorist threat will show that this sophisticated, dedicated

25   and ideologically driven nature of the threat and that these

76E59112                          argument

1    groups planned and executed attacks that take advantage of

2    existing vulnerabilities in a targeted security system and do

3    not depend as a modus operandi on the negligence of the

4    victims.

5              The 9/11 Commission report says that the 9/11

6    terrorists were instructed to use weapons that were not

7    detectable.  We should be able to show that the government had

8    knowledge about the nature of the terrorist threat and the

9    modus operandi of terrorist organizations.  And it is

10   particularly important because, as far as we know, there is no

11   direct evidence of how the terrorists succeeded in getting

12   items on board the aircrafts that could be used as weapons and

13   whether they had any other means to achieve their objective if

14   any particular items had been confiscated before the

15   highjackers boarded the planes.

16             One final example, your Honor, on proximate cause.

17   The 9/11 Commission noted that the government's avation

18   security strategy assumed that the highjackers would not

19   undertake suicide missions.  They expected the attacks would be

20   bombs on planes placed on there and then the terrorist leaves

21   and doesn't go on the plane.  That view actually underlies key

22   aspects of the avation security system.

23             For example, the decision not to fight the highjackers

24   was based on that decision.  The decision that not to have a

25   system that could prevent any possible item that could be used

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

76E59112                        argument

1    as a weapon was not included -- was not part of the system.

2    And we think that the government's decision, which was clearly

3    based on its intelligence --

4            THE COURT:  Mr. Wayland, were those simply not done or

5    were they pursuant to a decision not to do?

6            MR. WAYLAND:  I think what the evidence will show,

7    your Honor, is that the -- and what we have to go on right now

8    is mostly the 9/11 Commission report is that the -- and some

9    other documents too, but that the government considered the

10   various threats.  They explicitly determined that suicide

11   highjacking was not a high priority and they designed a system

12   that focused on the threats that they did recognize which were

13   the remote bombing.

14           THE COURT:  Is there any evidence to believe that the

15   government made a deliberate choice not to pursue methods of

16   detection in dealing with, say, suicide bombers?

17           MR. WAYLAND:  Your Honor, I can point you to sections

18   in here that we can then go find the government witnesses to

19   sponsor; but, yes.

20           If you look at page 83 of the report -- I think it is

21   83 -- I can find it -- on 84, your Honor.  I will just read it

22   to you.  It is talking about the CAPS procedures which were

23   discussed this morning and why they were set up the way they

24   were.  And what it says is this policy change, meaning an

25   affirmative act, was also reflected of the perspective that

76E59112                              argument

1    non-suicide sabotage was the primary threat to civil avation.

2            So, yes.  There is evidence to support that there was

3    an affirmative determination to take certain steps in the

4    security system based on a belief, government intelligence, as

5    to what the most likely threat was.

6            One final point about proximate cause, your Honor, and

7    then I will move on to reasonableness.  One of the issues on

8    proximate cause, I think, is the nature of the plot itself.

9    And the government, as you know, has agreed that it will not

10   raise relevancy objections as to what the government knows,

11   apparently, about the planning and execution of the plot as

12   well as the nature of the security system.

13           So, there is going to be government discovery and I

14   think that's a key -- a key -- factor to keep in mind, your

15   Honor.  There is going to be extensive government discovery

16   because the government has agreed to it.

17           One of the problems was if you were to carve out this

18   exception for government intelligence about the terrorist

19   threat not known to the avation defendants would be the

20   following:  I think it is very hard in practice to decide

21   whether some of this material goes directly to the 9/11 plot

22   itself or more generally to what the government knew about

23   terrorists and the Osama Bin Laden organization.

24           Now, I would argue, obviously, that most of that is

25   relevant to the plot itself.  I can see debates with the

76E59112                          argument

 1   plaintiffs and perhaps with the government about whether a

 2   particular piece of evidence goes to the plot and its

 3   implementation or whether it goes to, "the general knowledge

 4   the government has."

 5          So, I think adopting what the government wants and

 6   what the plaintiffs want would actually cause more problems

 7   than it would --

 8          THE COURT:  What does the government want?  Say that

 9   again.

10          MR. WAYLAND:  One of the objections that the

11   government has raised to our request is that it is going to

12   create a problem for them because they're going to have to

13   decide whether certain evidence is -- is subject to a national

14   security privilege or otherwise privileged.  And I guess my

15   issue here, your Honor, is that they're going to have to do

16   that anyway with respect to information about the 9/11 plot

17   because they say they're going to produce that sort of

18   information to us.

19          So, it is not a substantial additional burden since it

20   most likely will be the same witnesses and many of the same

21   documents for them to make that determination with respect to

22   the small cash out that they're trying to make.

23          Let me talk about reasonableness just for a minute,

24   your Honor.  And it follows on from everything that was

25   discussed this morning and one of the difficulties in deciding

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

76E59112                          argument

 1   what it is that ultimately is going to be put before the jury.

 2   But, as Mr. Josephson suggests --

 3           THE COURT:  Joseph.

 4           MR. WAYLAND:  Mr. Joseph suggested.

 5           THE COURT:  Josephson is a partner, used to be a

 6   partner.

 7           MR. WAYLAND:  I actually worked for him as a summer

 8   associate which is why I confused the two.  But yes.

 9           THE COURT:  You went on to a distinguished career with

10   the attorney general.

11           MR. WAYLAND:  Right.

12           We think it is pretty clear why government

13   intelligence would be directly relevant to the kind of

14   reasonableness case that the plaintiffs apparently want to put

15   in against us.

16           The theory is that we should have done something more.

17   And we can debate what that means but we should have done

18   something more.  And it seems crystal clear that in judging

19   whether we acted reasonably in doing whatever it was that the

20   plaintiffs say we should have done, to take into account what

21   it was that the government knew about the terrorist threat and

22   what it required the defendants to do and what actions it took

23   in response to these threats.

24           We think that's pretty clear and it is hard to imagine

25   any way to come back at that.

76E59112                          argument

1              I want to spend a little bit of a moment on taking

2     that one step further which is, if you were to cut back a

3     little bit on what the plaintiffs want to do and say, look,

4     what matters is whether you substantially and reasonably

5     complied with the federal regulations, which is where we think

6     the instruction ought to be at the end of the day, my question

7     is, is it still relevant?  Is what the government did still

8     relevant?  And it is precisely because, as your Honor

9     recognized, there is an amount of discretion even within the

10    federal regulations.

11             So take, for example, what we talked about this

12    morning, the idea that the regulations prohibit menacing

13    knives.

14             THE COURT:  Men --

15             MR. WAYLAND:  Menacing knives.

16             THE COURT:  Menacing knives.  Okay.

17             MR. WAYLAND:  I don't know the exact language but four

18    inches is the general rule unless otherwise menacing.  So,

19    there is judgment involved in whether the knife is menacing or

20    not.

21             So, the question is how do you judge whether what we

22    did was sufficient to satisfy our standard under the government

23    regulation unless we can use the menacing as an example.

24             On the one hand we have evidence that was available to

25    the defendants which is we knew that for decades what we were

76E59112                        argument

1    doing was working in the sense that we had prevented

2    highjacking, domestic highjacking for decades, so we will be

3    able to tell the jury that that was a reasonable basis perhaps

4    not to do anything more than what we were doing.

5           We also think we ought to be able to tell the jury the

6    following:  The government was responsible for these

7    regulations.  The government had F.A.A. people in the airport

8    supervising us every day.  The government knew what the threats

9    were.  The government also new what our performance was.

10          So, the government knew, for example, that there was

11   never 100 percent certainty in stopping all the prohibited

12   items.  The government knew about a lot of other problems that

13   came up in the system.  And the government also knew what was

14   out there, what was making the system blink red for months and

15   months and months before 9/11.

16          And the fact that the government had that information,

17   knew what was happening at checkpoints with all its flaws and

18   all its excesses and determined not to require any changes

19   within the federal regulations, we think, goes to the

20   reasonableness of our actions.

21          THE COURT:  But, this dysfunction of government

22   administration, therefore, is an excuse for your own negligence

23   generals?

24          MR. WAYLAND:  No.  Not at all, your Honor.  It has

25   nothing to do with an excuse.  It has to do with the

76E59112                          argument

1    reasonableness of our action.  It has to do with whether people

2    sitting in a jury box.

3            THE COURT:  The dysfunction of somebody else?

4            MR. WAYLAND:  It is not dysfunction.  It is function,

5    we are not --

6            THE COURT:  The conclusion of that 9/11 report was

7    that the government was dysfunctional.

8            MR. WAYLAND:  Right.  But that's not the issue for

9    which we want the evidence and that's not the issue that we are

10   putting before the jury.

11           The issue we are putting before the jury is whether

12   those actions, however you want to describe them, you can call

13   them bad, you can call them good --

14           THE COURT:  You are creating a deliberation on the

15   part of the government when the 9/11 commissioners thought it

16   was a dysfunction?

17           MR. WAYLAND:  I think -- I don't think it matters how

18   we characterize what the government did.  I think what matters

19   is that we have the information that's described in the

20   report --

21           THE COURT:  It seems to me a matter a lot that you are

22   going to create a separate trial longer than this trial.

23           MR. WAYLAND:  Not at all.  Not at all.

24           THE COURT:  Tell me about limits.

25           What do you propose?  How many depositions?  How many

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   documents?  How many proceedings with the TSA?  How many issues

2   of SSI?  How many appeals to various Courts of Appeals

3   throughout the country?  Much delay in these cases getting to

4   trial?

5           Talk to me about that.

6           MR. WAYLAND:  I think that's a great place to go, your

7   Honor.  And, again, let's start with the premise that the

8   government has accepted that we are entitled to a fair amount

9   of discovery already so a lot of those things are going to

10  happen.

11          THE COURT:  I have noted that in how much delay it has

12  caused already.

13          MR. WAYLAND:  So it is going to happen.

14          THE COURT:  The full employment policy from

15  Ms. Goldman and Ms. Norman notwithstanding the full employment

16  policy of about 15 other matters at least.

17          MR. WAYLAND:  It is going to happen, your Honor.  The

18  only question is whether what we want is going to add.

19          THE COURT:  No, it is not going to happen.  It may

20  happen.

21          MR. WAYLAND:  Right.

22          Well, so far the government says it is going to

23  happen.  We would like it not to happen.  If they can give us

24  the stuff, we can come back and be done.

25          THE COURT:  The government is not the judge.

76E59112                          argument

1          MR. WAYLAND:  I know.

2          The question is, your Honor, what do I see happening

3     next and how quickly can we get it done.  Here is what I think

4     and I have thought about this a lot:

5          I think once we get this issue of what we can see and

6     not see resolved, we will sit down with the government with

7     this book and several other government reports and say this is

8     the type of information we need to get in front of a jury.

9          THE COURT:  This book is the 9/11 report?

10          MR. WAYLAND:  I'm sorry, your Honor; the 9/11 report

11     and similar documents.  This is the type of information we want

12     and it is not a lot.  We have summarized it in our briefs.  The

13     report itself identifies the number of witnesses who purport to

14     be the sources of this.

15          THE COURT:  How many?

16          MR. WAYLAND:  I would say my estimate is the same as

17     it was last time, 20 to 30.

18          THE COURT:  Mr. Barry, how many depositions have you

19     told me you wanted?  65?

20          MR. BARRY:  Of the parties?  We said at least another

21     65, from them.  They wanted it of us.  That's what the

22     plaintiff wants of us.

23          THE COURT:  You want 65.

24          MR. BARRY:  No, plaintiff wants of us, of the

25     defendants.  That's what they said this morning.

76E59112                            argument

1           THE COURT:  Mr. Moller, I don't remember that number

2   being used.

3           MR. MOLLER:  The numbers are a surprise to me and I

4   don't think I could stay awake for 65 depositions.

5           THE COURT:  Well, I do know --

6           MR. BARRY:  They gave us a list of 130 so I cut it in

7   half.

8           THE COURT:  I think I woke you up.  It is not Saturday

9   morning, Mr. Moller.  It is still Thursday.

10          Mr. Barry, what are you talking about?  You have a

11  Sunday function, he has a Saturday function.

12          THE COURT:  To cut this short, I don't have any

13  confidence that the numbers will be limited to 20 or 30.  I

14  have every reason to believe that the numbers will be

15  considerably more and a multiple of those.

16          MR. WAYLAND:  Not for government witnesses, your

17  Honor.  I don't think so.  And, your Honor, that's an issue of

18  burden which we can resist if we take advantage of this.

19          THE COURT:  This issue is all 403.  You know under

20  Rule 26 of the Federal Rules of Civil Procedure anything that's

21  useful in effect is a bound of discovery.  And since usefulness

22  is very much subjective to a party, it tends to be very little

23  in the way of limits to discovery responsibly pursued.

24          MR. WAYLAND:  You can set those limits, your Honor.

25          THE COURT:  It is not so easy.

76E59112                    argument

1          Under Rule 403 of the Federal Rules of Evidence I have

2    to worry about something else.  Although relevant, evidence may

3    be excluded if its probative value is substantially outweighed

4    by the danger of unfair prejudice, confusion of the issues or

5    misleading the jury or by considerations of undue delay, waste

6    of time, or needless presentation of cumulative evidence.

7          Leaving aside various of the characteristics here,

8    what you are asking me to authorize is another trial of the

9    government.

10          MR. WAYLAND:  Absolutely, not, your Honor.  Absolutely

11   not.

12          THE COURT:  And I do not wish to do that.

13          MR. WAYLAND:  That is absolutely not true, your Honor.

14   And I think the wording of that rule is precisely on point.  It

15   talks about unfair prejudice and confusion.  And if the jury is

16   not permitted to hear what the government knew and then what it

17   decided to do or not to do, we will be severely prejudiced

18   because it will create a false world that didn't exist on 9/11

19   and it will put us at a substantial disadvantage and I think it

20   would be a serious error to put us in that position.

21          I think the burden is overstated, your Honor.  This is

22   the only discovery, essentially, the defendants are taking.

23   They've had all of the -- because that's what matters to us

24   because we were part of a system.  We were part of a system in

25   which the rules were dictated to us by statute, by the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59112                          argument

1   government, and a threat assessment --

2             THE COURT:  Dictation is not a problem because that's

3   information conveyed.

4             UNIDENTIFIED SPEAKER:  That's right.

5             MR. WAYLAND:  I'm sorry, your Honor?

6             THE COURT:  I don't need to have confirmation from

7   plaintiff's bench, please.  So far I'm doing all right.

8             That's information that's conveyed.  Nothing that

9   prevents you from taking discovery of information transmitted

10  to you.

11            What you are looking for is information that was not

12  transmitted to you.

13            MR. WAYLAND:  Because that's critical in understanding

14  the reasonableness of our actions and the proximate cause.

15            If the government had this information it couldn't

16  stop the terrorists.  The idea that Hermie Miller and people

17  like her could stop it, it just makes no sense.  So, it is

18  critical to us, your Honor, for that reason.

19            THE COURT:  Thank you, Mr. Wayland.

20            Who will present the government's position?

21            MS. GOLDMAN:  Beth Goldman.

22            Your Honor, I would like to start with the issue of

23  the burden because I think that one of the things Mr. Wayland

24  has done today and in their papers is to underestimate, to the

25  extreme, the burden that's going to be imposed on the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59112                          argument

1    government by the discovery they seek.

2                They try to describe it today as something --

3                THE COURT:  While you are describing burden on the

4    government, talk to me also about the delay to the Court and

5    the burden to the Judge.

6                MS. GOLDMAN:  Certainly.

7                They describe it as limited and narrow, not

8    burdensome.  And, in fact, they are seeking discovery so far

9    not only from the F.A.A.  And one of the lessons of

10   Mr. Wayland's statement is that no good deed goes unpunished

11   because we have agreed to provide certain limited discovery on

12   issues that are clearly relevant here.

13               THE COURT:  I'm going to take issue with good deeds.

14   You do what is necessary, Ms. Goldman.

15               MS. GOLDMAN:  We are doing what is appropriate and

16   then we are told, Well, it can't be much more of a burden to go

17   way beyond that.

18               But, of course, it is.  Because they've asked not only

19   for information from the F.A.A. but from three United States

20   intelligence agencies, the CIA, the FBI and the NSC.  And they

21   seek from those agencies a wide ranging topics of inquiry.  And

22   we don't yet have all of the requests.  We can only --

23               THE COURT:  What is NIC?

24               MS. GOLDMAN:  NSC, National Security Council.

25               We don't have all of the requests but we have some and

1    the requests include things like they want CIA and FBI

2    information and NSC information on pre-September 11th threats

3    to civil avation.  They want what the CIA and FBI had before

4    9/11 on Osama Bin Laden.  They want what the CIA and the FBI

5    had on Al Qaeda.  And they want all of the federal agencies

6    information about the highjackers.  And then, in their papers,

7    they admit that they may want to pursue other leads based on

8    the information that they may get.

9              So, this must be the tip of the iceberg if there is

10   any more.

11             Now, beyond that they have said consistently that they

12   want 20 to 30 government witnesses.  Now, 20 to 30 government

13   witnesses including multiple 30(b)6 witnesses is not the

14   equivalent of 20 do 30 screeners who have a limited amount of

15   information.  What they want are witnesses from the CIA, for

16   instance, to talk about raw threat information that they had

17   and what was done with that threat information.

18             This is the kind of discovery that will require the

19   government to spend countless hours and days finding

20   information and then preparing witnesses.  And, add to that,

21   that these are very sensitive areas of inquiry.  These are

22   areas where there is classified information --

23             THE COURT:  Suppose the government decides that it

24   does not want to give this information.  Where is their

25   recourse?

76E59112                          argument

1          MS. GOLDMAN:  Well, what the government will do is

2     respond to the requests and, as we have agreed to the parties,

3     the next step would be would be if we were to say "No" in the

4     Touhy response the parties would be to disagree to challenge

5     that Touhy comes --

6          THE COURT:  That comes to me?

7          MS. GOLDMAN:  To you under the APA.

8          THE COURT:  Well, Touhy is not APA.

9          MS. GOLDMAN:  Well, it would be to you because we have

10    agreed not to insist that they go to the fourth circuit or any

11    other circuit where the agencies may be cloaked.

12         THE COURT:  So, I would expect a weekly, long letter

13    under my individual rule 2E asking me to rule on various

14    questions?

15         MS. GOLDMAN:  Well, we would have to discuss whether

16    you believe Touhy because -- because the way you do it for this

17    is for them to file an action that's related that's an APA

18    action challenging the Touhy denial.

19         THE COURT:  File an action under the administrative

20    procedure act.

21         MS. GOLDMAN:  Right.

22         THE COURT:  They can do it here or they can do it in

23    the District of Columbia.

24         MS. GOLDMAN:  Right.  Although we did agree with the

25    parties in order to avoid having to force everybody to do that,

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59112                          argument

 1  that they would all agree to do it here, if that's okay with

 2  your Honor.

 3          THE COURT:  And so I get a separate petition and it

 4  comes to me as a related lawsuit and I rule on that and that's

 5  not so easy because if I have to rule on information that has

 6  very high classification, I may not be able to easily see this

 7  information.  I may not be able to have my law clerk view this

 8  information.  I may get into a fight with the government on

 9  whether or not my law clerk has access to this information.  We

10  may not have a court reporter who is cleared to see this

11  information.  The information may have to be viewed in a sealed

12  room in the Department of Justice.  There may be problems with

13  a record.  There may be efforts by the government to summarize

14  the information.  We would have problems of clearing how many

15  lawyers in this case?

16          We have spent several weeks dealing with -- weeks,

17  months, dealing with the lawyers in this case.  But that's very

18  simple for me to do, handle that very easily without affecting

19  the timing of these proceedings.  Right.

20          Mr. Wayland?

21          MR. WAYLAND:  Actually, no, your Honor.  And I think

22  you have it, with all due respect, wrong for the following

23  reasons:

24          What we have said is that we want information that the

25  government has already said is publicly disseminated.  What I

1   want to do is sit down with her and find the 10 witnesses, if

2   that's what it takes, to get this stuff into evidence.  That's

3   about 10 witnesses.

4           THE COURT:  If information is publicly disseminated

5   there may be techniques of getting that information in without

6   having to go through the risks of these kinds of proceedings.

7           I have been through these proceedings, Mr. Wayland.  I

8   speak not from hypothetical reasoning.

9           MR. WAYLAND:  I appreciate that, your Honor.

10          Then I would say the ruling then --

11          THE COURT:  I had a fight with the U.S. Attorney's

12  office -- not U.S. Attorney but the Department of Justice of

13  whether one of my rulings on which I wrote could go into the

14  federal law books.

15          MR. WAYLAND:  Your Honor.

16          THE COURT:  I won.

17          MR. WAYLAND:  Clearly, I think I have suggested --

18          THE COURT:  I'm the Judge.

19          MR. WAYLAND:  I suggest this can happen in a way much

20  more expeditious than you are contemplating.

21          THE COURT:  If there is a mutual will, there is a way.

22          MR. WAYLAND:  There is a way, your Honor.

23          THE COURT:  If there is not a mutual will, it is very

24  difficult, Mr. Wayland.  Very difficult.  And it should be very

25  difficult.

76E59112                              argument

1          MR. WAYLAND:  I agree.  We have said that we would do

2    everything necessary to make it go quickly.  We will keep our

3    witnesses down.  And if I can't convince you, your Honor, if

4    this is where you are going to go and this is the reason, then

5    I would ask that whatever ruling you make be limited to the

6    burden because, as you suggested, there are other ways to get

7    this evidence in so it would be a mistake, I think, to rule

8    broadly that we can't put any of this evidence in through some

9    other means.  It might be appropriate to say you can't burden

10   the government to get it but I think, clearly, that goes to

11   burden, not relevance.

12         MS. GOLDMAN:  Your Honor, if I may?  I think

13   Mr. Wayland's --

14         THE COURT:  You already won, Ms. Goldman.  Mr. Wayland

15   has said that I should restrict my ruling.

16         MR. WAYLAND:  If you are inclined to rule against us,

17   your Honor.

18         THE COURT:  I am.  I am because I have had

19   experience -- in this case and in other cases -- and it is

20   grossly unfair to the progress of these cases to everything

21   else I have to do as a Judge in this court and to these

22   plaintiffs to get involved in these kinds of proceedings unless

23   I have no recourse.  And there is recourse.  At least there is

24   at this moment.

25         I don't have to rule on relevance.  That can wait

76E59112                        argument

1    another day.  But, given the issues as they are presented to me

2    the burden, the confusion, the expense, and I won't go into

3    other considerations because these are enough, all dictate that

4    I should not allow this discovery.

5              Thank you very much, Ms. Goldman.  You were eloquent.

6              MR. MIGLIORI:  Can I thank her?

7              THE COURT:  I'm not going to write on this issue

8    unless somebody feels they need to.  I think I am better off.

9              Okay, nobody is asking to write.  Let's go back to

10   number 1.  We left Boeing's excellent argument made by

11   Ms. Gaston up for tantalizing review and Mr. Williamson is

12   going to respond.

13             Richard William son is speaking for —— who is your

14   client in this one, Mr. Williamson?

15             MR. WILLIAMSON:  World Trade Center Property

16   cross-claimants, your Honor; good afternoon.

17             Good afternoon, your Honor.  I was going to start, if

18   I may, with the arguments of Mr. Wood to go in, because they go

19   together with the arguments of Boeing.  So, I will deal with

20   the airport operator argument and then Boeing, if I may.

21             THE COURT:  That's fine.

22             (Continued on next page)

23

24

25

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

76E4WTC3

1        MR. WILLIAMSON:  Essentially what each of these is

2   doing is saying we are a specific type of defendant, so for us,

3   we want to have a different duty of care and we want to have

4   the court find that there could be no liability to us in these

5   circumstances.

6        THE COURT:  I don't think they are saying that.  I

7   think they are saying that the building was occupied.  I don't

8   want to do it on different arguments.  So let's focus on either

9   one, but don't mix them because they are different.

10        MR. WILLIAMSON:  OK.  With respect to Massport, page 1

11   of their opening brief, the moving brief is very revealing.  It

12   tells us in the third full paragraph that they are arguing that

13   under the regulations, the airport, I quote, the airport

14   operators had no duty to oversee, implement, supervise, or

15   other otherwise conduct passenger screening in any way, close

16   quote.  That's really the guts of their argument.

17        THE COURT:  I think what Mr. Wood taught me is that

18   their job was to allocate responsibilities among various

19   entities.  Once they did that, unless they were negligent in

20   their choice, their responsibility ends.

21        Have I captured your argument.

22        MR. WOOD:  If the FAA allocates responsibilities, then

23   we are to carry out ours and the airlines are to carry out

24   theirs.

25        THE COURT:  I never heard from you what were your

76E4WTC3

1    responsibilities.

2         MR. WOOD:  Our responsibilities under Part 107, your

3    Honor, are to put a fence around that airport, to control

4    access to that airport, to investigate and give badges to

5    people that want access to that airport, to provide a police

6    department at that airport, so that if we are summoned by the

7    airlines to deal with somebody at the airport, we have a

8    policeman that comes in.  In general, it's access and providing

9    a police department at that airport that Dulles, Newark, and

10   Massport are obligated to do under the federal statutes and

11   regulations.

12        THE COURT:  But not screening.

13        MR. WOOD:  But not screening.  Specifically 44901,

14   Congress specifically assigns that jobs to the air carriers or

15   their agents.

16        THE COURT:  OK.

17        MR. WILLIAMSON:  I think actually a number of

18   arguments were really made.  One is that under the law they

19   can't be liable, then we will examine in a second if I may

20   whether Massport's abilities and duties are as limited as you

21   just heard and as stated in their brief whereas I say they had

22   no duty.  Let's take a look at that together.  First, it's

23   contrary to the law.  The second Circuit has told us in *Japan*

24   *Airlines* in 1999 that such an argument is rejected when it was

25   made by a different airport operator.

76E4WTC3

1           In that particular case, it was the Port Authority.

2   The Port Authority's main argument, in the words of the Second

3   Circuit, and I quote at page 109, is that a finding of

4   negligence cannot be predicated upon its failure to clear

5   beyond the edges of the runway because it had no duty to do so.

6   We disagree.  The Port Authority's status as an airport

7   operator requires it to maintain JFK in a reasonably safe

8   manner for the benefit of passengers and carriers using the

9   airport, close quote.

10          It goes on to analyze that the Port Authority's

11  argument was predicated upon the fact that there were

12  regulations in place, it said we complied with them, we did the

13  minimum therefore we cannot possibly be liable.  The Second

14  Circuit rejected that argument, as I said, and said that the

15  airport operator had a duty to maintain the airport in a

16  reasonably safe manner.

17          To continue, the proposition being advanced today is

18  rejected by the Second Circuit; it's contrary to Second Circuit

19  law.

20          THE COURT:  What section.

21          MR. WOOD:  44901.

22          MR. WILLIAMSON:  May I go on, your Honor.

23          THE COURT:  One minute.

24          (Pause)

25          THE COURT:  Section 44901(a) imposes on the

76E4WTC3

1    administrator of the Federal Aviation Administration the

2    obligation to describe the regulations that require screening.

3    It goes on to say, the screening must take place before

4    boarding and be carried out by a weapon-detecting facility or

5    procedure used or operated by an employee or agent of the air

6    carrier, intrastate air carrier, or foreign air carrier.  It

7    doesn't say anything about the airport facility itself.  What

8    should I take from that statement.

9           MR. WILLIAMSON:  You are being asked to look at the

10   wrong section.  Let's look at the right section together.  If

11   we look at 601(b) of the Federal Aviation Act, which is

12   discussed and explicated in the Federal Aviation Handbook,

13   Exhibit 8 to our declaration, establishes, quote, Section

14   601(b) of the FA Act specifies, and it goes on to say that the

15   FAA --

16          THE COURT:  Let me get it.

17          (Pause)

18          THE COURT:  Entitled safety regulation of civil

19   aeronautics.

20          MR. WILLIAMSON:  Yes.

21          THE COURT:  It's describing standard rules and

22   regulations and issuing certificates, is that how it starts.

23          MR. WILLIAMSON:  Section 601(b) of FA Act specifies in

24   part when describing, yes, I think we are in the same place.

25          THE COURT:  OK.

76E4WTC3

1          MR. WILLIAMSON:  Here is what's important and what

2    debunks the propositions Mr. Wood was advancing.  I was picking

3    up, your Honor, with the quote that FAA shall give full

4    consideration to the duty resting upon air operators, that's

5    Massport, to perform their services with the highest possible

6    degree of safety in the public interest.  It continues and

7    says --

8          THE COURT:  My text says the administrator shall give

9    full consideration to the duty resting upon air carriers to

10   perform their services with the highest possible degree of

11   safety in the public interest.

12         MR. WILLIAMSON:  I am referencing Section 8300, your

13   Honor; it's 6-5 at the bottom.

14         THE COURT:  Tell me what this larger text is from.

15         MR. WILLIAMSON:  This is the FAA handbook that I was

16   drawing your attention to.

17         THE COURT:  What is the FAA handbook; is it a

18   regulation.

19         MR. WILLIAMSON:  It's promulgated by the FAA.

20         I don't know if I understand the question.

21         THE COURT:  What's the force of law; is it a

22   regulation codified in the Code of Federal Regulations.

23         MR. WILLIAMSON:  No, I think similar to the answer

24   Mr. Joseph gave you, I think it has persuasive authority, and

25   it explicates --

76E4WTC3

1            THE COURT:  It's an informational bulletin.

2            MR. WILLIAMSON:  It's more than that; it's what they

3    are operating under.  We can brief that separate point.  I just

4    wanted to draw your attention to its statement as to what the

5    FA Act is doing and what are the duties of airport operators,

6    which is what we are discussing.  This is consistent completely

7    with the Second Circuit's decision that I just referenced in

8    *Japan Airlines*, which is discussed in our brief.  There is

9    other law on point as well.

10           THE COURT:  This does talk about air operator, and you

11   are saying that Port Authority and Dulles and Massport are air

12   operators.

13           MR. WILLIAMSON:  Right.  It says here the FA Act,

14   again that's in the text, what I was about to go to.

15           THE COURT:  This reference to 601(b) and the statute

16   itself refers to air carriers.

17           MR. WILLIAMSON:  But it indicates here that the FAA

18   shall give full consideration to the duty resting upon the air

19   operators.  That was the point I was trying to make.

20           THE COURT:  I understand.

21           MR. WILLIAMSON:  So may I continue.

22           THE COURT:  Please.

23           MR. WILLIAMSON:  It goes on to say the FA Act

24   recognizes that holders of air operator certificates have a

25   direct responsibility for providing air transportation with the

76E4WTC3

1    highest possible degree of safety.  The meaning of Section

2    601(b) of the FA Act should be clearly understood.  It means

3    that this responsibility rests directly with the air operator,

4    irrespective of any action taken or not taken by an individual

5    FAA inspector or the FAA.

6         So the effort, by the argument presented today, and at

7    page 1 of the brief, to say we have no duty then at page 3 of

8    the opening brief to say we have a duty, the standard of care

9    should be limited to doing the minimum under federal

10   regulations and then we are off the hook, that is debunked, as

11   I say, by the Second Circuit decision in *Japan Airlines*.  The

12   FAA handbook tells us that's not right.  Air operators are

13   governed by that.  Let me continue.

14        We also have *DiBenedetto*, Second Circuit 2004.  In

15   *DiBenedetto*, in a situation where it was dealing with airport

16   security on the ground, OK, is examining what can be the

17   possible liability of the parties involved in the airport

18   security.  It concludes, this is at page 630, your Honor, they

19   have to taken reasonably appropriate steps to avoid or minimize

20   the likely harm.  I was quoting from the Second Circuit.  It's

21   not we are off the hook because we did what we say the

22   regulations provide and that minimum is good enough.

23        Let me continue.  Mr. Wood advanced an argument --

24        THE COURT:  Do you have the cites of *Japan Airlines*

25   and *DiBenedetto*.

76E4WTC3

1          MR. WILLIAMSON:  Absolutely.  *Japan Airlines* is 178

2     F.3d at 103, and the quotation I read to your Honor was at 109.

3     And should I give you the *DiBenedetto* as well.

4          THE COURT:  I have it.  Go on.

5          MR. WILLIAMSON:  So the motion advanced earlier this

6     morning that the airport operators cannot exceed regulations,

7     can't even use common sense is contrary to the law in this

8     circuit.  Also you were told I believe that Massport did not

9     know why it's being sued and couldn't really make it out from

10    the pleadings.  As you recall, when we were together in 2003,

11    Massport made a 12(b) motion, arguing that the complaint

12    against should be dismissed.  That was denied without

13    prejudice.

14          The proposition that Massport doesn't know why it's

15    being sued I submit is not supportable even under the barest

16    standards of notice pleading.  If we look together at Exhibit 3

17    to our declaration, you have chapter and verse for why Massport

18    is being sued.  Exhibit 3, your Honor.  There are three counts

19    directed to Massport as well as other defendants, the first one

20    being for negligence at page 10.

21          THE COURT:  In what respect.

22          MR. WILLIAMSON:  Then we have paragraphs 41 to 53.

23          THE COURT:  In what respect.

24          MR. WILLIAMSON:  To begin, in paragraph 42, for

25    example, the fifth line down from the top, it's alleged that

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E4WTC3

1    the defendants, this group including Massport, undertook and

2    did develop implement, own, operate, manage, supervise, staff,

3    equip, maintain, control and/or --

4                THE COURT:  Would it be fair to say that these

5    regulations are extremely general to satisfactory the rules of

6    pleading but they don't really give any specific knowledge to

7    the defendant.

8                MR. WILLIAMSON:  I think --

9                THE COURT:  I am not saying you have to; I am saying

10   they don't.

11               MR. WILLIAMSON:  This was only my first one; I have

12   many more paragraphs to go.

13               THE COURT:  Go to the last one.  It doesn't really

14   make a difference.  What's the next point.

15               MR. WILLIAMSON:  To the extent that, I think your

16   Honor asked this question as well, should you be moving for

17   summary judgment, if that's what Massport thinks it should be

18   doing, we stand prepared to --

19               THE COURT:  I am sure.

20               MR. WILLIAMSON:  -- submit evidence which suggests

21   that what was represented was to the contrary.

22               THE COURT:  Let me ask you, what is it you want me to

23   do at the end of today.

24               MR. WOOD:  Your Honor, I want to read it into the

25   record, because over the lunch hour over my salad I thought I

76E4WTC3

1    should have answered that better this morning.

2                This is what I want you to do.

3                I request that you rule today that the standard of

4    care for Dulles, for Newark and Logan Airports security duties

5    is defined by the security duties specifically assigned to

6    those airports under federal law, specifically 44 U.S.C. 44903,

7    which tells the administrator what to do, 14 C.F.R. Part 107,

8    which tells the airports what to do from the FAA, and the

9    Airport Security Plan approved by FAA, which tells us in detail

10   what to do.

11               If you would rule that today going forward on divorce

12   against these airports which was supposed to be limited four

13   years ago, experts employed by these airports, summary

14   judgments framed up by these airports are all going to be a

15   whole lot more efficient for this case and for this court,

16   because those laws preempt and completely fill the field of

17   what we are supposed to do.

18               The *Japan Airlines* case is a perfect example.  We are

19   supposed to take care of the runways, and the *Japan Airlines*

20   case was all about whether or not the snow and ice had been

21   properly removed from the runway.  It had nothing to do with

22   screening.

23               THE COURT:  I don't want to cut short Mr. Williamson.

24               MR. WOOD:  Excuse me; I get a little wound up

25   sometimes.

76E4WTC3

1          MR. WILLIAMSON:  Thank you, your Honor.

2          With respect to the motion --

3          THE COURT:  You couldn't have had much time to enjoy

4     your salad.

5          MR. WOOD:  You are more than important the salad.

6          THE COURT:  I said that to my wife.

7          MR. WILLIAMSON:  With respect to the motion that any

8     regulations that existed were ones that Massport satisfied and

9     they couldn't have done anything else, that is refuted in

10    numerous respects.

11         THE COURT:  Do you sue Massport for derivative

12    liability because you argue those who operated the checkpoints

13    were negligent, their companies were negligent, and therefore

14    Massport was negligent.

15         MR. WILLIAMSON:  Not only.  I was about to say

16    Massport's involvement here is much greater than is being

17    portrayed.  Let me be specific.  Massport had the power over

18    areas of security and had recognized authority and

19    responsibilities for the checkpoints.  It chose not to exercise

20    direct control over the checkpoints.

21         THE COURT:  What do you mean they had control.

22         MR. WILLIAMSON:  Massport's own airport, this is what

23    has emerged in discovery, there is no summary judgment motion

24    here so it's not being put forward, but since it was raised

25    today, Massport's airport security program provides, and I

76E4WTC3

1   quote, the FAA or Logan Airport and affected airlines will

2   determine when increased security measures are necessary.

3           THE COURT:  That's enough.

4           MR. WILLIAMSON:  So on.

5           THE COURT:  That's enough.

6           MR. WILLIAMSON:  I have more and more and more like

7   that.

8           THE COURT:  I am not going to give you an abstract

9   ruling.  If you want me to take specific action like dismiss

10   the case, I will consider it, but I am not going to give it,

11   just the way I declined to do it earlier.  These are in effect

12   motions in limine that will determine in large part how I might

13   rule if a specific issue were presented by way of a piece of

14   evidence or an instruction to a jury or a disposition of the

15   case.  I decline to do that.

16           MR. WOOD:  Your Honor, I understand that.  I wouldn't

17   stand here, because I understand the difference between summary

18   judgment and 12(b)(6) motions, I wouldn't stand here and ask

19   you to do that, because that's a question of how do we comply

20   with the law.  What we are asking today because of these very

21   specific federal statutes and regulations is for you to simply

22   rule this is the law that applies to these airports.

23           THE COURT:  I am not going to do that.  I learned that

24   my power of definition is limited.  I am not a legislator, I am

25   a judge, and I have to make rulings when I am compelled to do

76E4WTC3

1   so to decide a case.  This is not a decision of anything in the

2   case, so I am not going to do it.

3          MR. WOOD:  If I tried to frame it as this is the law

4   that applies to the very defined issue of security duties,

5   would I get any further down the road.

6          THE COURT:  No.  I don't supply a rule of decision

7   except with respect to a judicial action, and I am not asked to

8   do a judicial action.

9          Thank you very much, Mr. Williamson.

10         Let's go to Boeing.

11         MR. WILLIAMSON:  Yes, your Honor.  With respect to

12  Boeing, a number of interesting statements were made when

13  Ms. Gaston presented the argument.  One of the more interesting

14  questions that your Honor posed was why didn't you move for

15  summary judgment, because that's really what this Boeing memo

16  of law is, we submit, and the answer is they did.

17         What happened is we served targeted discovery

18  requests, I have a copy with me, on Boeing seeking further

19  information, specifically among other items, to their airport,

20  their air carrier security system, including without limitation

21  the cockpit doors, because the way the argument was presented

22  to you, it was purportedly with claims being limited to the

23  cockpit doors, although near the end Ms. Gaston did concede

24  that there are claims, indeed there certainly are in our

25  cross-claims, beyond just the cockpit doors.

76E4WTC3

1          We asked for discovery and document production with

2     respect to items going back to January 1, 1970, because you

3     hear today that in 1970, they decided that they shouldn't

4     change the way cockpit doors are made to be less intrusive.  So

5     we are supposed believe that in the last 30 years --

6          THE COURT:  She said something different; she said the

7     government instructed.  She is talking about government

8     regulations.

9          MR. WILLIAMSON:  So within the last 30 years, we are

10    to believe nobody has thought about it again.  I submit that

11    that's why we asked these questions numbers 66 to 78.

12         THE COURT:  She said, Mr. Williamson, she said that

13    the government proposed rule making as to the desirability of

14    an intrusion-proof cockpit door, found on the basis of comments

15    from the public and its own investigations that it was not

16    desirable to have an intrusive-proof cockpit door and withdrew

17    the regulations, which means that the government made a

18    decision that as between having intrusion-proof cockpit doors

19    and not having intrusion-proof cockpit doors, it was better in

20    all the circumstances not to have intrusion-proof cockpit

21    doors.

22         Boeing says, not in a motion for summary judgment

23    because they are scared to make a motion, they think I will do

24    something very nasty, which I won't, they say that, therefore,

25    in compliance with a federal decision, they decided not to have

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E4WTC3

1   intrusion-proof cockpit doors.  And since, as I have been given

2   to understand since I made my first decision in this case on

3   the issue of duty, the issue was intrusive-proof or not

4   intrusive-proof, I can understand their position that they

5   should not have an intrusion-proof cockpit door.  Maybe the

6   government was wrong, but the government instructed them.

7   That's what they say.

8          MR. WILLIAMSON:  That's what they say, your Honor.

9   Interesting.  I was going to give you the chronology.  We asked

10  for information on a category called interactions with

11  governmental agencies.  This is our discovery request served

12  April 12.  You asked why didn't they move motion for summary

13  judgment.  They actually did.  They did move motion for summary

14  judgment after they got our discovery requests targeted to,

15  among other things, their interactions with the governmental

16  agencies, one of which seeks to find out how come nobody has

17  woken up in 30 years, if you believe Boeing's story.

18         THE COURT:  When was your interrogatory propounded.

19         MR. WILLIAMSON:  April 12.

20         THE COURT:  Why has it not been answered.

21         MR. WILLIAMSON:  Because, interesting, tactics are

22  everything sometimes, the first thing they did was ask for more

23  time to produce documents or otherwise respond.

24         THE COURT:  Which we gave.

25         MR. WILLIAMSON:  Absolutely.

76E4WTC3

1                    THE COURT:  What's the enlarged date.

2                    MR. WILLIAMSON:  It is supposed to be today.

3                    THE COURT:  Maybe in your office you have them.

4                    MR. WILLIAMSON:  No, because we were told that they

5      were mailed to us, but maybe they will arrive.  Undoubtedly

6      they will; something will arrive.

7                    THE COURT:  If you were told they were mailed, I am

8      sure they were mailed.

9                    MR. WILLIAMSON:  I am sure they were mailed too.  It

10     would have been nicer, obviously my point is, to have gotten

11     them faster.

12                    THE COURT:  Maybe I should hear this again after you

13     receive them.

14                    MR. WILLIAMSON:  That's exactly right, because we

15     should see what they have to say.

16                    MS. GASTON:  No, your Honor, it's an issue of law, not

17     of fact.

18                    THE COURT:  No, no.  Suppose the government told you

19     that's what we thought about it in 1973, but we have had a

20     change of mind, it's up to you, Boeing, you decide what to do.

21                    MS. GASTON:  I would argue again that the issue of

22     preemption makes that issue irrelevant.  First of all --

23                    THE COURT:  It's not an issue of preemption.  The

24     government told you, it's up to you.

25                    MS. GASTON:  Then it would be in the federal

76E4WTC3

1    regulations.

2              THE COURT:  Not necessarily.  On the record, all we

3    have is the government withdrew the proposed ruling; that's

4    what we have.  It's like *certiorari* denied; there is no

5    precedent, except if there is nothing further, you have a very

6    strong argument, but there is no precedent.  If the government

7    told you something different, in the interval or some

8    circumstance changed in the interval, there may be a case.  I

9    don't know.

10             I am not going to make abstract rulings.  It should be

11   clear to everybody that I don't have enough confidence in my

12   ability to do that.

13             MS. GASTON:  Your Honor, respectfully, it requires

14   facts and it requires discovery in order to make conflict

15   preemption decisions.  It does not require the governmental

16   facts in order to make a field preemption decision.

17             THE COURT:  I don't want to do that.  How many areas

18   of law do we have to deal with preemption.

19             MS. GASTON:  I can't answer that.

20             THE COURT:  Beyond labor law, is there anything else.

21             MS. GASTON:  I don't know.

22             THE COURT:  Labor law and ERISA, what else.

23             MS. GASTON:  What other field is regulated to the

24   extent that aircraft design is, your Honor.

25             THE COURT:  I don't know.

76E4WTC3

1          MR. WOOD:  Tanker design, you bet.

2          MS. GASTON:  Maritime tankers.

3          THE COURT:  Federal maritime law.  I don't know.  I am

4    not a jurisdictional scholar, I am not a jurisprudential

5    scholar, I am an Article III judge, which means I can back

6    switch hands.  I am not making any rulings.

7          Mr. Williamson, thank you very much.

8          MR. WILLIAMSON:  Thank you, your Honor.

9          THE COURT:  I not writing on any of the issues so far.

10   It be has been a long day; I don't have anything to take back

11   so far.  The next issue is punitive damages.  Mr. Podesta.

12         MR. PODESTA:  Your Honor, Roger Podesta for American

13   Airlines, with respect to the motion as to the punitive damages

14   claim in flights 11, 77 and 175.  Let me get directly to the

15   concrete, your Honor.  There appear to be certain aspects of

16   this motion that are unopposed.  American and Ardenbrite have

17   moved for a dismissal of the Teague and Whittington flight 77

18   punitive damages claims because those are Warsaw Convention

19   cases, and the Second Circuit has held that punitive damages

20   are not recoverable against air carriers and their agents under

21   the Warsaw Convention.  The Teague and Whittington plaintiffs

22   have not opposed this motion, so those claims should be

23   dismissed period.  We are not requesting any abstract ruling;

24   we are requesting a dismissal of the punitive damages claim.

25         Secondly, it appears --

76E4WTC3

```
 1            THE COURT:  Stop for a minute.

 2            Any opposition to that.

 3            MR. MIGLIORE:  That issue came up earlier with Mr.

 4   Moller this morning.  There is a briefing schedule on other

 5   issues relating to those claims.  They were not raised

 6   specifically for purposes of this motion.  We ask that they

 7   just be carried over to the briefing, because there is a

 8   summary judgment motion pending on those cases on the issue of

 9   the convention.

10            THE COURT:  We were supposed to do punitive damages

11   today.

12            MR. MIGLIORE:  Your Honor, I wasn't responsible.  I am

13   asking the people who are briefing that issue.  To my knowledge

14   it wasn't briefed in this particular motion.

15            MR. PODESTA:  Yes, it was, and the proposed order

16   specifically called for the dismissal of the Teague and

17   Whittington punitive claims.

18            MR. MIGLIORE:  Candidly, your Honor, this wasn't

19   something that I was doing; I was here on the government brief.

20            THE COURT:  I will hear it on a rehearing if I give

21   it.

22            MR. MIGLIORE:  It may well be given what it is, we can

23   agree to it as well.  If you don't mind, let's defer it.

24            THE COURT:  I am going to rule.  I am going to dismiss

25   those cases.  If you want to bring a motion for a rehearing, I
```

76E4WTC3

1   will hear it.

2           MR. MIGLIORE:  You are going to dismiss that claim of

3   damages.

4           THE COURT:  That claim of damages against Teague and

5   Whittington.  OK, Mr. Podesta, doing great so far.

6           MR. PODESTA:  I am on a roll.  When I have a Second

7   Circuit decision directly on point and no opposition, I can win

8   them.

9           MR. MIGLIORE:  Without prejudice.

10          MR. PODESTA:  OK.  I will move into more dangerous

11  ground.  I believe that the motion to dismiss the punitive

12  damages claims is also unopposed as to the property damages.

13  The World Trade Center plaintiffs in their brief supporting

14  their cross-motion on severance and deferral expressly take no

15  position on the outcome of the punitive damages motions between

16  the aviation defendants and the other plaintiffs.

17          THE COURT:  Mr. Williamson.

18          MR. WILLIAMSON:  That is correct, your Honor.

19          THE COURT:  OK.  Dismissed.

20          MR. PODESTA:  I win that one too.

21          MR. JOSEPH:  We didn't make the punitive damages

22  claim, so it can't be dismissed.

23          THE COURT:  OK.

24          MR. PODESTA:  I am on a roll.  The whole group of

25  plaintiffs in their opposition in Section 2(b), which was the

76E4WTC3

1   only opposition on flights 11 and 175, which are the only cases

2   with property damages claims, only argue that they could pursue

3   their punitive damages claims with respect to personal injury

4   and wrongful death claims.

5         THE COURT:  There are no punitive damages claims left

6   in Teague and Whittington in any and all property damages

7   claims.

8         MR. PODESTA:  I believe that's correct.  Building on

9   this momentum, I will now move to oppose.  Look at the

10  progression here.  I had no opposition and a Second Circuit

11  decision, then just no opposition.  I am now graduating to the

12  point where I can deal with opposed motions.

13        THE COURT:  Anything further you would become a

14  retired partner or a judge.

15        MR. PODESTA:  The aviation defendants' motions as to

16  flights 11 and 175 rest on three basic premises, two of which

17  are undisputed by plaintiffs.  Remember, these are the flights

18  that left Logan for New York.  First, Section 408(a)(1) of the

19  ATSSSA or the Stabilization Act restricts recovery of all kinds

20  of damages in the 9/11 litigation to the limits of the aviation

21  defendants' liability insurance coverage.  Thus, as plaintiffs

22  concede, there can be no direct financial recovery in these

23  cases from the aviation defendants.  The only potential source

24  of recovery is from the liability insurance policies.  So far,

25  I think we are in agreement.

76E4WTC3

1          The second problem is the only one that I believe the

2     plaintiffs dispute.  That is, the aviation defendants contend

3     that under Section 408(b)(2) of ERISA, which we discussed at

4     length this morning, punitive damages issues are covered by New

5     York law.

6          THE COURT:  Not ERISA, I think you said ERISA.

7          MR. PODESTA:  ATSSSA.

8          Third, as plaintiffs again concede, New York has a

9     strong public policy prohibiting insurance coverage for

10    punitive damages.  That has been reaffirmed six times in the

11    last 30 years by the New York Court of Appeals.

12         Thus, a combination of these three premises --

13         THE COURT:  What was the second one.

14         MR. PODESTA:  That New York law applies.

15         THE COURT:  Because the flights ended up in New York.

16         MR. PODESTA:  Because the flights ended up here, and

17    under New York's choice of law rules, New York would apply its

18    own conduct regulating rules to the issue of punitive damages

19    and would apply its own public policy, both as to forum and

20    under the operation of its choice of law rules.

21         Thus, if New York law applies to the flight 11 and 175

22    cases, plaintiffs are prohibited from recovering punitive

23    damages, not only from the aviation defendants by virtue of

24    ATSSSA, there can be no directed injury recovery, but also by

25    virtue of New York law, they cannot recover punitive damages

76E4WTC3

1  from the liability insurance policies, because New York law

2  prohibits insurance coverage for punitive damages.

3       This makes sense as a matter of New York law.

4  Punitive damages are not, according to the New York Court of

5  Appeals, designed to serve a compensatory function.  They are

6  designed solely to deter and punish the wrongdoer by imposing

7  financial loss on that wrongdoer.  Because ATSSSA makes that

8  impossible here, there can be no financial loss to the aviation

9  defendants.  Punitive damages serve no conceivable purpose

10 under New York law and should be dismissed.

11      Plaintiffs make three principal points in opposition.

12 The first of these is that Congress somehow endorsed the

13 recoverability of punitive damages in all 9/11 cases,

14 regardless what state law may say, because it mentioned, it

15 used the words punitive damages in section 408(a)(1) of ATSSSA,

16 the Stabilization Act.

17      THE COURT:  Notwithstanding any other provision of

18 law, liability for all claims, whether for compensatory or

19 punitive damages or for contribution or indemnity arising from

20 the terrorist-related aircraft crashes on September 11, 2001,

21 against an air carrier, aircraft manufacturer, airport sponsor,

22 or person with a property interest in the World Trade Center on

23 September 11, 2001, I will skip some words, shall not be in an

24 amount greater than the limits of liability insurance coverage

25 maintained by that air carrier, aircraft manufacturer, airport

76E4WTC3

1   sponsor or person with a property interest.

2           MR. PODESTA:  As that language as you just read shows,

3   your Honor, Section 408(a)(1) does not create a cause of action

4   for punitive damages or anything else.  It operates solely as a

5   limitation on the liability of the aviation defendants to the

6   limits of their liability insurance coverage.  That section of

7   the statute mentions punitive damages only to make clear that

8   all types of damages, whether for compensatory damages or

9   whether for punitive damages or whether for contribution or

10  whether for indemnity are subject to the liability cap.

11          The federal cause of action for damages --

12          THE COURT:  But the payor is not the insurance company

13  directly; it's the aircraft company.

14          MR. PODESTA:  Well, they are the defendant.

15          THE COURT:  The money comes from insurance and they

16  can't pay out more than insurance, but it doesn't directly say

17  either that the insurance company is the paying agent directly

18  or that they can't pay whatever damages are assessed,

19  compensatory or punitive or otherwise.

20          MR. PODESTA:  408(a)(1) does not say whether punitive

21  damages can be recovered period.  It's totally neutral on the

22  subject.

23          THE COURT:  It may be inconsistent with the scheme set

24  up by Congress but it's not I think a direct consequence of the

25  wording of the statute.

76E4WTC3

1          MR. PODESTA:  No.  408(a)(1) just says whatever kind

2    of damages you have, punitive or compensatory, are limited to

3    your insurance coverage.  To reach my conclusion and to dismiss

4    their claims, you have to move beyond 408(a)(1) to New York

5    law.  It's the interaction of 408(a)(1) with New York law

6    chosen under 408.

7          THE COURT:  Why give up that argument.  Why give up

8    the motion that the statute intended to allow recovery only to

9    the extent of the defendants' insurance coverage.  It might be

10   inconsistent with giving windfall awards to particular people

11   as a means of punishing a defendant.  There was no way to know

12   when statute was created that the insurance coverage would be

13   sufficient to pay all claims.  It was only because of the

14   extraordinary work of the special master and the creation of

15   victim compensation fund in the same statute that that

16   particular problem seems to be academic.  It may not be

17   academic.

18          There are considerable property claims.  There are

19   considerable claims that come against the city with regard to

20   other aspects of the case.  No one knows how this will all work

21   out in the end.  It may be that there would not have been

22   enough money to pay all compensatory claims if there had not

23   been these other features.  So one could argue that it is

24   inconsistent with the statutory scheme of limiting liability to

25   insurance to allow any particular plaintiff to recover the

76E4WTC3

1    windfall of punitive damages

2            MR. PODESTA:  I think that's certainly an argument.

3            THE COURT:  It's a good argument.

4            MR. PODESTA:  Yes, it's a very good argument.

5            THE COURT:  Why don't you make this.

6            MR. PODESTA:  Because it really goes more towards the

7    question of deferral and severance than it does to outright

8    dismissal.

9            THE COURT:  I am not a bankruptcy judge.  I am not

10   going to wait until all claims I have allowed, all these

11   settled claims to be paid out and paid out promptly.  We can't

12   wait.  Look what a destructive scheme it would be to wait.

13   People in need of money would have to wait.  People who lost

14   their wage earner would have to wait.  It is inconceivable that

15   it would be Congress' plan.  It's a pay-as-you-go basis, and it

16   seems to me that the scheme is inconsistent with giving up

17   punitive damages.

18           MR. PODESTA:  Then I make that argument, your Honor.

19   You persuaded me.  I don't know whether you succeeded in

20   persuading Mr. Moller as yet, I endorse that argument.  I would

21   like to go on to the argument that I did make.  I am doing

22   great here; I am not only winning unopposed motions but I have

23   judges giving me arguments saying why don't you make those

24   arguments.  What more can I ask for; this is paradise.

25           But in any event, assuming I win on that, the federal

76E4WTC3

1    cause of action for damages is created by 408(b) and 408(b)(2)

2    directs this court to look to the law of the state of the

3    crash, including its choice of law rules, to determine whether

4    punitive damages are available.  In other words, Section

5    408(a)(1) does not authorize punitives.  If any punitives are

6    authorized under the statute --

7         THE COURT:  It's certainly not inconsistent with

8    federal law that New York law forbidding punitive damages in

9    this situation if paid by the insurance company would be the

10   choice of law.  Does New York law on the cases that have arisen

11   under New York law speak to a situation where a defendant is

12   being asked to pay punitive damages because insurance would pay

13   punitive damages and not apply.

14        MR. PODESTA:  The New York Court of Appeal has held in

15   six occasions in the last 30 years that defendants may not look

16   to insurance coverage to pay punitive damages and they have so

17   held even in situations where the contract expressly provided

18   that punitive damages were covered under the policy.  There is

19   absolutely no inconsistency between New York public policy

20   against insurance coverage for punitive damages and anything in

21   ATSSSA.

22        THE COURT:  So now we can cover flight 11.

23        MR. PODESTA:  And 175.

24        I have to cover the choice of law issue.

25        THE COURT:  That leaves the Virginia flight and the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E4WTC3

1    Pennsylvania flight.

2         MR. PODESTA:  I still have to establish that New York

3    law applies to flights 11 and 175 because that is disputed.

4         THE COURT:  The crash was in New York.

5         MR. PODESTA:  Yes, but the plaintiffs say that

6    Massachusetts law should control.

7         THE COURT:  Why.

8         MR. PODESTA:  Because under New York law rules, you

9    look to whether it's a conduct-regulating rule, and it's agreed

10   punitive damages are conduct-regulating rules, you look to the

11   law of the place of the tort.  Where two jurisdictions may

12   claim to be the place of the tort --

13        THE COURT:  The State of Massachusetts was the

14   conduct-regulating state because it passed through Logan.

15        MR. PODESTA:  The preboarding screening occurred

16   there.

17        THE COURT:  That's why you want me to rule that

18   federal law applies.

19        MR. PODESTA:  I want you to rule that New York law

20   controls as to the availability of punitives under, as flights

21   11 and 175, and 408(a)(1) also applies.

22        THE COURT:  If the conduct was in Massachusetts and

23   the crash occurred in New York, wouldn't New York's conflict of

24   laws point to Massachusetts.

25        MR. PODESTA:  No.  New York's conflict of laws would

76E4WTC3

1    point to New York because New York says where two jurisdictions

2    may claim to have an interest in applying their own

3    conduct-regulating rules, New York applies as a tie-breaker

4    where the last event necessary to make defendants liable

5    occurred.  That tie-breaker, I think even plaintiffs would

6    concede, operates here in favor of New York.

7              THE COURT:  Why.

8              MR. PODESTA:  Because the last event necessary to make

9    the defendants liable on the personal injury cases and the

10   ground wonderful death cases was the crash of the planes into

11   the World Trade Center.  Until that point there had been no

12   breach of duty, there had been no injury to those plaintiffs.

13             With respect to the wrongful death passenger planes --

14             THE COURT:  What was the conduct-regulating activity

15   in New York.

16             MR. PODESTA:  The place of the issue is whether they

17   are the place of the tort and the place of the tort typically

18   is where the last injury occurs.  There is no tort until there

19   is injury, so that's what makes New York the place of the tort.

20             THE COURT:  But the conduct regulating removes that

21   from the place of injury and goes back to where the conduct

22   was.  The negligence, if there was negligence, was in the

23   airport screening that took place in Massachusetts.

24             MR. PODESTA:  It's also alleged to have occurred

25   onboard the flight in the way the hijacking was handled.

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

1    That's the cockpit door argument and common strategy argument.

2              THE COURT:  The conduct with the cockpit door had to

3    do with Seattle, Washington.

4              MR. PODESTA:  Not as to the airlines, it didn't.

5              THE COURT:  What was the negligence of the cockpit

6    doors.

7              MR. PODESTA:  That we didn't have a reinforced cockpit

8    door and that we did not take appropriate measures to secure

9    even an unreinforced cockpit door.  But in any event, New York,

10   I mean the reason New York law applies is --

11             THE COURT:  Go on to Virginia.

12             MR. PODESTA:  I need to go on to Massachusetts.  It

13   doesn't really matter, it's academic, because Massachusetts is

14   one of the few states in the country that does not recognize

15   punitive damages at common law.  If the personal injury claims,

16   if they were governed by Massachusetts, they have to be --

17             THE COURT:  You have New York law and Massachusetts

18   law.

19             MR. PODESTA:  No conflict.  The same is true as to

20   wrongful death cases, because while Massachusetts authorizes

21   punitives in wrongful deaths by statute, it applies the same

22   approach as New York.  There is no Massachusetts case that has

23   allowed for insurance coverage for punitives.  Massachusetts

24   rarely considers these issues.

25             THE COURT:  Let's go on to Virginia.

76E4WTC3

1          MR. PODESTA:  OK.  There is no truth conflict between

2     New York and Massachusetts.  Either way --

3          THE COURT:  You are finished with Massachusetts.

4          MR. PODESTA:  The Virginia issue is very simple

5     really.  Virginia does allow for punitives.

6          THE COURT:  Time out before you get to Virginia.

7          I am Part I judge this week; I have to sign some

8     papers.

9          (Pause)

10          MR. PODESTA:  Virginia is relatively simple.  Virginia

11     does permit insurance for punitive damages, but it has a

12     $350,000 statutory cap that applies, and our interpretation of

13     the statute has not been contested.

14          THE COURT:  In the aggregate or per claim.

15          MR. PODESTA:  It applies to all defendants in the

16     action as a single limit; in other words, the total amount that

17     any --

18          THE COURT:  How about all plaintiffs.

19          MR. PODESTA:  That's not clear.  We have asked for

20     purposes of this, one district court in Virginia has so

21     suggested, but I think that it's entirely possible that the

22     proper interpretation of the statute is that each decedent and

23     each injured plaintiff, not beneficiary or consortium people,

24     but each physically injured plaintiff and each wrongful death

25     plaintiff could recover $350,000 from all defendants who happen

76E4WTC3

1    to be at trial in the action.

2              THE COURT:  Pennsylvania.

3              MR. PODESTA:  As to that, I have to respond to

4    plaintiffs' argument.  Plaintiffs say that cap can't apply

5    because it's inconsistent with ATSSSA.  They say it's

6    inconsistent with 408(a)(1), and that's just repeating the same

7    mistake.

8              THE COURT:  Pennsylvania.

9              MR. PODESTA:  Pennsylvania, I have to defer to

10   Mr. Ellis.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76E59114                         argument

1              THE COURT:  Mr. Ellis.

2              Mr. Ellis, stay where you are.

3              MR. ELLIS:  I will make it quick, Judge.  First of

4      all, I adopt your argument.

5              Second of all, I would like to say Pennsylvania is

6      relatively easy.  Really, there is no conflict.  The only laws

7      that could apply would either be Pennsylvania, New Jersey, or

8      Illinois where plaintiffs claim there was corporate policy

9      issues that make us liable.  Again, they haven't specified

10     which ones.

11             But, the bottom line is --

12             THE COURT:  Pennsylvania claim came from Newark,

13     right?

14             MR. ELLIS:  Yes, your Honor.  The flight took off from

15     Newark.  Plaintiffs, in their choice of law argument explain --

16             THE COURT:  So, it is New Jersey or Pennsylvania.

17             MR. ELLIS:  It is New Jersey, Pennsylvania or

18     Illinois.  And basically they came out in first place.

19             United, as a result of their bankruptcy, any recovery

20     can only be from their insurance policy.  Plaintiffs don't

21     dispute that.  The only thing the plaintiffs claim is that the

22     law of Pennsylvania should apply.  We will get into that in

23     their compensatory damage motion.  But, for purposes of

24     punitives, as we point out in our reply brief, Pennsylvania law

25     does not allow the recovery of punitive damages if there is a

76E59114                         argument

1   finding of direct liability even if there was a finding also of

2   vicarious liability.

3            The point of the matter is New York, New Jersey -- I

4   mean Pennsylvania, New Jersey, Illinois, all do not allow these

5   damages to be insured.

6            THE COURT:  Give me Pennsylvania again.  What is the

7   law?

8            MR. ELLIS:  The law in Pennsylvania is simply that if

9   you are only vicariously liable -- only vicariously liable.

10            THE COURT:  Why is the aircraft vicariously liable?

11            MR. ELLIS:  Again, Judge, I have no idea.  They

12   haven't told us but this is what they claim, they claim we can

13   show.

14            THE COURT:  They claim United's people allowed the

15   people on the plane.

16            MR. ELLIS:  As a matter of fact, they briefed claims

17   specifically that we were both direct and vicariously liable.

18   So, they're out as a matter of law.

19            THE COURT:  So, we have to assume that there is a

20   direct liability not a vicarious liability.

21            MR. ELLIS:  And there is no recovery -- I can't insure

22   that under Pennsylvania law.

23            THE COURT:  Same as New York?

24            MR. ELLIS:  Same as New York.

25            THE COURT:  Can't recover insurance money.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59114                    argument

1          MR. ELLIS:  There is little nuances but under these

2    circumstances, same result.

3          THE COURT:  And New Jersey?

4          MR. ELLIS:  Same thing.

5          And Illinois doesn't allow recovery of punitives,

6    period.

7          THE COURT:  I don't understand why Illinois is

8    involved.

9          MR. ELLIS:  Because plaintiffs allege that there was

10   corporate policy decisions.  United is headquartered in

11   Illinois.  Again, it remains to be seen what they're going to

12   claim but it is cited because of the breadth of the their

13   claims.

14         Thank you, your Honor.

15         THE COURT:  Okay.

16         Mr. Shultz.

17         MR. SHULTZ:  Would you also prefer that I stay here as

18   opposed to the podium?  I will keep my remarks brief, your

19   Honor.

20         First, Boeing also adopts the positions set forth and

21   agreed to by Mr. Podesta and Mr. Ellis, that any award --

22         THE COURT:  Just go to Washington.  Where was the

23   plane made?

24         MR. SHULTZ:  Designed in Washington, manufactured in

25   Washington, and all four planes were delivered to American and

76E59114                         argument

1    United Airlines in the state of Washington.  We believe

2    Washington covers Boeing's conduct including punitive damage

3    claims.

4            THE COURT:  What is the rule of Washington?

5            MR. SHULTZ:  Washington does not allow punitive damage

6    claims in this case.

7            THE COURT:  Mr. Moller?

8            MR. MOLLER:  Your Honor, I would like to step back for

9    a moment from jumping to the conclusions that my colleagues on

10   the other side have been doing.

11           Having now heard from the defendants in their

12   arguments to the Court and having read their briefs, they

13   persist, I believe mistakenly, in conflating the issues of

14   recoverability of punitive damages with the issue of

15   collectibility of punitive damages.

16           The states in which these planes crashed all allow

17   recovery for punitive damages either in a wrongful death case

18   or in a survival action.  The defendants also carefully avoid

19   acknowledging the glaring inconsistency between the state

20   policies which do not permit the insurability of punitive

21   damages claims and impose that burden upon tort feasor with the

22   unprecedented federal legislation which Congress enacted to

23   deal with the 9/11 disasters, the Air Transportation Act that

24   we have been talking about.  This legislation makes the

25   question of who should pay punitive damages a matter of federal

76E59114                         argument

1    policy and not state policy.

2           The Act reflects a careful balance between three

3    competing interests –– first, the perceived desire of Congress

4    to be responsive to the avation industry's cry for protection

5    and assistance in the wake of 9/11 caused in part by the

6    avation defendants' concern that they might be held liable for

7    very substantial punitive damages as well as compensatory

8    damages, a prospect that was deemed real and still is in the

9    shadow of the horrific events of 9/11.

10          Second, Congress was concerned about the humanitarian

11   impulse of the nation to create a vehicle outside of the

12   litigation process for those people who elected to take

13   advantage of the Victims' Compensation Fund to receive

14   compensation without litigation.  And those people had to give

15   up the right to recover punitive damages if they entered the

16   system.

17          THE COURT:  It wasn't worded that way.  You have the

18   right to sue under normal tort law.

19          MR. MOLLER:  And by virtue of giving up the right to

20   sue they would give up right to seek punitive damages.

21          And, thirdly, Congress preserved all the rights and

22   remedies of parties who sustained losses through wrongful death

23   or personal injury who elected to pursue the litigation

24   process, as I just said.

25          The balance Congress struck to address these competing

76E59114                         argument

1    interests was, of course, the victims' compensation fund;

2    second, statutory protection for the aviation defendants by

3    providing that their treasuries could not be reached to satisfy

4    judgments for compensatory or punitive damages, and of course

5    preserving the victims' rights to pursue claims for

6    compensatory and punitive damages which each state in which the

7    crashes occurred allowed.

8              And here is the tradeoff:  We all know that for the

9    victims who elected not seek compensation they can only get

10   money from the insurance policies which cover the various

11   defendants up to the limits of coverage.

12             The New York policy precluding insurance coverage for

13   punitive damages was not one which was made in the context of

14   9/11 and the New York State courts dealing with the issue were

15   balancing different interests.

16             Congress could not, and there is no evidence to

17   suggest that it ever intended, a purchase to be permitted to

18   seek punitive damages and then not collect those damages.

19             To deny plaintiffs the ability to collect a punitive

20   damage award which Congress specifically allowed would mean

21   that the plaintiff would lose rights.  And the loss of rights

22   cannot be presumed or inferred.

23             Therefore the answer, I believe, to the question you

24   posed earlier to counsel, is that it is the statute itself

25   which stands for the proposition that punitive damages are

1   collectible from the insurance policies here because there is

2   no statement in the legislation to preclude it.

3            Now, what I would like to do is walk through the ATSSA

4   statute to make the point of how often Congress addressed

5   punitive damages and, by doing so, they had to be aware of the

6   New York State policy which the defendants argue should come

7   into play because most of the debts occurred here.  And when

8   Congress enacts a piece of legislation, it is presumed to know

9   what laws it will displace or affect.

10           The Second Circuit, when it was dealing with the

11   Virgilio case cited to a comment by Senator McCain on September

12   21st, 2001 in which he addressed specifically the purpose of

13   the federal legislation.  The Congressional record of that day

14   records that he said that the purpose of the stabilization

15   act -- and this language is also cited in footnote 7 in

16   Virgilio -- was, "to ensure that the victims and families of

17   victims who were physically injured or killed on September 11th

18   are compensated even if Courts determine that the airlines and

19   any other potential corporate defendants are not liable for the

20   harm; if insurance monies are exhausted or are consumed by

21   massive punitive damages awards for attorneys fees.

22           The bill also creates a victims' compensation fund.

23           So, Senator McCain certainly knew that it was the

24   purpose of the statute to allow people to recover punitive

25   damages from the insurance policies if they were successful in

76E59114                         argument

1    proving that claim at trial.

2           Now, Congress took another look at the ATSSA in

3    November of 2001 when amendments were under consideration.

4    When those amendments to the September 2001 legislation were on

5    the floor, Representative John Conyers wanted the right to

6    recover punitive damages stricken from the statute but he was

7    unsuccessful and he made a long statement in support of his

8    position which obviously did not carry.

9           Now, let's look at the statute itself.

10          THE COURT:  What should I take from that?

11          MR. MOLLER:  That Congress was aware that punitive

12   damages would be claimed and would have to be paid from the

13   only source available and that the attempt by Representative

14   Conyers to have punitive damages dropped from the legislation

15   was, simply, unsuccessful.

16          So, it endorses the original assistant that Senator

17   McCain put on the table.

18          THE COURT:  Suppose Congress felt that punitive

19   damages would not likely be recovered.

20          MR. MOLLER:  Well, Congress was guessing.  But we

21   don't know that that's part of the equation.

22          THE COURT:  One minute.  (Pause)  Be back in a minute.

23   (Pause)

24          THE COURT:  Let's proceed.

25          MR. MOLLER:  I wanted to make a point that what I

1   attributed to Congress was the flawed managements of the

2   amendments position which Conyers proposed.

3           But, the point is that the effort to drop the punitive

4   damages and the right to make a claim was defeated when the

5   November amendments were under consideration.

6           I would like to look at the Act and follow the Court's

7   suggestion of going to the source and figuring out what lessons

8   could be learned from it.

9           First, the obvious purpose of the ATSSA statute is to

10  protect the airline industry and not the insurance industry.

11  It is worth repeating that this debate is about insurance and

12  insurers trying to limit their exposure, and the aviation

13  defendants, at the end of the day, really don't have a dog in

14  this fight because their money is not at play.

15          Section 201(b)1 of the ATSSA -- and I thank my friend

16  Mr. Barry for putting that into play -- the 201(b) says:

17  Reimbursement of insurance cost increases.  In general, the

18  secretary may reimburse an air carrier for an increase in the

19  cost of insurance with respect to a premium for coverage ending

20  before October 1, 2002, against loss or damage arising out of

21  any risk from the operation of an aircraft over the insurance

22  premium that was in effect for a comparable operation during

23  the period beginning September 4, 2001 and ending September 10,

24  2001.

25          I think that's relevant and is significant because it

76E59114                        argument

1    recognizes that insurers are in the business of dealing with

2    and accepting and adjusting to risk and the losses they choose

3    to underwrite and the premiums they will charge.

4           Congress knew that there was a likelihood which

5    happens to have eventuated that insurers would raise premiums

6    and stepped in to protect the airlines.  But the insurers'

7    responsibility to pay the bill was limited only by subsequent

8    sections of the act that we will address in a moment.

9           Second, Section 201(b)2 provides, and this I think

10   very significant, that for acts of terrorism committed on or to

11   an air carrier during the 180-day period following the date of

12   enactment of this act, the Secretary of Transportation may

13   certify that the air carrier was a victim of an act of

14   terrorism.  And, the section goes on to provide that the

15   government will, essentially, be an excess carrier above $100

16   million.

17          The last sentence in that paragraph reads:  No

18   punitive damages may be awarded against an air carrier

19   parenthetically, or the government taking responsibility for an

20   air carrier under this paragraph) under a cause of action

21   arising out of such act.

22          THE COURT:  So, the argument is that by expressing the

23   particular in a following catastrophe --

24          MR. MOLLER:  That's correct.

25          THE COURT:  -- by implication, the statute recognized

76E59114                        argument

1    that punitive damages could be available, for instance on

2    September 11th.

3              MR. MOLLER:  Precisely.

4              But it is not only that Congress recognized that

5    potential.  It was recognizing and demonstrating its ability to

6    deal with punitive damages for 9/11 events.  Had they wanted to

7    eliminate the right to recover and collect a punitive damages

8    claim, the statute would have said so.

9              Then you go to Title IV, Victims' Compensation Fund.

10   The Victims' Compensation Fund instructed the special master

11   that, and this is in 405, "no punitive damages."  The special

12   master may not include amounts for punitive damages in any

13   compensation paid under this title.  Another obvious

14   demonstration that punitive damages collectibility,

15   recoverability, payment, was on the mind of Congress and they

16   decided to foreclose the special master from making that kind

17   of an award.  But, it is most important for the state of mind

18   of the Congress when it enacted ATSSA.

19             Now you get Section 408.  408(a)1, of course, provides

20   the key language allowing recovery of compensatory and punitive

21   damages provided that the recovery shall not be an amount

22   greater than the limits of coverage.

23             I would like to focus on the specific language of that

24   section and highlight a few words.

25             First, 408(a) says, notwithstanding any other

provision of law.  Liability for all claims whether for

compensatory or punitive damages arising from the terrorist

related aircraft crashes of September 11th, 2001, against any

air carrier shall not be an amount greater than the limits of

coverage notwithstanding any other provision of law.

Those are not words to be disregarded.  And, to the

extent that New York policy is a reflection of a competing body

of law, New York State is read out of the equation.

You go on, then, to -- I just want to put in a

paragraph that picks up on 408(a).  In the November 2001

legislation an amendment granted similar ATSSA protection to

the City of New York.  That became 408(a)(3).  408(a)(3) reads:

Liability for all claims, whether for compensatory or punitive

damages or for contribution or indemnity arising from the

terrorist-related aircraft crashes of September 11, 2001

against the City of New York, shall not exceed the greater of

the city's insurance coverage or $350,000.

Now, a lawsuit against the City of New York would

arise under New York Law.  If they were going to limit punitive

and compensatory damages to insurance coverage and not permit a

victim or a damaged party from seeking the coverage, they would

have been able to rely upon the New York policy and the

language in (a)3 of insurance coverage would have been

surplusage.

They obviously knew that somebody with a punitive

1   damages claim that was proved could go against the coverage.

2              THE COURT:  What's the language in that amendment?

3   Read it to me again.

4              MR. MOLLER:  I will read first sentence:  Liability

5   for all claims, whether for compensatory or punitive damages or

6   for contribution or indemnity arising from the

7   terrorist-related aircraft crashes of September 11, 2001

8   against the City of New York, shall not exceed the greater of

9   the city's insurance coverage or $350,000.

10             Shall not exceed the greater of $350 million -- excuse

11  me.  $350 million.

12             So, there would have been no need for the reference to

13  insurance coverage as a limitation if you couldn't get to it

14  under New York Law.

15             Now 408(b)1 did several things.  Let's go to 408(b)1.

16  The availability of action.  There shall exist a federal cause

17  of action for damages arising out of the highjacking and

18  subsequent crashes.  And the section goes on to say:  This

19  cause of action shall be the exclusive remedy for such damages

20  arising out of the highjacking and the subsequent crashes of

21  such flights.

22             Collectibility of a punitive damages award is a

23  remedy.  And if you can't get it, then this statute means

24  nothing.

25             THE COURT:  Give me that again.  I'm not following

76E59114                         argument

1    this point.

2              MR. MOLLER:  Section 408(b)1, federalized causes of

3    action --

4              THE COURT:  Right.

5              MR. MOLLER:   -- and said that this cause of action

6    shall be the exclusive remedy for such damages arising out of

7    the highjacking.

8              THE COURT:  Right.

9              MR. MOLLER:  That does more than put the case into

10   this Court.  It means that the remedies here --

11             THE COURT:  If federalizes the law, as Mr. Podesta

12   said.

13             MR. MOLLER:  If federalizes the law but then it is no

14   longer state policy that would control the remedy.  It is

15   federal law that controls the remedy, at least to the extent of

16   being able to collect a damages award.

17             THE COURT:  What the federal law said is that as a

18   matter of federal law we will look to state law if that state

19   law is inconsistent with --

20             MR. MOLLER:  Correct.  And it is clearly inconsistent.

21   Because what the federal law has done is it has said for

22   federal policy reasons that we are not going to let you go into

23   the tort feasor's treasury.

24             THE COURT:  There is a bouncing back and forth which

25   is why I had trouble understanding, but the federal law, as you

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1  have compounded it, is open to the possibility of punitive

2  damage recoveries under state law.  And where there is a state

3  law that disallows, arguably punitive damages recovery, your

4  argument is that it is inconsistent with the federal law that

5  allows for the possibility of punitive damage recovery.

6          MR. MOLLER:  Close, but not quite.  I'm saying it a

7  little bit differently.

8          The states allow the recoverability of punitive

9  damages, period.  The second question is who do you get the

10  money from?  The state policy is you can't get it from an

11  insurance company.  The federal policy, we submit, is that you

12  can get it from a insurance policy.  Because once they

13  eliminated the right to go -- once the federal government --

14          THE COURT:  You are making it very difficult to deal

15  with the situation because you don't really know all the time

16  what is punitive and what is compensatory.  And then you have

17  problems of administration.

18          MR. MOLLER:  That depends on the charge that you give

19  the jury and how it responds on a verdict sheet.

20          THE COURT:  But even if I had it on a verdict sheet

21  you have different problems because you don't know when your

22  recovery period of damages is unless you deal with it in the

23  aggregate.

24          MR. MOLLER:  I don't think that's a problem that

25  defeats the argument that I am making.

1          THE COURT:  All right.

2          MR. MOLLER:  There are two things at play.  Can I

3   recover punitive damages and who pays them.

4          THE COURT:  Mr. Moller, I follow you what you say.  It

5   is a very careful and very good statutory exposition.  In

6   looking at the statute, however, and having to administer it

7   for some period of time, I have come to the view that punitive

8   damage recovery could make it difficult for later recovering

9   claims to recover.  I therefore put the argument to Mr. Podesta

10  that the overall statutory scheme may be inconsistent with any

11  kind of an award that is not tied to compensation.

12         Under Supreme Court law *Phillip Morris v. Williams* and

13  *BMW v. Gore*, it is clear that punitive damages have to do with

14  defendants' conduct and not compensation of a plaintiff.  And

15  there is a factor that's introduced of harm of the

16  reprehensibility of the defendant's conduct as it applies to a

17  plaintiff.

18         Well, each of these plaintiffs were similarly situated

19  in relation to the harm that was caused and the prospect of

20  possibility is that earlier recoverers could recover punitive

21  damages and later recoverers might not because they're all

22  limited to insurance recoveries, not recover compensatory

23  damages, which would be obnoxious.

24         MR. MOLLER:  Well, you have -- you have heard that the

25  property damage people are not pursuing punitive damages

 1   claims.

 2           The fact that there may be difficulty administering or

 3   coming to grips with the Supreme Court's view of how to treat

 4   punitive damages in Philip Morris v. Williams does not mitigate

 5   in favor of dismissing those claims.

 6           I grant you --

 7           THE COURT:  Not the claim just -- yeah.  Not the

 8   claims.

 9           MR. MOLLER:  If I have got a right to assert a claim,

10   can prove it and win it but then can't collect the money --

11   that's not a claim.

12           THE COURT:  Let's suppose Mr. Williamson, who has a

13   very big claim for the World Trade Center is last in line, as

14   he is likely to be, and let's say he recovers and there is no

15   more money left.  Now, we need not shed tears for the Port

16   Authority and the World Trade Center properties but, in law,

17   they have equal status to personal injury claims.  And let's

18   say there is no more money?

19           MR. MOLLER:  I think the answer to that is if we are

20   successful, as I think we would be in proving punitive damages

21   for reasons I can go into but this is not a fact analysis, the

22   award of punitive damages could be retained, could be held,

23   could not be enforced until you get the answer to the other

24   questions that you pose.

25           There is a practical way to deal with it but the

76E59114                          argument

1  practical problems --

2          THE COURT:  Gigantic escrow fund.

3          MR. MOLLER:  Yes.  So, put the rest of the money in

4  escrow.

5          THE COURT:  What do I do with settlements?

6          MR. MOLLER:  People who settle give up their right to

7  punitive damages because that's why they're settling if they

8  want to stick around, which some of them do.  Remember that the

9  people who went into a litigation process did so for several

10 reasons, and I believe that the least of them was money.  One

11 of them was the right to be able to prove their entitlement to

12 punitive damages, the conduct of the defendant and to see that

13 this doesn't happen again.

14         THE COURT:  Mr. Migliori seems to object.

15         MR. MIGLIORI:  No.  No objection, just to buttress.

16 That was also the purpose of the parties in Motley, having the

17 bulk of the punitive claims left, presumably.

18         That was the purpose of the bifurcation stay that we

19 entered into with the other parties, that the execution or

20 collection of any such award would be held off until the end

21 and we would not seek payment under that component.  So as to

22 allow --

23         THE COURT:  I didn't sign that.

24         MR. MIGLIORI:  I know that.  And yesterday the Court

25 ordered.  But, I think it speaks directly to your question now

76E59114                          argument

 1    in terms of administration of this problem, at least on behalf

 2    of the 30 of the 30 plus of those claimants with punitive

 3    claims.  We are saying we wouldn't seek that enforcement now

 4    and we would defer it until the very end on just punitives.

 5            MR. MOLLER:  So, I hope I have addressed that.  There

 6    are practical problems that Williams v. Philip Morris and some

 7    of the other cases raise, but the practical problems are

 8    solvable but they don't mitigate so strongly that we should not

 9    be permitted to pursue the claims of punitive damages and worry

10    about whether we collect a hundred cents on the dollar or

11    somewhat less.  It is a very important and significant

12    distinction.

13            There was reference made to a stipulation but before I

14    get to the stipulations, one other point.  Congress passed

15    legislation to support anti-terrorism by fostering effective

16    technologies in November of 2002.  In that statute 6, U.S.C.

17    442, Section B1, there is another declaration that addresses

18    punitive damages and says:  No punitive damages intended to

19    punish or deter exemplary damages or other damages not intended

20    to compensate a plaintiff for actual losses may be awarded, nor

21    shall any party be liable for interest prior to judgment.

22            It is another expression of Congress that they knew

23    how to deal with punitive damages and if they wanted, as a

24    matter of federal policy, not to allow those damages, they knew

25    how to do it.

76E59114                          argument

1          I think it would be wrong to infer into the ATSSA a

2     right to recover punitive damages which all of the relevant

3     states here allow and then say, sorry, you can't collect them.

4          THE COURT:  If I rule against the argument of

5     presumption, what's your view of choice of law and other

6     applicable state laws?

7          MR. MOLLER:  I don't think there is a real significant

8     choice of law issue.  With respect to the interest analysis,

9     the case states involved share the same analysis.

10         I don't believe there is any state in the country that

11    is a higher interest than any other in deterring the conduct

12    that led to 9/11, whether it is a manufacturing issue of Boeing

13    or whether it is an operations issue of the airlines.

14         THE COURT:  New York Law is set to have a limit that

15    does not allow recovery that will come from an insurance

16    company.

17         MR. MOLLER:  That's correct.

18         THE COURT:  And, let's say I don't accept your

19    preemption argument; do you agree with that statement of New

20    York Law?

21         MR. MOLLER:  Yes.  If I can't -- yes.  New York Law

22    does not allow me to recover damages from an insurance company.

23         THE COURT:  Is the same law operative in the other

24    states that are potentially appliable?

25         MR. MOLLER:  There is a slight -- there is a nuance of

76E59114                          argument

1   difference that you can recover punitive damages from insurance

2   company for vicarious liability in Texas and New Jersey.

3            THE COURT:  I don't think we have vicarious liability.

4            MR. MOLLER:  To the extent that the airlines are

5   responsible for what the security companies did you could

6   classify that as vicarious but airlines have a direct and

7   vicarious responsibility.

8            THE COURT:  Vicarious requires non-involvement,

9   complete passivity, and we don't have that.

10           MR. MOLLER:  Okay.  But you asked me the distinction.

11  There are differences but I think basically the states involved

12  would not allow recovery from an insurance policy.

13           Keep in mind that Argenbright has been read out of the

14  ATSSA for purposes of the insulation of a liability cap, so

15  that's a slightly different situation.  But, yes --

16           THE COURT:  By my ruling?

17           MR. MOLLER:  No.  The statute.  There is a statute

18  which cuts Argenbright out of the limitation of liability to

19  insurance coverage.  But, by and large, the states involved do

20  not allow recovery from an insurance policy which is precisely

21  why the glaring inconsistency exists between the ATSSA --

22           THE COURT:  So, your argument that punitive damages

23  are recoverable and the final analysis depends on a ruling that

24  federal law preempts these.

25           MR. MOLLER:  If it is stated that way I would prefer

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E59114                        argument

 1   that it be stated that there is an inconsistency --

 2            THE COURT:  Okay.

 3            MR. MOLLER:  -- with the two policies that state law

 4   says, no; federal law says, essentially, yes.

 5            THE COURT:  I follow.  Okay.

 6            Okay, thank you on that.  Unless there is someone that

 7   needs a final word.  I will reserve issue on the issue of

 8   punitive damages.

 9            The last issue today is whether Pennsylvania law

10   should apply to United Airlines flight 93 compensatory damage

11   claims.

12            Mr. Ellis will argue for United Airlines and

13   Mr. Motley here --

14            MR. ELSNER:  I'm sorry, your Honor.  Mr. Motley is ill

15   so he has asked me to fill in.

16            THE COURT:  Michael Elsner.

17            MR. ELSNER:  Your Honor, the issue before us today is

18   choice of law for Flight 93.  Flight 93 took off from Newark,

19   New Jersey and crashed in Pennsylvania, so under the ATSSA it

20   instructs us to file following choice of law rules and

21   subsequent law of Pennsylvania at the location of the crash.

22            Pennsylvania choice of law analysis follows a -- for

23   torts, a government interest analysis and the significant

24   relationship theory.  And to do so it employed the restatement

25   second of conflicts of laws.

1          As your Honor has previously ruled and as was affirmed

2     by the Second Circuit in the GSI versus the Silverstein

3     Properties case, the Court specifically considered whether the

4     wrongful death and survival statute choice of law analysis in

5     Pennsylvania should be governed by Pennsylvania law or some

6     other law.

7          And you ruled, your Honor, and Second Circuit affirmed

8     applying the restatement analysis, that the law that should

9     govern should be Pennsylvania law.  And the reason was

10    two-fold.  One was that there were several domiciles of the

11    parties in that case and, as was cited by the Second Circuit,

12    given possible compensations of potential litigation flowing

13    from the crash of Flight 93, it makes sense to apply one set of

14    law to the claims involved.  Accordingly, deference to

15    uniformity weighs in favor of Pennsylvania law versus German

16    law.

17         And I think that the reasoning that you gave and the

18    Second Circuit gave was strong and firm and should be followed.

19         If your Honor would like to hear additional argument

20    on the other reasons, I'm happy to go forward.

21         THE COURT:  What other arguments are implied?

22         MR. ELSNER:  Well, one is whether a true conflict of

23    law exists or a false conflict.

24         THE COURT:  As among which states?

25         MR. ELSNER:  Between Pennsylvania, New Jersey, and the

76E59114                        argument

1    other domicile of the plaintiffs in the case, so that would

2    include New York, New Jersey, Florida, California.

3          THE COURT:  Well, perhaps I should let Mr. Ellis make

4    his arguments and then we will see:

5          MR. ELLIS:  It is a little unusual for me, Judge, to

6    stand up here and listen to the plaintiffs argue in favor of

7    preemptive scheme, but what they seem to be saying is that the

8    statute, for the sake of uniformity, would require the law of

9    one jurisdiction to apply for Flight 93.  Well, if that

10   preemptive scheme from ATSSA was to apply, then it would apply

11   equally to Flight 175 and we would then be using New York Law

12   to settle those cases or to try those cases.

13          And I can only indicate, your Honor, that throughout

14   the course of this litigation when we have worked with you,

15   Ms. Birnbaum and the plaintiffs' attorneys to try and assure

16   some recovery for the individuals who lost their lives, we have

17   been following the law of the domicile which is, ironically,

18   with respect to Flight 93, what the Pennsylvania Supreme Court

19   has held on two occasions to be applicable when an airplane

20   crash occurs and it is labeled a fortuitous event.

21          The only exception to whether or not an event is

22   fortuitous is if -- and this is the test that is set forth in

23   the case law -- a party -- a party voluntarily and

24   intentionally enters the state.  They cite one case -- one

25   case -- an automobile case --

76E59114                     argument

1          THE COURT:  What's your candidate for choice of law?

2          MR. ELLIS:  Your Honor, it can either be New Jersey or

3   it could be Illinois.  Or, quite frankly, insofar as

4   compensatory -- well, that's for conduct.

5          For compensatory damages, very simple.  The law of the

6   domicile.  It is the law we have been following throughout this

7   litigation process and to change it here is perplexing to say

8   the least.

9          THE COURT:  Mr. Elsner, why do you want Pennsylvania

10  to reign supreme?

11         MR. ELSNER:  The opinion, your Honor, is because in

12  the cases cited by Mr. Ellis is that there is a strong and

13  overwhelmingly significant interest that Pennsylvania law has.

14         THE COURT:  What does Pennsylvania law provide that is

15  particularly advantageous to your client?

16         MR. ELSNER:  Pennsylvania law provides for a survival

17  right of action which includes fright, terror damage,

18  pre-impact damage.  It also has a wrongful death law and the

19  law of other jurisdiction.  It provides loss of consortium,

20  companionship, society and comfort.

21         It also allows the decedent estate to recover for loss

22  of decedent gross earning power from the time of death through

23  his estimated working life span.

24         THE COURT:  The question I have is why, in this kind

25  of a tragic situation, we should favor Pennsylvania law just

1    because the crash occurred in the Shanksville Field?  The plane

2    was destined for Washington.  The plane originally was destined

3    for some place on the west coast.  People boarded, I guess, for

4    San Francisco.  People boarded in Newark.  They could have come

5    from New York, they could have come from Pennsylvania.

6           MR. ELSNER:  I don't think you should, your Honor.

7    Pennsylvania law rejected applying the location of the crash

8    site itself as the only indicating factor.  They rejected that.

9           What it said was let's look at it a little more

10   broadly.  There is a presumption under Pennsylvania law that

11   will look at the site of the injury but that's not the only

12   analysis.

13          THE COURT:  Those are probably automobile cases.

14          MR. ELSNER:  There are automobile cases but even the

15   aviation cases, when you take a step back and when you look at

16   what Pennsylvania's policy is, Pennsylvania's strong and

17   overwhelming policy is to provide full and complete damage

18   remedies to victims of torts that occur within Pennsylvania.

19          And, when you look at the seminal case on this issue

20   which is cited by the defendants, it is an aviation case, it

21   was a case in which there were Pennsylvania residents and they

22   crashed in Colorado.  And what the Court said was that in the

23   face of a hundred years of applying the site of the location

24   itself, we think that Pennsylvania's law concerning damages and

25   our interest in fully compensating plaintiffs is so great that

76E59114                        argument

1    we are willing to overturn a 100-year history in order to

2    protect that significant interest.  And that's a different

3    policy than many other states have.

4           And the point is, is it a true conflict or a false

5    conflict?  A conflict only exists if the law of another state

6    is prejudiced.  Counsel has not identified any significant

7    interest that New Jersey has.

8           THE COURT:  I can't make that decision then unless I

9    have the specific plaintiffs in mind.

10          MR. ELSNER:  And we have them.  There are seven

11   plaintiffs who have claims that are pending from Flight 93, two

12   reside in New Jersey, two -- I'm sorry -- three reside in New

13   Jersey, two reside in California, one resides in Florida and

14   one resides in New York.

15          THE COURT:  Three in New Jersey.  How many in

16   California?

17          MR. ELSNER:  Two in California.

18          THE COURT:  One in Florida and one in New York?

19          MR. ELSNER:  That's right.

20          THE COURT:  Is there no differences among those

21   states?

22          MR. ELSNER:  Yes, there are differences.

23          The damages law of Pennsylvania provides a greater

24   remedy in every circumstance than the law of those other

25   jurisdictions.

76E59114                          argument

1          But, what interest does the domicile state have in the

2     application of the wrongful death and survival statutes?  The

3     only interest that the domicile state has is the proper

4     administration of a decedent's estate.

5          The only interest that New Jersey would have would be

6     conduct based.  And so, the analysis leads us back to when we

7     step back and we look at all the analysis we say, Well, what

8     has the most significant relationship to this issue?  And the

9     most significant interest here which has been expressed in

10    every single case --

11         THE COURT:  I can't see any real interest in

12    Pennsylvania except that it was the unlucky place where some

13    great people died.

14         MR. ELSNER:  Well, the second point I make, your

15    Honor, is that it wasn't just fortuitous that the plane crashed

16    in Pennsylvania.  The passengers on that flight took a

17    different course of action.

18         THE COURT:  You don't know when they started to take

19    that course of action?

20         MR. ELSNER:  They started that course of action over

21    Pennsylvania.

22         THE COURT:  You don't know that.  Nobody knows that.

23         MR. ELSNER:  Well, your Honor.

24         THE COURT:  Where did the plane turn around?  Over

25    what city?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1           MR. ELSNER:  The flight turned around in Ohio after it

2     was highjacked.  We know from Cleveland Air Traffic control

3     that they heard the highjackers crashing through the cockpit.

4     We know from phone calls from passengers on board, including

5     phone call from Tom Burnett, who learned while he was in

6     Pennsylvania -- he didn't know he was in Pennsylvania -- but,

7     we know from the air traffic control diagrams provided by the

8     government where the plane was at different times that he

9     learned the fact that planes had been highjacked and flown into

10    the World Trade Center while in Pennsylvania.

11          THE COURT:  Pennsylvania was the largest state so the

12    most geography in that route but it still was fortuitous.

13          MR. ELSNER:  And no state has an interest in limiting

14    the recovery of any of these plaintiffs.

15          THE COURT:  You know, the conduct regulating was

16    probably federal.  The place -- the jurisdiction which had the

17    greatest interest in regulating conduct, in my judgment, was

18    federal, which accidents have a conflicts of law rule here.

19    The interest of New York, Florida, California and New Jersey

20    were just as tangential as Pennsylvania.

21          MR. ELSNER:  I'm not an expert in this area and I'm

22    just filling in, your Honor.

23          THE COURT:  I know.

24          MR. ELSNER:  But my understanding of federal common

25    law is you look to sources of law including the restatement.

76E59114                      argument

1              THE COURT:  I know.

2              MR. ELSNER:  And the restatement here says that we

3    will look at a significant, what state has the most significant

4    interest.  And the presumption would be the site of the injury.

5              THE COURT:  I think there would be a federal interest

6    under the ATSSA, although there may not be any sources to

7    support my view that outliers in the states would not be

8    recognized and that a normal distribution rule, I think the

9    other states have pretty much the same kinds of rules would

10   probably be the better ruling decision.  Whether that view is

11   supported in classic conflicts theory, I don't know.

12             I know Judge Weinstein had the notion that there

13   should be federal common law in the Agent Orange case and the

14   Second Circuit disagreed.

15             MR. ELSNER:  Your Honor, if Congress wanted to do

16   that, they could have.

17             THE COURT:  That's true with a lot of things.

18             MR. ELSNER:  Apply substantive law and choice of law

19   rules by the states where the cashes occur.

20             THE COURT:  All right, gentlemen.  Anything more.

21             MR. ELLIS:  I don't think so.

22             THE COURT:  Thank you very much.  Decision is reserved

23   on this decision as well.

24             Let's talk about going forward while I have your

25   attention.  And Mr. Migliori may want to comment because the

1    view was expressed by him earlier.

2            I have been thinking about how to handle this case --

3    this set of cases.  It is the same view I have of other cases

4    as well.

5            We are now going into close to the end of the sixth

6    year since the tragic events of September 11, 2001.  Lives have

7    changed, children have grown up, widows and widowers have

8    remarried.  Some have gone on with their lives.  Some remain

9    substantially immobilized by the emotional loss that was

10   suffered on September 11.  It is time to break the impasse.

11           I have been looking, with a great deal of favor, that

12   the settlements that have occurred in this case.  And

13   Mr. Barry's latest report of five additional cases that are

14   settled is extremely welcomed.

15           In Flight 11, 22 cases have settled, five remain

16   pending including two ground claims.

17           In Flight 77, 16 have settled and 15 remain pending

18   including eight ground claims.

19           In Flight 175, nine have settled, 10 remain pending.

20           In Flight 93, seven have settled, seven remain

21   pending.

22           There are four personal injury claimants in the World

23   Trade Center as well.  I think we may not be at the end of

24   settlements but they're getting more difficult.  And so, I

25   think that the thought that these cases will be resolved by

76E59114                              argument

1   settlements has become more romantic than previously.  So, I

2   look to what remains possible in the resolution of these cases.

3   Even with the denial of the defendants' desire for additional

4   discovery, a great deal of discovery remains open.  And it

5   would seem to me as a very rough guess that a year or two could

6   easily be consumed as we get into some knotty questions of

7   security, longer.

8           So, I don't have any sense of optimism that I can try

9   the whole case and the assignment of a trial date would not be

10  very useful given this uncertainty.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

76E4WTC5

1              THE COURT:  I believe counsel have been working hard

2       and they don't need as a goad the fixing of an arbitrary trial

3       date which would have to be continuously adjourned in light of

4       difficulties in the discovery process.  I have to remember that

5       in back of the personal injury claims there are property

6       claims.  There has not been a willingness on the part of the

7       defendants to deal with these property claims in a settlement

8       mode.  I do not say this critically; I say this recognizing the

9       facts.

10             We thought long and hard on how to approach this very

11      difficult problem.  What seems to be open is to obtain a value

12      for the cases through jury decisions that in turn I believe

13      will assist settlements.  The discovery of issues of value

14      either have been completed or can quickly become completed.

15      Where they have not been completed, it is possible to identify

16      cases that can be put up for early trial so that the attorneys

17      can complete their discovery.  The trials will be short,

18      relatively, and manageable and I think of substantial utility.

19             So I thought it might be a wise course to begin trials

20      of some of these cases as early as July.  We can do one, two,

21      three trials and see what that does in the way of additional

22      settlements.  I believe there is great value in settlements

23      because people are assigning values themselves.  I think in

24      many respects that's a fairer way of approaching the

25      proposition of compensation for loss than particular jury

76E4WTC5

1    trials and jury verdicts.

2            So I thought we would try very hard to resolve the

3    decisions on which I reserved in a very short time, perhaps set

4    June 25 at 4:00 as a time for our next meeting to discuss how

5    we would proceed.  Either then or prior to that, we could

6    identify one, two, or three cases for damages trials.

7            What do you think.

8            MR. MIGLIORE:  Thank you, your Honor.  Just to bring

9    the court up to date a little bit.  We did on behalf of our

10   flight 175 clients provide United and Huntley, those

11   defendants, additional information towards resolution.  And

12   just so the court doesn't believe that all is romantic, there

13   are in fact some actions and activity going on with respect to

14   still trying to resolve some cases.  All is not completely

15   lost.  We have been waiting about a month for a response to our

16   last foray.

17           That said, it's not a surprise to this court to hear

18   me say and to hear our clients directly say when the court was

19   involved with mediation that a lot of this has to do for them

20   with accountability and not compensation.  I know the court's

21   response to our clients when they have said that, but I can

22   tell you that the idea that a client would be asked to try a

23   case only as to damage without that other component which

24   motivated most and to some extent all of our clients to opt out

25   of the fund and seek accountability as a component.

76E4WTC5

1          THE COURT:  Nothing prevents them from waiting around.

2          MR. MIGLIORE:  When the court said that it was

3     considering --

4          THE COURT:  I could try damages, a jury could deliver

5     a verdict and if the client wishes to proceed and test

6     liability, they can do that.

7          MR. MIGLIORE:  This just happened to me in a case; I

8     just finished a trial this week unsuccessfully I report.  The

9     defendants in that case tried to sterilize my case on certain

10    medical causation issues.  They signed a unilateral stipulation

11    saying they will not contest a certain component.  The trial

12    judge in state court said it's the plaintiff's right to give

13    the context to its claim for damages so if the plaintiff still

14    wants to put those experts on the stand to explain causation

15    for whatever reasons, he or she should be allowed to.

16         The idea of sterilizing these damages claims by

17    removing from it all facts is problematic.  That said, there

18    may be some clients of our 30 some-odd clients remaining who

19    may have a different level of concern about that piece or they

20    may be voluntarily willing to take on a damage-first

21    bifurcation.  If the court is leaning that way, my request

22    would be simply that the court not pick those cases, that the

23    court allow us to identify cases in our group of cases where

24    that model may not be against their wishes, may not be against

25    what they had hoped would be their day in court.

76E4WTC5

1          So it's a way of saying outright the accountability

2    factor is important to all our clients and sterilizing a

3    damages-only trial would necessarily be against why our clients

4    chose this long route.

5          THE COURT:  I would be wanting to assign cases that

6    would appear to me to have a representative quality to them.

7          MR. MIGLIORE:  I would suggest maybe we give the court

8    five examples from which it can choose but at least allow us

9    the opportunity to talk to our clients and say would this be

10   something that you would do willingly.  Because I can tell you,

11   I know the court has met in this mediation process clients of

12   ours that if they were forced to do this, they would do it

13   very, very unwillingly.

14         THE COURT:  It's mixed impressions that come out of

15   this, Mr. Migliori.  My impression is that clients that enter

16   the process were willing to compromise but their numbers of

17   compromise were higher than that which was available and so

18   questions of principle often occluded.  It's like a client who

19   comes to the lawyer and says, look, this is a question of

20   principle, I want you to go all the way, principle is what

21   counts, then the lawyer sends his first bill, and all of a

22   sudden there is no longer a principle, he settles.

23         MR. MIGLIORE:  We don't bill on our side of the table.

24   I appreciate that.  I can't separate out, none of the three

25   major reasons why plaintiffs sued are distinguishable; they

76E4WTC5

1   necessarily overlap.

2          THE COURT:  I understand.

3          MR. MIGLIORE:  I would ask your Honor that we at least

4   be allowed to focus, especially since this is a test plan, that

5   we at least be able to identify those plaintiffs that may be

6   very willing to do that, given where they are in this process,

7   the fatigue that they may feel as a result of this process, the

8   closure if there is any for them in this process.

9          THE COURT:  I don't mind your making recommendations,

10  but I am going to reserve freedom of action, because if I am

11  going to do this, I want the maximum utility out of it.

12         Mr. Barry.

13         MR. BARRY:  Thank you, your Honor.  I must admit we

14  have discussed this among the defendants ourselves as to

15  whether or not this is a course of action that we think would

16  be beneficial to your Honor, to the parties, to achieve more

17  settlements.  At the moment, we are not of one mind on that, I

18  can report to you, as to whether or not it would be beneficial

19  or that all of the defendants are willing to go through that

20  process.  It's still under consideration.

21         I will tell you this, that I don't think July trial

22  dates is realistic at all even if we were to proceed with the

23  damages only, because we have not really conducted formal

24  discovery in any of these cases.  We have gone along with what

25  plaintiffs have given to us in damages.

76E4WTC5

 1          THE COURT:  A very good reason to start doing it.

 2     This is not going to be meet up with SSI problems.

 3          MR. BARRY:  That's for sure, but it is going to take

 4     time.  It's something we have to discuss between now and June

 5     25 when we met again.  I don't think the issue, however, your

 6     Honor --

 7          THE COURT:  I have some long criminal trials coming up

 8     in the fall.  I can't predict my trial schedule completely.  I

 9     don't set up trial dates until people are ready.  So I find

10     that I can try cases when I need to try cases.  But I have some

11     long trials coming up.  It's time, you know, five and a half

12     years, it's a long time.  I don't like it; it makes me

13     uncomfortable.  I want to see these cases disposed of.  Many

14     are being disposed of in the best way possible.  But you know,

15     it's getting harder and harder.

16          MR. BARRY:  I think more will be disposed of.

17          THE COURT:  I am sure, but it's getting harder and

18     harder.  It takes longer each time.  The ripe fruit has been

19     plucked.

20          MR. BARRY:  I will tell you it is not a question of

21     what is the reasonable value of these cases.  Every lawyer in

22     this room, plaintiff or defense lawyer, knows what these cases

23     are worth.  That's not the issue.  The issue is what was stated

24     by Mr. Migliori.

25          THE COURT:  They know differently.

76E4WTC5

1          MR. BARRY:  No.  I think there is an issue with many

2     of the plaintiffs that they want to get their day in court as

3     to liability.  They want accountability and responsibility.

4          THE COURT:  I have seen enough to know that there are

5     different conceptions of value.

6          MR. BARRY:  I am not sure you are going to accomplish

7     the goal you are setting out to accomplish by doing this.  You

8     may.  I have been down this road before in many other cases.

9     And in the normal case, the normal air crash case, it has

10    worked, if there has been an issue; a couple of cases were

11    tried, the rest settled.  I am very concerned about the fact

12    that this is the 9/11 case and what sort of publicity would

13    come out of it, what sort of message would be given if the

14    defendants were to stand up and say we do not contest

15    liability, because that's the only way that the case can be

16    tried on damages.

17         THE COURT:  Why.

18         MR. BARRY:  We would have to agree, if you are going

19    to have a verdict entered against the defendants in an amount

20    of money and a judgment entered --

21         THE COURT:  The judgment then would be entered and it

22    would be a provisional judgment.  You would be able to retain

23    your right to contest liability.  If liability is tried and

24    proved, the damages would be fixed.

25         MR. BARRY:  So what does that accomplish.

76E4WTC5

1          THE COURT:  It fixes the value.  It gives the most

2   important consideration of value it could be, and that's a

3   verdict of a jury.

4          MR. BARRY:  Let us talk about it amongst ourselves and

5   we will be ready to report back to you on the 25th, but I will

6   tell you that, I can only repeat, everybody here knows the

7   value of these cases and what an appellate court would sustain

8   under the damage facts.

9          THE COURT:  I disagree.

10          MR. MIGLIORE:  I do too.  We definitely have a

11   difference of opinion about that.

12          THE COURT:  I don't need any testimony.  I get

13   involved in the process.  I can see the process.  I know the

14   process.  I know the conceptions.  How could there be a

15   difference.  So long as you have concepts that are as elusive

16   as you do in the compensation of a plaintiff in a tort case,

17   you have wide varieties of possibilities.  A value has arisen

18   in terms of cases that have settled.  I have been very strong

19   in my expressions in terms of not favoring early settlers

20   against later settlers and vice versa.  There has been a rough

21   consistency but not everybody has to agree to that consistency.

22          I will not criticize a lawyer who thinks that he or

23   she can get more for his client by waiting or doing more or

24   doing differently or arguing differently

25          MR. BARRY:  I don't think that those lawyers who think

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

76E4WTC5

1  they are going to get more are the ones that are going to agree

2  to a damages-only trial in the sterile atmosphere Mr. Migliori

3  is talking about because it will have to be sterile.

4          THE COURT:  If I have discretion, it doesn't make a

5  difference if they agree or not, right.

6          MR. BARRY:  I don't know whether you have discretion

7  to tell you the truth to order somebody to proceed with a

8  damages-only trial.

9          THE COURT:  If I order such a trial someone is going

10  to have to bring a motion and I will have to decide the motion.

11  It may go up to the Court of Appeals by *mandamus* perhaps.  This

12  will not be the first time in these case that that will happen,

13  probably not the last.

14          MR. MIGLIORE:  Your Honor, what I would like to do if

15  it's welcome by the court, I would like to submit a list of

16  what we think are representative claims.  I assume we are

17  talking about single non-dependent issues.

18          THE COURT:  Probably.  Ms. Birnbaum has worked very

19  effectively; everybody agrees to that.  It will be good for

20  both sides to discuss this idea with her and see if you can

21  identify appropriate cases.  To do it by consent is much more

22  valuable than if I have to do it by decision.

23          MR. MIGLIORE:  There are issues with those that have

24  preimpact fear claims, those that don't.  There will be a need

25  for discovery of, for example, an expert who can testify about

76E4WTC5

| | |
|---|---|
| 1 | what happens in that period of time.  I can tell you there is a |
| 2 | lot that still has to be revolved.  If the court is inclined to |
| 3 | do this, we will do everything we can and would like to get |
| 4 | that trial as soon as possible. |
| 5 | THE COURT:  Mr. Migliori, I want to resolve as many |
| 6 | cases as I can as early as I can.  That's my job.  For many |
| 7 | people, justice delayed is justice denied.  For anyone, justice |
| 8 | delayed is justice denied.  No matter how people want an |
| 9 | accounting, people are impatient, and it's five and more years, |
| 10 | and it's too much time. |
| 11 | MR. MIGLIORE:  I am agreeing.  If the court is going |
| 12 | to exercise its discretion to do this, we would rather do it |
| 13 | this summer.  We agree with the court. |
| 14 | THE COURT:  Talk together, talk with Ms. Birnbaum, and |
| 15 | I will have a report on June 25 at 4:00. |
| 16 | Thank you very much.  It's been a wonderful day, it |
| 17 | was very interesting, and I compliment all of you who have |
| 18 | argued excellent arguments. |
| 19 | -  -  - |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |